1    XAVIER BECERRA
     Attorney General of California
2    NICKLAS A. AKERS
     Senior Assistant Attorney General
3    MICHAEL E. ELISOFON (SBN 240707)
     BERNARD A. ESKANDARI (SBN 244395)
4    Supervising Deputy Attorneys General
     AMOS E. HARTSTON (SBN 186471)
5    STEVEN D. DE SALVO (SBN 199904)
     Deputy Attorneys General
6     300 South Spring Street, Suite 1702
      Los Angeles, CA 90013
7     Tel: (213) 269-6348
      Fax: (213) 897-4951
8     Email: bernard.eskandari@doj.ca.gov

9    *Attorneys for Plaintiff the People of the State of
     California*

10

11                    IN THE UNITED STATES DISTRICT COURT

12                  FOR THE NORTHERN DISTRICT OF CALIFORNIA

13

| | |
|---|---|
| **PEOPLE OF THE STATE OF CALIFORNIA** ex rel. Xavier Becerra, Attorney General of California,<br><br>Plaintiff,<br><br>v.<br><br>**UNITED STATES DEPARTMENT OF EDUCATION** and **BETSY DEVOS**, in her official capacity as Secretary of Education,<br><br>Defendants. | Case No. 17-cv-07106-SK<br><br>**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>**ADMINISTRATIVE PROCEDURE ACT CASE** |

## INTRODUCTION

1.      The United States Department of Education ("ED") is unlawfully reneging on its legal commitment to provide critical, expedited debt relief to tens of thousands of students who were defrauded into attending the predatory, for-profit Corinthian Colleges, Inc. ("Corinthian"). ED's unjustified failure to expeditiously discharge the entirety of these students' invalid federal loans is outrageous and immoral—and it violates the Administrative Procedure Act ("APA").

2.      In consultation with the California Attorney General's Office, ED found in 2015 and 2016 that some 80,000 student borrowers nationwide—including more than 38,000 in California—were fraudulently induced to enroll in low-quality educational programs offered by Corinthian, a now-defunct operator of vocational-training schools. ED determined that these students qualified under its "borrower defense" regulation for expedited discharge of their federal student loans and reimbursement of all amounts previously paid.

3.      To process the ensuing flood of borrower-defense claims, ED implemented streamlined review procedures to quickly grant full relief to these already-qualified Corinthian students. ED, the California Attorney General's Office, California public colleges and universities, and others undertook extensive outreach efforts to inform these students of their eligibility for relief. Between June 2015 and January 20, 2017, ED granted 28,000 of these borrower-defense claims, totaling more than half a billion dollars in critical debt relief.

4.      Starting on January 20, 2017, however, ED abruptly halted approving all pending borrower-defense claims. Shortly after the California Attorney General filed its initial complaint in this case on December 14, 2017, ED finally acted.

5.      On December 20, 2017, ED announced a new rule that purports to provide only partial relief to defrauded students. In addition to changing the borrower-defense process prospectively, ED is unlawfully applying this rule retroactively, denying expedited, full relief to Corinthian borrowers. These Corinthian borrowers include people with pending claims who applied for borrower-defense relief years ago and thousands of people who submitted claims prior to ED's announcement of its new rule.

6.      In addition to unlawful retroactive application of its new partial-relief rule, ED also continues to unreasonably delay and unlawfully withhold approval of numerous borrower-defense claims. Tens of thousands of defrauded Corinthian students with pending claims have been waiting more than 18 months, in some cases three years, for promised relief. The backlog of borrower-defense claims from defrauded Corinthian students continues to grow.

7.      ED's reversal of course for handling and approving Corinthian borrower-defense claims is unlawful. The impermissible retroactive application of a new rule to eligible Corinthian

2

borrowers is contrary to law, violates the APA, and has prevented borrowers from obtaining expedited, full relief, as provided under ED's process and rule prior to January 20, 2017.

8.   On May 25, 2018, this Court held that ED's adoption of the new partial-relief rule was unlawful on other grounds and, accordingly, enjoined ED from further implementing the new rule. As it now stands at the time of filing this First Amended Complaint, no borrower-defense claims are being approved.

9.   ED has violated the APA in a number of ways. First, the APA prohibits retroactive rulemaking. ED implemented a rule that Corinthian borrowers qualify for expedited, full debt relief, consistently applied this rule for over two years, and approved tens of thousands of claims for this relief. ED cannot reverse course and retroactively provide different and lesser relief to Corinthian borrowers without violating the APA's bar on applying new rules retroactively. This bar to retroactive rule making is well-established, actionable under the APA, and distinct from constitutional due-process challenges.

10.   In addition, ED's ongoing delay in approving pending claims of defrauded Corinthian students is unlawful under the APA. This delay—18 months and counting—is unreasonable and illegal because ED has already determined that these students qualify for expedited, full relief of their applicable federal loans. ED has no justification for this unreasonable and continuing delay, or for withholding promised full relief. ED is required to provide the same full relief it previously determined is available and appropriate for defrauded Corinthian students under existing streamlined procedures.

11.   Further compounding the plight of defrauded Corinthian students, ED continues to employ draconian debt-collection tactics against many students with pending borrower-defense claims and borrowers that ED knows are eligible for debt relief. ED has caused the seizure of these students' tax refunds and garnished their wages in violation of the APA.

**JURISDICTION AND VENUE**

12.   This action arises under the APA, 5 U.S.C. §§ 701-706, and the Higher Education Act, 20 U.S.C. § 1082. This Court has subject-matter jurisdiction over this action because it is a case arising under federal law. 28 U.S.C. § 1331.

3

13.     Venue is proper in this Court under 28 U.S.C. § 1391(e)(1) because a substantial part of the events or omissions giving rise to the claims occurred in this district and because the People reside in this district.

14.     This Court is authorized to grant the requested relief under the Declaratory Relief Act, 28 U.S.C. §§ 2201-2202; the APA, 5 U.S.C. § 706; the Mandamus Act, 28 U.S.C. § 1361; and the Higher Education Act, 20 U.S.C. § 1082

## INTRADISTRICT ASSIGNMENT

15.     Assignment to the San Francisco Division is appropriate because a substantial part of the events or omissions giving rise to the claims in this complaint occurred in this division. *See* Local Rule 3-2(c). Among other events, for years, ED instructed all affected Corinthian students to submit their written borrower-defense claims to an ED address in San Francisco. Moreover, multiple Corinthian campuses were once located in San Francisco County.

## PARTIES

16.     The People of the State of California ("California" or "People") bring this action by and through its Attorney General, Xavier Becerra, California's chief law officer. Cal. Const. art. V, § 13.

17.     Defendant United States Department of Education is an executive agency of the United States government. ED's principal address is 400 Maryland Avenue, SW, Washington, D.C. 20202.

18.     Defendant Betsy DeVos is the Secretary of Education and is being sued in her official capacity. Her official address is 400 Maryland Avenue, SW, Washington, D.C. 20202.

## FACTUAL ALLEGATIONS

### I.     FEDERAL STUDENT LOANS AND FOR-PROFIT SCHOOLS

19.     Students pursuing higher education can receive federal financial assistance in the form of grants, subsidies, and loans under Title IV of the Higher Education Act of 1965, as amended ("HEA"), 20 U.S.C. § 1070 et seq. These programs provide critical assistance to prospective students and expand access to higher education to those who could not otherwise afford it.

4

20.     ED administers various Title IV programs, including the William D. Ford Federal Direct Loan Program, 10 U.S.C. §§ 1087a-1087j. Under the Direct Loan Program, ED directly lends money to eligible student borrowers for use at "participating institutions of higher education" as approved by ED. The purpose of the Direct Loan Program is "to assist in making available the benefits of postsecondary education to eligible students . . . ." *Id*. § 1070(a). The Direct Loan Program, like other Title IV programs, is an important source of financing for students who otherwise would not be able to afford higher education and could not meet the underwriting standards of private lenders.

21.     Title IV funds are a significant source of revenue for many postsecondary institutions. For-profit schools receive the vast majority of their revenue from these funds. In 2009, the 15 publicly traded, for-profit education companies received 86% of their revenues from Title IV funds.[1] Federal-aid dollars to for-profit schools totaled $32 billion in the 2009-2010 academic year.[2]

22.     For-profit schools typically advertise to students with modest financial resources who are eligible for federal financial aid in the form of grants, subsidies, and loans. Many of these students are the first in their families to seek higher education. For-profit schools in many instances direct their marketing toward low-income and minority students, particularly low-income women of color, and veterans.

## II.    DEFENSE TO REPAYMENT

23.     In 1993, Congress altered the terms and conditions of Direct Loans to allow borrowers to cancel their loans based on school misconduct: "the Secretary shall specify in regulations which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a loan made under this part . . . ." 20 U.S.C. §1087e(h).

24.     In 1994, ED promulgated a regulation ("borrower-defense regulation") that permits a Direct Loan borrower to assert, as a defense to repayment, "any act or omission of the

---

[1] *For Profit Higher Education: The Failure to Safeguard the Federal Investment and Ensure Student Success*, United States Senate, Health, Education, Labor and Pensions Committee, at 3 (July 30, 2012), http://www.help.senate.gov/imo/media/for_profit_report/Contents.pdf.
[2] *Id*. at 15.

school attended by the student that would give rise to a cause of action against the school under applicable State law." 34 C.F.R. § 685.206(c)(1).

25.     Defense to repayment relieves the borrower "of the obligation to repay all or part of the loan and associated costs and fees that the borrower would otherwise be obligated to pay." 34 C.F.R. § 685.206(c)(2). The Secretary is empowered to provide "further relief," including "[r]eimbursing the borrower for amounts paid toward the loan," "[d]etermining that the borrower is not in default on the loan" and is therefore eligible for Title IV assistance, and "[u]pdating reports to consumer reporting agencies to which the Secretary previously made adverse credit reports with regard to the borrower's Direct Loan." *Id.* § 685.206(c)(2)(i)-(iii).

26.     Defense to repayment is also a contractual right written into every borrower's Master Promissory Note since 1994: "you may assert, under applicable law and regulations, a defense against repayment of your loan on the basis that the school did something wrong or failed to do something that it should have done."

27.     If a borrower-defense claim is successful, the Secretary may seek reimbursement from the offending school: "The Secretary may initiate an appropriate proceeding to require the school whose act or omission resulted in the borrower's successful defense against repayment of a Direct Loan to pay to the Secretary the amount of the loan to which the defense applies." *Id.* § 685.206(c)(3).

28.     The borrower-defense regulation became effective July 1, 1995. Nothing in its authorizing statutes, or in the HEA generally, provides an express grant of authority to ED to adopt retroactive rules as part of ED's implementation of borrower defense.

29.     The borrower-defense regulation governs the loans at issue in this case, consistent with the terms of those notes.

### III.   CORINTHIAN'S RAMPANT FRAUD AND COLLAPSE

30.     Corinthian was once one of the largest for-profit education companies in the world. At its height, Corinthian operated more than 100 campuses under its Everest, Heald, and WyoTech brands, including more than 30 campuses in California. Over the course of its existence, Corinthian enrolled hundreds of thousands of students in career-oriented programs.

6

Corinthian marketed these programs as a way for prospective students to obtain jobs in various fields, including health care, business, criminal justice, and information technology.

31.     Like most predatory, for-profit schools, Corinthian kept enrollment—and profits—up by systemically targeting low-income, financially unsophisticated, and vulnerable groups with false promises of a good education, high-paying jobs, and lifelong career services. In reality, Corinthian's programs often left its students with a mountain of debt and no better career prospects.

32.     In October 2013, the California Attorney General led the charge against Corinthian by filing an enforcement action to put an end to Corinthian's misconduct. *People v. Heald College*, No. CGC-13-534793 (S.F. Super. Ct., filed Oct. 11, 2013). Other states and federal agencies followed suit, including the Consumer Financial Protection Bureau.[3]

33.     In November 2014, amid mounting government investigations, law-enforcement actions, and financial difficulties, Corinthian sold 53 of its campuses outside of California and took steps to liquidate its private student-loan portfolio, which had a face value of over $500 million.

34.     In April 2015, based on a joint investigation with the California Attorney General's Office, ED confirmed that Corinthian engaged in systematic and widespread misrepresentations of job-placement rates to current and prospective students in 947 separate programs at its Heald campuses and fined Corinthian approximately $30 million.[4] ED explained its findings as follows:

> Heald College's inaccurate or incomplete disclosures were misleading to students; that they overstated the employment prospects of graduates of Heald's programs; and that current and prospective students of Heald could have relied upon that information as they were choosing whether to attend the school. Heald College provided the Department and its accreditors this inaccurate information as well.

35.     On April 27, 2015, after ED notified Corinthian of its intention to impose a $30 million fine based on Heald's falsified job-placement rates, Corinthian announced the closure of

---

[3] *See, e.g.*, *Consumer Fin'l Prot. Bureau v. Corinthian*, No. 14-7194 (N.D. Ill., filed Sept. 16, 2014).

[4] http://www.ed.gov/news/press-releases/us-department-education-fines-corinthian-colleges-30-million-misrepresentation.

7

1   its remaining 28 campuses.

2       36.    On May 4, 2015, Corinthian filed a Chapter 11 bankruptcy petition to liquidate.

3       37.    On March 23, 2016, the People obtained a default judgment against Corinthian in

4   California Superior Court, County of San Francisco (Karnow, J.). The court found, based on

5   substantial evidence presented by the California Attorney General, that Corinthian engaged in

6   systematic and pervasive misconduct to fraudulently induce students to enroll in its programs,

7   including, for example, that Corinthian (a) published, online and in disclosures provided to

8   prospective students during enrollment, job-placement rates that were systematically false,

9   misleading, and erroneous; (b) ran millions of advertisements for programs that it did not offer;

10  (c) unlawfully used official military seals in its materials; (d) misrepresented the transferability of

11  credits to prospective and enrolled students; and (e) misrepresented its financial stability to

12  prospective and enrolled students.

13      38.    Based on California law, the People sought full restitution for California victims of

14  Corinthian's wrongful conduct. The court agreed, finding that full-relief is the appropriate remedy

15  under California law. The judgment ordered Corinthian to pay more than $1.17 billion in

16  monetary relief, including $820 million in restitution to Californians who attended Corinthian.

17  This restitution amount was derived from an analysis of the full, aggregate total tuition and fees

18  paid to Corinthian by California students who attended programs with false and overstated job-

19  placement rates. The court's award of full restitution to these victims was supported by

20  California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 et seq., in which courts

21  remedy violations by restoring victims to the status quo ante. *See, e.g.*, *Korea Supply Co. v.*

22  *Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1149 (2003) ("Object of [UCL] restitution is to restore

23  the status quo by returning to the plaintiff funds in which he or she has an ownership interest");

24  *People v. Beaumont Inv.*, 111 Cal. App. 4th 102, 134 (2003) ("[C]ourts are not concerned with

25  restoring the violator to the status quo ante. The focus instead is on the victim.").

26      39.    Because Corinthian filed bankruptcy with limited assets for distribution to

27  creditors, Corinthian borrowers could not seek remediation by suing Corinthian or through

28  California's pursuit of victim restitution directly against Corinthian in state court. Further, the

8

state court lacked authority to invalidate the federal student loans of defrauded borrowers. Corinthian students were therefore required to seek relief under the borrower-defense regulation and the terms of their loan notes.

## IV.   THE CORINTHIAN FULL-RELIEF RULE

40.    Corinthian's rampant fraud and sudden collapse meant that tens of thousands of students could seek to discharge their federal student loans under the borrower-defense regulation and the terms of their loan notes, based on violations of California state law.

41.    ED has recognized that "[b]ecause borrowers have a right to submit a defense to repayment claim, [ED] must set up a process to review and adjudicate them."[5] Further, ED "has a legal responsibility to timely provide" relief and "protect harmed borrowers."[6]

42.    On June 8, 2015, in consultation with the California Attorney General's Office, ED announced that it would create a "streamlined process" to review claims of Corinthian students with borrower-defense claims that would simplify and expedite relief and reduce the burden on borrowers:

> [A]fter analyzing the Department's findings in its investigation of Heald College and relevant California law, the Department has determined that evidence of misrepresentation exists for students enrolled in a large majority of programs offered at Heald College campuses between 2010 and 2015. Specifically, the Department has determined that students who relied on misrepresentations found in published job placement rates for many Heald programs qualify to have their federal direct student loans discharged. Students can have their loans forgiven and receive refunds for amounts paid based on a simple attestation.[7]

43.    To implement this relief, and in coordination and collaboration with the California Attorney General's Office, ED formulated and adopted a rule ("Corinthian Full-Relief Rule") to govern the borrower-defense claims of whole groups of Corinthian students who enrolled in various programs. The Corinthian Full-Relief Rule consisted of the following ED determinations based on state-law theories developed in coordination with the California Attorney General:

---

[5] FSA Request to OMB Re: Emergency Clearance of Information Collection to Allow for Receipt of Borrower Defense to Repayment Loan Discharge Claims, at 3 (June 4, 2015).
[6] *Id.*
[7] Fact Sheet: Protecting Students from Abusive Career Colleges ("Fact Sheet"), http://www.ed.gov/news/press-releases/fact-sheet-protecting-students-abusive-career-colleges.

9

(a) Because Corinthian was headquartered in and managed from California and Corinthian operated multiple schools in California, California is the "applicable state law" for purposes of determining, nationwide, whether there is a cause of action against the school under 34 C.F.R. § 685.206(c)(1);

(b) Corinthian misrepresented job-placement rates at specified campuses, for certain educational programs, during specific time periods ("Corinthian Fraud Findings");

(c) Borrowers covered by the Corinthian Fraud Findings are eligible for borrower-defense relief and can establish their eligibility "through an expedited process" by completing and submitting a "simple attestation form" provided by ED, which allows borrowers to confirm the impact of Corinthian's misrepresented job-placement rates on them in a manner that supports a cause of action under California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 et seq.; and

(d) California law controls the scope of relief, which entitles borrowers covered by the Corinthian Fraud Findings to "full relief" by discharging the entirety of their federal loans and refunding all amounts collected by ED on them.

44.    On information and belief, ED's analysis and exercise of discretion in establishing the Corinthian Full-Relief Rule, and the consummation of the agency's decision-making process, is confirmed and memorialized in various memoranda written, approved, and relied upon by ED, including, without limitation, the following: (a) a May 2015 memorandum prepared by ED's Office of General Counsel; (b) findings in a fine action letter prepared by Administrative Actions & Appeals Service Group of ED's office of Federal Student Aid ("FSA"); (c) findings in an April 2015 document prepared by FSA's Administrative Actions & Appeals Service Group; (d) an October 2016 memorandum prepared by ED's Borrower Defense Unit; (e) a January 9, 2017 memorandum drafted by ED's Borrower Defense Unit to Under Secretary Ted Mitched regarding "Recommendation for Corinthian Borrowers Alleging That They Were Guaranteed Employment"; (f) dozens of FSA Enforcement Unit "approval memos"; and (g) instructions to contractors retained by ED's Borrower Defense Unit detailing the processing of claims under the Corinthian Full-Relief Rule.

10

45.     For example, a January 9, 2017 memorandum to the Under Secretary from ED's Borrower Defense Unit determined that full relief was appropriate for all borrowers covered by the Corinthian Fraud Findings:

> [T]he Borrower Defense Unit recommends full relief for Corinthian borrower defense (BO) applicants who submit "guaranteed employment allegations'' – that is, borrowers who (1) enrolled at any Corinthian-operated Heald, Everest, or WyoTech campus between the time Corinthian opened or acquired the campus and April 2015; and (2) alleged that they were promised, guaranteed, or otherwise assured that they would receive a job upon graduation, or that all graduates obtain employment (implicitly including themselves).

46.     That memorandum included legal analysis of applicable California law and a determination that full relief under state law is the only appropriate remedy in a section titled, "**Application of the Borrower Defense Regulation Supports Eligibility and Full Relief for Borrowers Alleging Guaranteed Employment Misrepresentations Under Applicable State Law . . . .**"[8]

47.     On information and belief, in adopting the Corinthian Full-Relief Rule, ED did not reserve discretion to change the amount of relief from full relief to partial relief for eligible defrauded Corinthian borrowers. ED bound its discretion to grant only full relief to defrauded borrowers who enrolled in programs covered by the Corinthian Fraud Findings.

48.     ED publicly announced the Corinthian Fraud Findings—and thus eligibility for expedited relief under the Corinthian Full-Relief Rule—in three stages.

49.     ED announced its first set of findings on June 8, 2015. Based on a joint investigation with the California Attorney General's Office, ED "determined that evidence of misrepresentation exists for students enrolled in a large majority of programs offered at Heald College campuses between 2010 and 2015." ED estimated that 50,000 borrowers enrolled in these programs, making them immediately eligible for expedited relief under the Corinthian Full-Relief Rule.

50.     On November 17, 2015, ED announced additional findings from the joint investigation with the California Attorney General's Office. ED found that Corinthian systematically misrepresented job-placement rates to enrolled and prospective students at an

---

[8] Emphasis in original.

additional 124 Corinthian programs offered at 20 of its Everest and WyoTech campuses in California and Florida.[9] Affected borrowers immediately became eligible for expedited relief under the Corinthian Full-Relief Rule.

51.     On March 25, 2016, ED announced additional findings that Corinthian systematically misrepresented job-placement rates to enrolled and prospective students: "[S]tudents who were defrauded at 91 former [Corinthian] campuses nationwide have a clear path to loan forgiveness under evidence uncovered by ED while working with multiple state attorneys general."[10] These additional findings applied to borrowers who attended Corinthian's Everest and WyoTech campuses at approximately 800 programs in more than 20 states. As with prior findings, affected borrowers immediately became eligible for expedited relief under the Corinthian Full-Relief Rule.

52.     Altogether, the Corinthian Fraud Findings qualified approximately 80,000 defrauded students who attended Corinthian schools in 24 states for expedited borrower-defense relief under the Corinthian Full-Relief Rule.[11] These findings applied to over 38,000 Californians.

53.     To implement the Corinthian Full-Relief Rule, ED created a simple attestation form for Corinthian borrowers to complete and posted the form on its website.[12] This form allowed (and still allows) borrowers to confirm the impact of Corinthian's inflated job-placement rates on them in a manner that supports a cause of action under California's Unfair Competition Law. The attestation form requests information related only to program of study, campus, and dates attended. The form does not request information regarding the "value" of having attended a Corinthian program or the harm caused to the individual borrower by Corinthian's misconduct.

---

[9] Department of Education and Attorney General Kamala Harris Announce Findings from Investigation of Wyotech and Everest Programs, http://www.ed.gov/ news/press-releases/department-education-and-attorney-general-kamala-harris-announce-findings-investigation-wyotech-and-everest-programs.

[10] http://www.ed.gov/news/press-releases/us-department-education-announces-path-debt-relief-students-91-additional-corinthian-campuses.

[11] These findings applied to Corinthian campuses in the following states: California; Colorado; Florida; Georgia; Illinois; Indiana; Maryland; Massachusetts; Michigan; Minnesota; Missouri; Nevada; New Jersey; New York; Ohio; Oregon; Pennsylvania; Texas; Utah; Virginia; Washington; West Virginia; Wisconsin; and Wyoming.

[12] http://studentaid.ed.gov/sa/about/announcements/corinthian#fraud-violations-state-law

The form does not request any information regarding the borrower's income or any other factors that would support providing individually calculated or less-than full relief.

54.    Borrowers could also use the attestation form to request that ED place their federal student loans in forbearance and stop collections while ED processes their claims.

55.    On June 4, 2015, ED requested that the Office of Management and Budget ("OMB") approve the attestation form. In that request, ED made clear that completion of the attestation form alone would be sufficient for eligible Corinthian borrowers to have their federal loans discharged:

> Student borrowers who attended the Heald College programs that the Department has found made false representations will have their loans discharged if they complete the attached attestation. These borrowers need not prove that Heald College's actions violated State law as the Department's findings show a State law violation.

56.    Thus, a completed attestation form was all that ED needed from defrauded borrowers "to determine whether [they] met the elements for relief, namely whether they were enrolled in the covered programs for the time periods for which the Department found that [Corinthian] had misrepresented job placement rates."[13]

57.    The Corinthian Full-Relief Rule was consistent with prior ED interpretations of the borrower-defense regulation, stretching back decades. In previous applications of this regulation, ED uniformly determined that both the right to relief and the scope of relief available to a borrower depends on state law. Until its announcement on December 20, 2017, ED had not wavered from its interpretation that the borrower-defense regulation, including the determination of the appropriate relief under 34 C.F.R. § 685.206(c)(2), is dependent on state law.

58.    The existence, specifics, and operation of the Corinthian Full-Relief Rule are supported by numerous, widely disseminated public statements by ED.

59.    For example, in its June 8, 2015 announcement, ED stated that a consistent process would apply to "whole groups" of defrauded Corinthian students to "simplify and expedite"

---

[13] Second Report of the Special Master for Borrower Defense to the Under Secretary, at 3 (Dec. 3, 2015) ("Second Special Master Report"), http://www2.ed.gov/documents/press-releases/report-special-master-borrower-defense-2.pdf.

relief:

> Wherever possible, [ED] will rely on evidence established by appropriate authorities in considering whether whole groups of students (for example, an entire academic program at a specific campus during a certain time frame) are eligible for borrower defense relief. This will simplify and expedite the relief process, reducing the burden on borrowers.[14]

60.     A September 3, 2015 report by Joseph A. Smith, the ED-appointed Special Master for Borrower Defense ("Special Master") who was tasked with, among other things, developing "a set of rules for deciding cases in a consistent way,"[15] explained that California law would serve as the predicate state-law violation supporting Corinthian borrower-defense claims nationwide because Corinthian was headquartered in and managed from California:

> Because Heald was headquartered in and managed from California, [ED] looked to California law and determined that Heald's misrepresentation of placement rates constituted prohibited unfair competition under California's Unfair Competition Law (UCL). Accordingly, students that relied on such misleading placement rates when they enrolled at Heald would have a cause of action under state law. Based on this analysis, [ED] created a simple attestation form that allows borrowers to document the inflated rates' impact on them in a manner that supports a cause of action under the UCL.[16]

61.     A December 3, 2015 Special Master report explained that the appropriate scope of relief was also determined by California law:

> [A]fter consultation with the Office of the California Attorney General, . . . students who relied upon false or misleading placement rate disclosures in enrolling in Heald College programs would have established a [borrower-defense] claim as *to which relief would be granted under California law*. The Heald Attestation Form provided by ED to student borrowers incorporated each of these elements of a claim as to which relief could be granted.[17]

62.     In that same report, the Special Master publicly recommended "full relief (restitution of all amounts paid)" for all approved borrower-defense claims; a recommendation that ED accepted.

63.     ED's November 29, 2017 response to a draft report by the Office of Inspector

---

[14] Fact Sheet, *supra* note 7.

[15] First Report of the Special Master for Borrower Defense to the Under Secretary, at 9 (Sept. 3, 2015), http://www2.ed.gov/documents/press-releases/report-special-master-borrower-defense-1.pdf

[16] *Id*. at 5.

[17] Second Special Master Report, *supra* note 13, at 3.

14

General ("OIG") further confirms that ED determined that "full relief" was appropriate for all

borrowers subject to the Corinthian Fraud Findings:

> [T[he legal framework, review criteria, and legal basis for granting [borrower-defense] claims all were established by the Office of the Under Secretary ("OUS"), [the Office of General Counsel ("OGC")], and the Special Master in 2015 – prior to the establishment of the borrower defense claim review process in FSA. It was OUS, OGC and the Special Master who determined in 2015 that "full relief" (defined as a full discharge of loans associated with the program at issue and a full refund of amounts paid) was appropriate for Heald, Everest and WyoTech borrowers with approved Job Placement Rate ("JPR") claims.[18]

64.     Numerous additional public statements by ED further confirm that eligible

Corinthian borrowers would receive full relief, including, for example, statements on ED's

website, which ED broadly and prominently posted on Facebook specifically to give public notice

to borrowers that may not regularly check email or postal mail:

> [ED] is committed to forgiving the federal student loans of eligible former Heald College students. If you qualify for forgiveness, *you will not be required to pay back your qualifying Heald federal student loans* and you may be refunded any amount that you already paid.[19]

65.     The decision letters that ED sent to successful Corinthian borrower-defense

claimants informed them that the loans related to their claim "will be discharged (forgiven)"

without qualification:

> The Department of Education has approved your claim for forgiveness of your federal student loans under the borrower defense to repayment rule, 34 C.F.R. § 685.206(c). . . .
>
> **The federal student Direct Loans you received for the programs of study related to your approved claim will be discharged (forgiven)**. The Department will notify your loan servicer of the approved forgiveness, and the forgiveness should be completed within the next 60-120 days. Your servicer will send you more details about the forgiveness, including which loans have been forgiven.[20]

66.     Subsequent notices sent to successful claimants by loan servicers also made clear

that the borrower's applicable loans had been discharged in full:

---

[18] OIG Report, Control No. ED-OIG/I04N0003, "Federal Student Aid's Borrower Defense to Repayment Loan Discharge Process," at 30 (Dec. 8, 2017) (Appx. C, FSA Comments).

[19] http://blog.ed.gov/2016/07/apply-student-loan-forgiveness-attended-heald-college; http://www.facebook.com/FederalStudentAid/posts/1067179450029853 (emphasis added).

[20] Emphasis in original.

After carefully reviewing your claim, ED has determined that your claim meets the requirements of a successful borrower defense claim because the acts or omissions of a school you attended would give rise to a cause of action under state law. **Accordingly, the federal student loans you received for the programs of study related to those acts or omissions have now been discharged.**[21]

67.     As of July 27, 2018, the Department's website still states that the Corinthian Fraud Findings qualify defrauded borrowers—without qualification or limitation—for discharge of federal student loans:

ED has found that between 2010 and 2014, Heald College misrepresented job placement rates for many of its programs of study. While borrower defense applications typically require the borrower to specifically show that his or her school violated state law, the Heald College findings qualify students enrolled in the covered programs and time periods to apply for a discharge of their federal Direct Loans through an expedited process using a simple attestation form.[22]

68.     ED's consistent conduct and sustained practice also demonstrates the existence of the Corinthian Full-Relief Rule. Between June 2015 and January 20, 2017, ED approved 28,000 borrower-defense claims from defrauded Corinthian students and in every instance—without exception—granted full relief.

## V.     OUTREACH EFFORTS TO BORROWERS ELIGIBLE FOR RELIEF UNDER THE CORINTHIAN FULL-RELIEF RULE

69.     Starting in June 2015, following the announcement of ED's initial Corinthian Fraud Findings, ED, the California Attorney General's Office, California's public colleges and universities, and others have engaged in extensive outreach efforts to notify eligible borrowers that they qualify for expedited debt relief under the Corinthian Full-Relief Rule.

70.     Outreach efforts have been aided by the fact that ED possesses individualized program-level enrollment data for students who used federal financial aid to attended Corinthian. This information includes, among other things, borrower name, address, program of study, and program start date. In 2016, ED shared this bulk enrollment data with the California Attorney General's Office and a number of other States, in connection with ED's request for outreach

---

[21] Emphasis in original.
[22] http://studentaid.ed.gov/sa/about/announcements/corinthian. An identical statement also appears on the same ED webpage for the Everest and WyoTech Findings.

16

assistance. The States then expended significant time and resources paring down this bulk data to identify those students who attended programs covered by the Corinthian Fraud Findings to assist with outreach efforts. The States shared this data with ED.

71.     ED has conducted far-reaching outreach to borrowers it determined were eligible for expedited relief under the Corinthian Full-Relief Rule. For example, in July 2015, ED conducted an email outreach campaign to over 50,000 borrowers who attended Heald College. The email provided information about eligibility and linked to both the list of programs then-covered by the Corinthian Fraud Findings and a website where borrowers could complete and submit an attestation form.

72.     Over the Special Master's one-year tenure, ED sent over 330,000 letters by email and postal mail to former Corinthian borrowers:

> [ED] is making numerous efforts to reach borrowers who may be eligible for loan discharges under the CCI job placement rate findings, and continues to work to improve its outreach efforts. This outreach consists of multiple rounds of emails and postal mail to CCI borrowers who had their first loan disbursement as early as January 1, 2010. This includes email and postal mail to over 280,000 Everest and WyoTech borrowers and over 55,000 Heald borrowers

73.     The FSA Enforcement Unit, after taking over the borrower-defense process from the Special Master, conducted "ongoing outreach efforts to former students of Corinthian Colleges, Inc."

74.     In October 2016, ED explained that the methods it employed to "inform borrowers that they may be eligible for borrower defense relief" included "expanded postal mail outreach, a Facebook advertisement pilot, a servicer pilot that relies on emails, postal mail, phone calls, and texts, and an outreach partnership with state attorneys general . . . ."[23]

75.     State Attorneys General, including the California Attorney General, have expended substantial resources on outreach to eligible Corinthian borrowers in 2015, 2016, and 2017. For example, in 2017, at ED's request, a bipartisan group of 47 States, including California, used a common fund administered by the National Association of Attorneys General to retain a

---

[23] http://www.ed.gov/news/press-releases/american-career-institute-borrowers-receive-automatic-group-relief-federal-student-loans

settlement administrator, causing the States to incur nearly $290,000 in costs related to outreach to former Corinthian students. The administrator ultimately conducted outreach to more than 100,000 former Corinthian students notifying them of their eligibility for expedited relief under the Corinthian Full-Relief Rule.

76.     In addition, in summer 2015, the California Community Colleges, along with the California Attorney General's Office, the California Student Aid Commission, the Bureau for Private and Post-Postsecondary Education, and the East Bay Community Law Center, participated in a webinar to discuss information and resources available to students affected by the Corinthian Colleges closures. A significant part of this and other outreach by the California Community Colleges involved informing borrowers about how to determine if they were eligible for expedited discharge of their federal student loans and how to obtain assistance in submitting a borrower-defense claim to ED. Legal-services organizations also set up numerous clinics to assist eligible borrower submit borrower-defense claims.

77.     Despite extensive efforts, outreach has not reached every Corinthian borrower eligible for relief.

78.     The People are informed and believe that Corinthian borrowers who received notices from ED, and outreach from the California Attorney General's Office, California's public colleges and universities, legal-services organizations, and others who engaged in outreach efforts in collaboration and coordination with ED, notifying eligible borrowers that they qualify for expedited relief, reasonably expected to receive full relief from their federal student loans. These expectations were reasonable in light of the notices received from ED; ED's public statements; and ED's consistent, uniform practice of granting all eligible Corinthian borrowers full relief for over two years, starting in June 2015 until the new partial-relief rule was announced on December 20, 2017, including approximately 28,000 claims.

**VI.     ED APPROVES 28,000 CLAIMS UNDER THE CORINTHIAN FULL-RELIEF RULE**

79.     Starting in late 2015, ED began approving Corinthian borrower-defense claims. As of December 3, 2015, the Special Master had recommended approval of 1,312 borrower-defense

claims and recommended full relief in accordance with the Corinthian Full-Relief Rule.[24] The Under Secretary authorized this relief. The vast majority of approved claims (1,062) were from defrauded Californians. The Special Master continued to recommend approval of batches of Corinthian borrower-defense claims throughout his one-year tenure. In total, the Special Master recommended approval of 3,787 borrower-defense claims under the Corinthian Full-Relief Rule,[25] for which the Under Secretary authorized full relief in every case.

80.     On February 8, 2016, ED announced the creation of the FSA Enforcement Office to respond more quickly and efficiently to allegations of school misconduct. This was part of ED's larger efforts to strengthen FSA's enforcement and oversight activities. The Enforcement Office would include a dedicated Borrower Defense Unit to process and analyze borrower-defense claims, investigate institutions in connection with those claims, and coordinate its efforts with federal and state agencies. The Borrower Defense Unit would be led by a Director who would oversee "a team dedicated to investigating and adjudicating borrower defense claims."[26] The Borrower Defense Unit would take over from the Special Master at the conclusion of his tenure on June 29, 2016.

81.     On October 28, 2016, the FSA Enforcement Office issued a "Report on Borrower Defense." As of that date, ED had approved 15,694 borrower-defense claims under the Corinthian Full-Relief Rule, granting full relief to all approved claims. At the time, "the Department expect[ed] to resolve all pending eligible [Corinthian Fraud] [F]indings claims by spring 2017."[27] The FSA Enforcement Office also stated that, following a "thorough" investigation into Corinthian's practices, it had identified additional categories of wrongdoing that would qualify Corinthian students for borrower-defense relief, including misrepresentations Corinthian made

---

[24] Second Special Master Report, *supra* note 13, at 3.

[25] Fourth Report of the Special Master for Borrower Defense to the Under Secretary, at 1 (June 29, 2016), http://www2.ed.gov/documents/press-releases/ report-special-master-borrower-defense-4.pdf.

[26] Federal Student Aid Enforcement Office Report on Borrower Defense, at 1 (Oct. 28, 2016), http://www2.ed.gov/documents/press-releases/borrower-defense-report.pdf.

[27] *Id.*

about the transferability of credits.[28]

82.     On January 13, 2017, ED announced that it had approved 12,000 additional borrower-defense claims. This brought the total number of approved claims to around 28,000, representing roughly $558 million in loan relief. As of January 13, 2017, ED had granted all approved claimants full relief. ED also announced that it had approved two additional categories of Corinthian borrower-defense claims: (a) those involving misrepresentations about the transferability of credits as the basis for debt relief; and (b) those involving Corinthian's false guarantees of employment for graduates.[29]

83.     In accordance with the Corinthian Full-Relief Rule, every borrower-defense claim that ED approved, subject to the Corinthian Fraud Findings prior to January 20, 2017, received full relief, without exception.

84.     Although ED had granted 28,000 claims as of January 20, 2017, approximately 39,000 additional claims from Corinthian students—with more than 11,000 from Californians— still awaited processing by ED.

## VII.  ED ABRUPTLY HALTS APPROVING BORROWER-DEFENSE CLAIMS

85.     On January 20, 2017, ED abruptly halted approval of all borrower-defense claims.

86.     For nearly a year, between January 20, 2017, and December 20, 2017, ED did not approve a single borrower-defense claim. It adjudicated only two; it denied both.[30]

87.     Meanwhile, defrauded students have continued to submit claims for relief under the borrower-defense rule. As of July 7, 2017, 65,169 borrower-defense claims were pending. Of these, 45,092 were from Corinthian students—with more than 13,000 from Californians.

88.     ED's publicly available "active contracts" list shows "a growing backlog of over 85,000 borrower claims submitter [sic] by applicants to request relief from student debt due [to]

---

[28] *Id*. at 3.

[29] http://www.ed.gov/news/press-releases/american-career-institute-borrowers-receive-automatic-group-relief-federal-student-loans.

[30] Office of Inspector General, Report: Federal Student Aid's Borrower Defense to Repayment Loan Discharge Process, at 3 (Dec. 8, 2017), http://www2.\ed.gov/about/offices/list/oig/auditreports/fy2018/i04r0003.pdf.

education institution abuses or other types of problems."[31]

89.     The vast majority of these pending claims are from Corinthian students. On information and belief, the number of pending Corinthian borrower-defense claims currently pending before ED exceeds 50,000.

90.     The precise number of borrowers eligible for discharge under the Corinthian Full-Relief Rule is known to ED, which possesses program-level enrollment data that allows it to determine which individual borrowers are covered by the Corinthian Fraud Findings.

91.     Prior to December 2017, ED provided no reasonable or adequate justification for delaying and withholding approval of tens of thousands of pending borrower-defense claims that ED had already determined qualify for expedited and full debt relief. These pending claims are indistinguishable from the 28,000 claims for which ED already approved and granted full relief prior to January 20, 2017.

92.     Public officials have decried ED's delay. On May 17, 2017, five Senators wrote to ED requesting an update on the processing of claims. On June 5, 2017, the California Attorney General, with 19 other attorneys general, wrote to ED inquiring about the delay and urging ED to expeditiously grant pending Corinthian claims.

93.     ED's responses provided no commitment or timetable to process claims. In response to the letter from the attorneys general, ED stated that the pending claims "will be processed under the current regulatory requirements."

94.     On September 7, 2017, the Senate Committee on Appropriations expressed concern over the growing backlog of borrower-defense claims:

> Former students who enrolled in many programs of study at more than 100 [Corinthian] campuses were provided with highly misleading job placement rate information. At least 45,000 former [Corinthian] students have pending applications with the Department *for a discharge and refund* of their fraudulently issued federal loan debt, and the Committee believes that many more students have not applied.[32]

---

[31] An Excel file that details the Department's active contracts is available here: http://www2.ed.gov/about/offices/list/ocfo/contracts/active_contracts_list.xls (last visited July 27, 2018).

[32] S. Rep. No. 115-150, at 184 (2017) (emphasis added).

21

The Committee directed "the Secretary to process applications as expeditiously as possible, and ensure students are aware of their potential eligibility for relief by identifying and contacting borrowers who may qualify to assert a defense to repayment utilizing the program-level enrollment information provided to ED by states in 2016."[33]

95.     Since her appointment, Secretary DeVos has broadly evinced support for for-profit schools and hostility toward borrower defense. On June 14, 2017, Secretary DeVos announced a "regulatory reset" of ED's legislative rules affecting for-profit schools.[34] This "reset" included delaying new borrower-defense regulations that would have applied prospectively and were set to go into effect on July 1, 2017.[35] Among other borrower protections, these new regulations would have provided more-efficient procedures for ED to provide automatic relief to groups of defrauded students without the necessity of students submitting individual claims. Despite broad support from law-enforcement agencies, student advocates, and others, the Secretary stated these regulations created "a muddled process that's unfair to students and schools, and puts taxpayers on the hook for significant costs."

96.     On September 22, 2017, speaking at the Mackinac Republican Leadership Conference, Secretary DeVos criticized the Department's borrower-defense rules and processes: "Under the previous rules, all [students] had to do was raise his or her hands to be entitled to so-called free money."

97.     On October 24, 2017, in announcing additional delays tied to Secretary DeVos's "regulatory reset," ED stated that it "would continue to process borrower defense claims under the existing regulations that will remain in effect during the delay so that borrowers may continue

---

[33] *Id.*

[34] http://www.ed.gov/news/press-releases/secretary-devos-announces-regulatory-reset-protect-students-taxpayers-higher-ed-institutions.

[35] The Department promulgated revised borrower-defense regulations on November 1, 2016, with an effective date of July 1, 2017. However, the Department delayed that date. *See* 82 Fed. Reg. 27,621; 82 Fed. Reg. 49,114; 82 Fed. Reg. 49155. This delay is the subject of a separate APA challenge, to which the People are a party. *Mass. v. U.S. Dept. of Educ.*, No. 17-1331 (D.D.C., filed July 6, 2017).

to apply for the discharge of all or a part of their loans."[36] And, "the Department is continuing to process borrower defense claims under the existing regulations that will remain in effect during the postponement."[37]

98.     In the December 8, 2017 OIG report regarding "Federal Student Aid's Borrower Defense to Repayment Loan Discharge Process," the OIG recommended that ED "resume the review, approval, and discharge processes for claims qualifying under the seven established categories, including claims that have been flagged for approval." These seven categories included claims eligible for relief under the Corinthian Full-Relief Rule.

99.     After almost 11 months of unexplained, unjustified, and unreasonable delay in processing the borrower-defense claims of California borrowers, California filed this action on December 14, 2017.

## VIII. ED ABANDONS THE CORINTHIAN FULL-RELIEF RULE, REPLACES IT WITH A PARTIAL-RELIEF RULE, AND ILLEGALLY APPLIES THAT NEW RULE RETROACTIVELY TO CORINTHIAN BORROWERS

100.     On December 20, 2017, six days after the People filed their initial complaint, ED publicly confirmed its abandonment of the Corinthian Full-Relief Rule and announced its replacement. ED described this new rule as "an improved discharge process," which "rather than taking an 'all or nothing' approach to discharge, the improved process will provide tiers of relief to compensate former Corinthian students based on damages incurred."[38]

101.     ED's new rule ("Partial-Relief Rule") determines the amount of relief due a borrower-defense claimant by comparing the average income of borrowers from the claimant's program of study with the average income data from borrowers at an unidentified "peer" school. Claimants whose earnings are 50% or more of their "peers" receive "proportionately tiered relief to compensate for the difference and make them whole."

102.     In many instances, under the Partial-Relief Rule, borrowers will receive as little as 10% of their federal loans discharged, instead of the 100% they would have received under the

---

[36] 82 Fed. Reg. at 49,156.
[37] 82 Fed. Reg. at 49,115.
[38] http://www.ed.gov/news/press-releases/improved-borrower-defense-discharge-process-will-aid-defrauded-borrowers-protect-taxpayers.

23

1    Corinthian Full-Relief Rule. ED estimates that the Partial-Relief Rule will cut the overall amount

2    of relief granted to borrowers by around 60%.

3         103.    The Partial-Relief Rule is untethered to and conflicts with California law regarding

4    the appropriate amount of remediation due a defrauded borrower who attended a program covered

5    by the Corinthian Fraud Findings. By comparing the average income of a set of borrowers with

6    the average income of some other set of borrowers (none of which are the claimant) to determine

7    the appropriate scope of relief, the Partial-Relief Rule focuses on considerations that would be

8    irrelevant to victim restitution under Business & Professions Code section 17200, et seq.

9         104.    ED memorialized the Partial-Relief Rule in at least two documents: (a) the

10   Secretary issued a memorandum, dated December 15, 2017, authored by a Senior Advisor to

11   ED's Office of Chief Financial Officer, in collaboration with Federal Student Aid and ED's

12   Office of General Counsel; and (b) on December 20, 2017, ED issued a press release, describing

13   its new process under the Partial-Relief Rule for determining relief for borrower-defense claims.

14   The announcement included that the new analysis and partial relief would apply to pending

15   claims by Corinthian borrowers.

16        105.    On December 20, 2017, ED also announced that it had approved 12,900 borrower-

17   defense claims from Corinthian borrowers under the Partial-Relief Rule, and it had denied 8,600

18   claims.

19        106.    ED has applied and intends to continue applying the Partial-Relief Rule

20   retroactively, including to Corinthian borrowers with pending borrower-defense claims who were

21   notified and applied for expedited, full relief under the Corinthian Full-Relief Rule before

22   announcement of the new rule, and to those who ED deemed eligible for full relief but have not

23   yet applied.

24        107.    On May 25, 2018, this Court granted in part and denied in part a motion for

25   preliminary injunction against ED in a related case filed as a putative class action by individual

26   plaintiffs. The Court enjoined ED from applying the Partial-Relief Rule. The Court also halted

27   ED from taking any collection actions against borrowers with approved claims under the Partial-

28   Relief Rule and those with pending borrower-defense claims covered by the Corinthian Fraud

24

Findings. The Court's injunction does not bar ED from applying the Corinthian Full-Relief Rule.

108.    Accordingly, both as of the filing of the initial complaint in this matter, and as of the filing of this First Amended Complaint, ED is not processing the large backlog of borrower-defense claims. ED is unreasonably delaying and withholding approval of borrower-defense claims of defrauded Corinthian borrowers. ED has failed to make any meaningful progress toward processing the massive backlog of claims for more than 18 months, since it stopped approving claims on January 20, 2017. Tens of thousands of the pending claims have been waiting years; thousands were submitted in 2015 and have still not yet been processed. ED's first and only step toward processing the backlog—the Partial-Relief Rule—was quickly enjoined by this Court. Tens of thousands of borrower-defense claims remain pending and have been waiting an unreasonable amount of time; relief has been unlawfully withheld from these claimants.

## IX.    ED'S ACTIONS HARM CALIFORNIA BORROWERS AND RESIDENTS

109.    ED's actions harm thousands of defrauded Corinthian borrowers. Both unreasonable delay in processing claims and the retroactive application of the Partial-Relief Rule harm California borrowers subject to the Corinthian Fraud Findings that have not yet received full discharge of their loans and a refund of amounts paid as required under the Corinthian Full-Relief Rule, consistent with California law, and consistent with the thousands of similar cases previously adjudicated by ED. ED's employment of draconian debt-collection tactics to collect the loans of defrauded Corinthian borrowers also causes significant harm.

110.    This harm is substantial, especially for borrowers seeking to continue their education. In particular, ED's failure to provide prompt relief, and its failure to provide full relief, substantially impacts the economic health and well-being of these students and their families, their financial and educational opportunities, their ability to continue their education and obtain higher-paying jobs to support themselves and their families, and their ability to improve their lives after having fallen victim to a predatory school.

111.    There are significant indirect effects that extend beyond economic injury. Outstanding federal student loans are a source of stress and anxiety for borrowers and their families. Financial strain and consumer debt has been associated with depression and poor

25

psychological functioning. Increased student debt has also been correlated with decreased duration and quality of sleep, which in turn is associated with a number of health problems, including obesity and cardiovascular disease. Borrowers with higher student debt are more likely to forego home ownership, delay marriage and parenthood, and suffer long-term lost wealth.

112.    ED's actions compound the psychological distress that defrauded Corinthian students carry, due to the fact that they are saddled with invalid loans that ED has already determined are the product of illegal behavior by Corinthian. It also increases distrust of government and education systems. Debt collection, including administrative offset and tax refund offset, compounds these harms.

113.    Further, many of these borrowers are in dire financial circumstances. Being forced to repay even a portion of the loans threatens borrowers' ability to pay for basic expenses like food and rent. Beyond that, economic deprivation can wreak havoc on families. For example, poverty can impede parents from performing their parental duties with full attention. Depression and stress associated with student debt can ultimately cause family dysfunction.

114.    ED's failure to expeditiously grant full relief to borrowers creates unnecessary disruption in the lives of students waiting for ED to act. For example, numerous borrowers have lost the opportunity to continue their educations.

115.    Federal law prohibits students with defaulted federal loans from obtaining grants, loans, or work assistance under Title IV. 20 U.S.C. § 1091(a)(3); 34 C.F.R. § 668.32(g)(1). Thus, borrowers who defaulted on their loans prior to submitting a valid borrower-defense claim are ineligible for additional financial aid, including additional federal loans and participation in the Federal Work-Study Program, until ED acts. *Id*. For many of these borrowers, the defaulted status of their loans would not be resolved by only partial relief. The dire financial circumstances of many former Corinthian students means that they cannot pay back even a fraction of the invalid loans taken out to attend Corinthian; even if granted partial relief, they would still be in default or would immediately fall back into default. Full relief, on the other hand, would resolve the defaulted status and make these borrowers eligible for financial aid, allowing them to continue their educations.

26

116.    For borrowers not in default, both delay and the prospect of only partial relief also cause serious harm. The full amount of these loans currently, and the remaining balances after partial discharge, count against maximum aggregate federal-loan limits (i.e., lifetime loan limits), and, therefore, also limit the amount of further federal loans available, if any, unless or until the outstanding loans are paid or discharged. 34 C.F.R. § 668.32(g)(1). The current, maximum aggregate loan limit for a dependent undergraduate student is $31,000, 34 CFR § 685.203(d), and $57,500 for an independent undergraduate student, *id*. § 685.203(e).

117.    Accordingly, ED's actions delaying and withholding relief under the Corinthian Full-Relief Rule and retroactively applying the Partial-Relief Rule to Corinthian borrowers cuts off availability of further federal aid (including loans and work assistance) that would be available to these students to further their educations if full relief were granted.

118.    Examples of specific, identifiable students harmed by ED's delay and withholding of relief, as well as students harmed by receiving only partial relief, are detailed below.

119.    Additionally, interest continues to accrue on the federal student loans of borrowers with pending borrower-defense claims.

120.    For borrowers who defaulted on their federal student loans prior to submitting their borrower-defense claim, ED continues to report these loans as defaulted to credit reporting agencies, harming borrowers' credit ratings while ED delays and withholds the processing of their claims.

121.    The retroactive application of ED's rule change as applied to Corinthian borrowers also harms defrauded Corinthian students who qualify but have not yet submitted a claim for relief.

## X.    ED'S ACTIONS HARM CALIFORNIA'S QUASI-SOVEREIGN AND SOVEREIGN INTERESTS

122.    Thousands of California borrowers are harmed by ED's actions in delaying and withholding the approval of borrower-defense claims, as well as by ED's illegal retroactive application of the Partial-Relief Rule to Corinthian borrowers. As detailed above and below, in addition to direct economic and other injury to thousands of California residents, the harm from

27

ED's violations of law have many wide-ranging indirect effects both on the individual students, their families, and California's broader population.

123.    California has "quasi-sovereign" interests in the health and well-being—both physical and economic—of its residents including these students and their families, their financial and educational opportunities, their ability to continue their education and obtain higher-paying jobs to support themselves and their families, and their ability to improve their lives after having fallen victim to predatory schools. Also, California has an interest in encouraging, supporting, maintaining, and defending higher education for its residents and consumer protection.

124.    California's strong interest in promoting and supporting the health and well-being of its residents, including the education of its residents, is undeniable, as is California's strong interest in stopping, preventing, and redressing fraud in connection with the advertising and sale of education services by for-profit colleges within its borders.

125.    California's strong interests in consumer protection includes full compensation and restitution to victims of predatory schools and in seeing that its consumer-protection laws are uniformly and adequately enforced.

126.    ED's delay and withholding of relief under the Corinthian Full-Relief Rule and retroactive application of the Partial-Relief Rule harms each of these quasi-sovereign and sovereign interests.

127.    California also has an interest in promoting opportunities for education in California's public colleges and universities and in deterring private, predatory schools from unfairly competing with them. Deliberate efforts by Corinthian to take advantage of and defraud low-income, vulnerable students seeking to better themselves through education impacts a substantial portion of California's population, even beyond students who fall within the Corinthian Fraud Findings. ED's unlawful about-face on its commitment to provide critical, expedited debt relief to tens of thousands of students who were defrauded into taking out federal student loans to attend Corinthian also harms those interests beyond the individual borrower's economic interests. Fair and consistent application of the Corinthian Full-Relief Rule and California law protects the economic health, safety, and welfare of California residents, including

28

prospective students, deters predatory schools from violating California law, and promotes educational opportunity.

128.     California is keenly aware of the importance of higher education and job training, and devotes extensive resources towards post-secondary education of its residents. Education is critical to the future of California. Post-secondary education is an integral aspect of living and working in California.

129.     Funding education is one of the most important functions performed by the State. Public-school, K-12 funding is the largest expenditure in California's budget, receiving 41.8% of General Fund resources in California's 2016-17 budget.[39] That budget included $51.2 billion in resources for K-12 education.[40] In 2016-17, higher education was the third largest General Fund expenditure, receiving $14.6 billion in resources, which accounted for 11.9% of General Fund resources.[41] The majority of California's higher-education funding was divided among California's three post-secondary education systems: University of California; California State University; and California Community Colleges.

130.     California also has an interest in vindicating the rights of its residents to the benefits provided under the federal borrower-defense program, and has an interest in seeing that these benefits are available to its residents in a fair, nondiscriminatory manner that treats individuals in the same way as others in similar conditions and circumstances—an interest that is separate and distinct from any pecuniary interest of individual borrowers.

131.     In addition, States have historically been the primary regulators of higher education, performing this function prior to the existence of the federal government. Over time, however, the federal government's role in the regulation of higher education has increased exponentially.

132.     California is a member of the "triad" of actors—the federal government, state governments, and accreditors—that currently regulate post-secondary education. One of the

---

[39] Governor's Budget Summary 2016-17, at 15, available at http://www.ebudget.ca.gov/ 2016-17/pdf /BudgetSummary/FullBudgetSummary.pdf (last visited July 27, 2018).
[40] *Id.*
[41] *Id.*

State's primary roles in the triad is consumer protection.

133.    California has a strong interest in the regulation of post-secondary schools within its borders. ED's borrower-defense regulation, its authorizing statute, and attendant rules have a significant impact on the regulation of these schools because student reliance on federal financial aid has substantially grown in recent decades. California has an interest in ensuring that each actor that regulates post-secondary education does so in accordance with law.

134.    In particular, the HEA increased the role of the federal government in post-secondary education, primarily by creating the system of grants, subsidies, and loans that fund higher education to this day. Because of the cost of education, federal aid plays a significant role in access to education within California. California has an interest in making sure that Californians are able to obtain appropriate relief when California law is violated, including in connection with these loans which substantially impact the ability of California students to continue their education.

135.    These federal student loans cannot be discharged under state law. Federal law provides the exclusive means to discharge these debts, which includes the borrower-defense regulation. Educational loans also are presumptively not dischargeable under the bankruptcy code. 11 U.S.C. § 523(a)(8).

136.    The People also are charged with enforcing California's consumer-protection statutes and ensuring that these laws are uniformly and adequately enforced. These statutes prohibit, among other things, unlawful, unfair, and fraudulent business acts and practices. *See, e.g.*, Cal. Bus. & Prof. Code § 17200 et seq. These laws regulate commerce in California and apply to predatory schools like Corinthian. California has a sovereign and quasi-sovereign interest in ensuring consumer protection and in securing its borders against violations. California also has a quasi-sovereign and parens patriae interest in protecting the health, safety, and welfare of its residents.

137.    California has a direct and tangible interest in the health, safety, and welfare of its residents, which are threatened by ED's actions.

138.    As detailed above and below, ED's actions (a) unreasonably delaying relief to

pending borrower-defense claimants, (b) unlawfully withholding relief under the Corinthian Full-Relief Rule, (c) retroactively applying the Partial-Relief Rule to Corinthian students, and (d) employing draconian debt-collection tactics to collect the loans of defrauded Corinthian borrowers harms the health and well-being of Corinthian borrowers and their families, and has substantial direct and indirect effects that harm the well-being of California residents, California's public colleges and universities, and other state interests.

## XI. ED'S ACTIONS HARM CALIFORNIA'S PUBLIC COLLEGES AND UNIVERSITIES

139.   ED's actions directly and indirectly harm California's public colleges and universities.

140.   The mission of California's public colleges and universities is set by statute. California Education Code § 66010.2 states that the California Community Colleges, the California State University, and the University of California "share goals designed to provide educational opportunity and success to the broadest possible range of our citizens, and shall provide the following:"

> (a) Access to education, and the opportunity for educational success, for all qualified Californians. Particular efforts should be made with regard to those who are historically and currently underrepresented in both their graduation rates from secondary institutions and in their attendance at California higher educational institutions.

> (b) Quality teaching and programs of excellence for their students. This commitment to academic excellence shall provide all students the opportunity to address issues, including ethical issues, that are central to their full development as responsible citizens.

> (c) Educational equity not only through a diverse and representative student body and faculty but also through educational environments in which each person, regardless of race, gender, gender identity, gender expression, sexual orientation, age, disability, or economic circumstances, has a reasonable chance to fully develop his or her potential.[42]

141.   ED's actions unreasonably delaying relief, unlawfully withholding relief under the Corinthian Full-Relief Rule, and retroactively applying the Partial-Relief Rule to Corinthian students prevents numerous former Corinthian students from enrolling in California's public colleges and universities because of their outstanding federal student loans related to Corinthian.

---

[42] *Id.*

31

142.    As detailed above, federal law prohibits students from securing additional federal financial aid when they have either defaulted on their federal student loans or reached the maximum aggregate federal-loan limit. 20 U.S.C. § 1091(a)(3); 34 C.F.R. § 668.32(g).

143.    ED's delay in processing eligible borrower-defense claims and in refusing to fully discharge federal student loans of former Corinthian students thus delays, limits, or blocks current and prospective students from continuing their educations at California's public colleges and universities, unless the students can afford tuition and other education-related expenses without financial aid. Few, if any, can.

144.    This impairs the educational mission of California's public colleges and universities. For example, it is within the mission of California's public colleges and universities to serve the students affected by the closing of various predatory, for-profit institutions in California, including Corinthian, many of whom are veterans, immigrants, people of color, single parents, and first-generation college students.

145.    "Restoring access to higher education for those who need it remains a major system priority" for California Community Colleges.[43] On September 21, 2015, the Board of Governors of the California Community Colleges requested an additional $175 million in funding in 2016-17 for increased access for approximately 70,000 students. The request was specifically made to accommodate additional, expected enrollments from "veterans returning from Iraq and Afghanistan, and the closure of several for-profit institutions (e.g., the Corinthian schools)," among others.[44]

146.    The California Community Colleges have engaged in outreach to former Corinthian students and have expended resources on such outreach.

147.    California Community Colleges, in particular, are required to admit any California resident possessing a high-school diploma or equivalent. Additionally, California Community Colleges may admit residents without a high-school diploma or equivalent who are capable of profiting from the instruction offered.

---

[43] http://extranet.cccco.edu/Portals/1/ExecutiveOffice/Board/2015_agendas/September/2_2_2016_17_System_Budget_Request_.pdf
[44] *Id.*

148.    The loss of these former Corinthian students as both current and prospective students harms the educational mission of California's public colleges and universities. Without discharge of their federal student loans related to Corinthian and without the ability to obtain additional federal financial aid to help pay for education-related expenses at California's public colleges and universities, these students are forced to leave or be limited or blocked from enrolling in and attending these public institutions.

149.    ED's actions to unreasonably delay relief, unlawfully withhold relief under the Corinthian Full-Relief Rule, inconsistently grant relief to similarly situated California residents, and retroactively apply the Partial-Relief Rule cuts off the availability of additional federal aid that would otherwise be available to these students to further their educations at California's public colleges and universities. 20 U.S.C. § 1091(a)(3); 34 C.F.R. § 668.32(g).

150.    As an example, former Corinthian student N.C. attended Everest College in City of Industry, California, in 2010 and 2011. She obtained federal loans to attend Everest College. She graduated in April 2011, but was not able to find a job in her field of study with the Everest College diploma. To this day, she has not been able to find work in her field of study. N.C. was interested in continuing her education at a California public college. In 2011, she enrolled and started taking classes at Citrus Community College located in Glendora, California. In 2012, N.C. stopped attending Citrus Community College because she could not afford to continue without additional financial aid. In 2016, her federal student loans related to Corinthian fell into default. ED offset around $5,000 of her federal tax refund to collect on the Corinthian federal student debt. In April 2017, N.C. filed a borrower-defense claim with ED. It was her understanding that her federal loans were supposed to be forgiven. ED, however, has not acted on her application, which has been pending for 15 months.

151.    N.C. recently sought to re-enroll in Citrus Community College to continue her education and earn a degree that would better enable her to provide for her family. However, due to her defaulted federal student loans from Everest College, she is ineligible for financial aid and she cannot afford to enroll in Citrus Community College. If her defaulted Corinthian loans were fully discharged, she would no longer be in default, would be eligible for additional financial aid,

33

1    and would be able to continue her education at Citrus Community College.

2         152.   As another example, former Corinthian student A.H. attended Heald College in

3    Concord, California, and completed her Heald degrees in 2010 and 2011. She obtained multiple

4    federal student loans related to Heald. A.H. was not able to get a job in her field of study or

5    transfer units as represented. In 2011, A.H. enrolled in and started taking classes to continue her

6    education at Cal State University, East Bay ("CSU East Bay"). She attended CSU East Bay on

7    and off through 2013. When the financial-aid office informed A.H. that she was no longer eligible

8    for financial aid due to maxing out her aggregate federal-loan eligibility, she withdrew. A.H.

9    could not afford to continue her education at CSU East Bay without federal financial aid. In July

10   2015, A.H. filed a borrower-defense claim with ED. She wants to continue her education at CSU

11   East Bay. Relief from her federal loans related to Corinthian would make that possible because

12   she would be eligible for federal aid. ED, however, has not acted on her application, which has

13   been pending for three years.

14        153.   A.H. continues to want to re-enroll at CSU East Bay to further her education and

15   earn a degree that would better enable her to provide for her family. However, her outstanding

16   federal loans prevent her from attending CSU East Bay and completing her undergraduate degree.

17   A.H. strongly believes that in the economy of the Bay Area, she is unable to provide fully for her

18   family without achieving a higher education, which is extremely important to her. If her defaulted

19   Corinthian loans were fully discharged, she would be eligible for additional federal aid, and she

20   would continue her education through CSU East Bay.

21        154.   As another example, former Corinthian student I.M. attended WyoTech in Long

22   Beach, California in 2013 and 2014. In 2016, I.M. filed a borrower-defense claim with ED. He is

23   interested in continuing his education including at a California community college, but his

24   experience at WyoTech has left a sour taste in his mouth and also he does not have the financial

25   means to pursue additional education because of his outstanding federal student loans related to

26   Corinthian.

27        155.   I.M. recently became unemployed. I.M. also recently learned that instead of all his

28   federal loans being discharged, ED only credited his account with a 10% discharge. He does not

34

1    know how ED calculated that he is only entitled to 10% discharge rather than a 100% discharge.

2    This means he will continue to have to pay for a substantial amount of the loans, which he cannot

3    afford, plus accruing interest, for classes that did not help him obtain employment or help him

4    start a new career as promised. The remaining balance of the loans continues to cause I.M. stress

5    and frustration, and prevents I.M. from obtaining new student loans to continue his education and

6    obtain a better job or career. If 100% of the loans were discharged, I.M. would seek to continue

7    his education through a California community college and possibly other programs.

8        156.    As another example, former Corinthian student R.D. attended WyoTech in

9    Fremont, California between 2011 and 2013. After graduating, he was not able to find a job in his

10   field of study and was saddled with over $22,000 in federal student loans related to Corinthian.

11   Because he was not able to find a good job with the WyoTech diplomas, he thought about going

12   back to school at a California community college. He did not enroll, however, in part, because he

13   could not afford the cost of school in addition to the WyoTech loans that he had to pay back. He

14   previously had gone to San Jose City College and Peralta Community College District schools

15   and believes going back to school could lead to a higher-paying job. In 2016, R.D. filed a

16   borrower-defense claim with ED.

17       157.    After finding out he was eligible to have his WyoTech loans discharged, R.D. told

18   a WyoTech classmate how to apply. His classmate also submitted an attestation form and

19   received 100% discharge of his federal loans. R.D. has not yet heard a decision from ED on his

20   application. It was his understanding that his federal loans were supposed to be forgiven. ED,

21   however, has not acted on his application, which has been pending for almost 28 months. Every

22   time R.D. thinks about going back to school, he thinks about how he cannot afford it while he still

23   has unpaid loans for WyoTech. In addition, because so much time has passed, he feels like the

24   opportunity to go back to school is slipping away. He now has three kids to care for, including a

25   baby and a teenage daughter who hopefully will be attending college in three years. R.D. does not

26   believe he will be able to afford to pay for her college as well as his, especially if 100% of his

27   WyoTech loans remain unforgiven. Because of ED's delay in discharging his loans, and the

28   prospect that ED may not discharge 100% of his loans, R.D. has had to delay making decisions

1    about going back to school.

2           158.    As another example, former Corinthian student R.M. attended Heald in Salinas,

3    California between 2009 and 2012. After graduating, she was unable to find a job in her field of

4    study or transfer credits as she was promised. In 2015, R.M. filed a borrower-defense claim with

5    ED. She wants to continue her education, and she has attempted to attend community college, but

6    she was told by the financial-aid office that she is not currently eligible for any additional federal

7    loans because of her not-yet-discharged federal student loans related to Heald. She is not able to

8    afford to take classes at community college or other schools without federal aid. ED has not acted

9    on her application, which has been pending since 2015.

10          159.    The People are informed and believe that there are numerous other former

11   Corinthian students, in addition to N.C., A.H., I.M., R.D., and R.M., that are eligible for

12   borrower-defense relief and are being actively prevented from enrolling in and attending

13   California's public colleges and universities because of ED's delay in providing relief under the

14   borrower-defense rule, and because of ED's failure to provide full relief to Corinthian borrowers.

15          160.    As detailed above, N.C., A.H., I.M., R.D., and R.M. cannot continue their

16   educations at California's public colleges and universities because of ED's actions in delaying

17   relief to pending borrower-defense claimants, withholding relief to claimants under the

18   Corinthian Full-Relief Rule, and retroactively applying the Partial-Relief Rule to Corinthian

19   borrowers. These borrowers are ineligible for additional federal financial aid under 20 U.S.C.

20   § 1091(a)(3) and 34 C.F.R. § 668.32(g), and therefore cannot afford to continue their educations

21   at California's public colleges and universities, which they would otherwise attend if their loans

22   were forgiven.

23          161.    The loss of these current and prospective students also harms California by

24   depriving the State of the opportunity to hire these students through the Federal Work-Study

25   Program. 20 U.S.C. § 1087-51–1087-58. Employers eligible under the Federal Work-Study

26   Program include, among others, California's public colleges and universities, as well as

27   California state agencies. *Id*. § 1087-51(c). The program encourages students to participate in

28   community-service activities and engenders in students a sense of social responsibility and

36

1    commitment to the community. 20 U.S.C. § 1087-51(a). Financial aid through the Federal Work-

2    Study Program mutually benefits both eligible students and eligible employers. Students benefit

3    by earning money to help with their educational expenses. Employers benefit by receiving a

4    subsidy from the federal government that, in most cases, covers more than 50% of the student's

5    wages. In some cases, such as for reading or mathematics tutors, the federal share of the wages

6    can be as high as 100%. Former Corinthian students that have defaulted on their federal student

7    loans are ineligible to participate in the Federal Work-Study Program. 20 U.S.C. § 1091(a)(3); 34

8    C.F.R. § 668.32(g). California's public colleges and universities, as well as California state

9    agencies, are therefore unable to hire these students under the program.

10   **XII.  ED'S ACTIONS HARM CALIFORNIA'S FISC**

11           162.    As detailed above, at ED's specific request, the California Attorney General

12   expended time, resources, and funds assisting ED with outreach to borrowers eligible for

13   expedited relief under the Corinthian Full-Relief Rule. The California Community Colleges, the

14   California Student Aid Commission, and the Bureau for Private and Post-Postsecondary

15   Education also invested in and assisted with outreach.

16           163.    ED's actions in delaying relief to pending borrower-defense claimants,

17   withholding relief to claimants under the Corinthian Full-Relief Rule, and retroactively applying

18   the Partial-Relief Rule harms and undermines these investments. In particular, ED's failure to

19   approve any borrower-defense claims between January 20, 2017, and the date the People filed

20   their initial complaint in this case, December 14, 2017, has caused California to lose its

21   investment in outreach during that time period. ED's momentary attempt to grant reduced relief

22   under the unlawful Partial-Relief Rule was enjoined just months after ED announced it.

23           164.    Accordingly, tens of thousands of Corinthian borrower-defense claims are still

24   pending adjudication before the Department—and have been pending for more than 18 months.

25   Thousands of claims have been pending for years, some more than three years.

26           165.    As of the date of the filing of this First Amended Complaint, ED is still not

27   granting any pending borrower-defense claims. ED's refusal to process any borrower-defense

28   claims over this extended period, and continuing into the foreseeable future, has further caused

37

California to lose its investment in outreach.

166.     California would not have spent time, resources, and funds on outreach had it known that ED would cease providing any relief to defrauded Corinthian borrowers, as was the situation when the People filed their initial complaint on December 14, 2017, and as is the current situation on the date the People filed this First Amended Complaint. Moreover, had California known that ED would impose a new rule to limit relief based on factors outside the scope of ED's attestation form, California could have notified borrowers to submit additional information, including income information, with their borrower-defense claims.

## XIII. ED'S ACTIONS HARM CALIFORNIA'S SOVEREIGN INTEREST IN STATE LAW

167.     Federal law recognizes the States' crucial consumer-protection role by incorporating a state-law standard into the borrower-defense regulation. For decades, ED interpreted the borrower-defense regulation as dependent on state law for determining not only the underlying violation supporting a borrower-defense claim, but also the scope of appropriate relief. During the formulation and administration of the Corinthian Full-Relief Rule, ED consistently held to this interpretation. ED expressly recognized that the borrower-defense regulation in effect at the adoption of the Corinthian Full-Relief Rule was "wholly dependent" on state law.[45] In addition, when establishing the Corinthian Full-Relief Rule, ED expressly relied on California law both for ascertaining the right to relief and also for setting the amount of relief.

168.     California has a sovereign interest in ED's continued adherence to the governing state-law standard for determining relief under the borrower-defense regulation. California also has a sovereign interest in the effective enforcement and interpretation of its state laws and in the ability to obtain consumer relief pursuant to and in amounts consistent with its laws, both to deter future violations of state law and to make defrauded residents whole.

169.     ED's failure to properly interpret and enforce California law as implemented by the Partial-Relief Rule harms California's sovereign interest in the effective interpretation and enforcement of its laws. California's Unfair Competition Law provides for full restitution to victims who relied on Corinthian's falsified job-placement rates. For example, the California

---

[45] Student Assistance General Provisions, 81 Fed. Reg. 39330, 39339 (June 16, 2016).

Superior Court, County of San Francisco, already determined that full relief for these victims is appropriate under applicable California law.

170.    As detailed above, ED's misinterpretation of and failure to enforce California law significantly harms California, its public colleges and universities, and its borrowers who are eligible for full relief under the Corinthian Full-Relief Rule but who will be granted less than full relief under the Partial-Relief Rule, among others.

**CLAIM 1**

**UNLAWFUL RETROACTIVE AGENCY ACTION**

171.    The People incorporate by reference the foregoing paragraphs.

172.    Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

173.    The Corinthian Full-Relief Rule is a "rule" under the APA. 5 U.S.C. § 551(4).

174.    The Corinthian Full-Relief Rule qualified tens of thousands of defrauded borrowers who attended programs covered by the Corinthian Fraud Findings to expedited, full relief from their applicable federal student loans, which included a complete discharge of those loans and a return of all amounts collected by ED on those loans.

175.    ED has provided or attempted to provide notice of the Corinthian Full-Relief Rule to tens of thousands of borrowers eligible for relief under it.

176.    Tens of thousands of borrowers have submitted borrower-defense claims to ED under the Corinthian Full-Relief Rule.

177.    Before January 20, 2017, ED approved and granted full relief to 28,000 borrower-defense claimants under the Corinthian Full-Relief Rule.

178.    ED has abandoned the Corinthian Full-Relief Rule and replaced it with the Partial-Relief Rule, a rule that no longer grants full relief to numerous borrower-defense claims covered by the Corinthian Fraud Findings.

179.    The Partial-Relief Rule is a "rule" under the APA. 5 U.S.C. § 551(4).

180.    ED has applied and intends to continue applying the Partial-Relief Rule

39

retroactively, not in accordance law, to borrowers with pending borrower-defense claims and to future borrower-defense claimants who qualify under the Corinthian Fraud Findings.

181.  Application of a rule other than the Corinthian Full-Relief Rule to these claims wrongly disrupts those borrowers' settled expectations of full relief under the Corinthian Full-Relief Rule.

182.  Application of a rule other than the Corinthian Full-Relief Rule to these claims attaches new legal consequences to them, depriving borrowers of full relief under the Corinthian Full-Relief Rule.

183.  Affected borrowers have reasonably relied on the Corinthian Full-Relief Rule, as well as ED's notices and public statements and ED's consistent prior practice consistent with the Corinthian Full-Relief Rule.

184.  ED's retroactive application of the Partial-Relief Rule or a rule other than the Corinthian Full-Relief Rule to borrowers who attended programs covered by the Corinthian Fraud Findings harms those borrowers.

185.  ED's application of a revised rule to affected borrowers' claims violates 5 U.S.C. § 551(4) because it is an unlawful retroactive application of a new rule to borrowers that ED has already determined are qualified for full relief under the Corinthian Full-Relief Rule. It is therefore arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, and should be vacated and set aside under 5 U.S.C. § 706(2)(A).

## CLAIM 2

### UNREASONABLY DELAYED AGENCY ACTION

186.  The People incorporate by reference the foregoing paragraphs.

187.  Under the APA, a reviewing court shall compel agency action "unreasonably delayed." 5 U.S.C. § 706(1).

188.  The Corinthian Full-Relief Rule is a "rule" under the APA. 5 U.S.C. § 551(4).

189.  The Corinthian Full-Relief Rule qualified tens of thousands of defrauded borrowers who attended programs covered by the Corinthian Fraud Findings to expedited, full relief from their applicable federal student loans, which included a complete discharge of those

40

1    loans and a return of all amounts collected by ED on those loans.

2           190.    To implement the Corinthian Full-Relief Rule, ED established streamlined

3    procedures to review and process borrower-defense claims submitted by affected borrowers using

4    ED's simple attestation form.

5           191.    Before January 20, 2017, ED approved and granted expedited, full relief to 28,000

6    borrower-defense claimants using these procedures.

7           192.    Since January 20, 2017, ED has not approved a single borrower-defense claim

8    under the Corinthian Full-Relief Rule.

9           193.    More than 50,000 borrower-defense claims from Corinthian students are currently

10   pending before ED. ED has already determined that tens of thousands of these claims qualify for

11   expedited, full relief under the Corinthian Fraud Findings. New claims continue to mount.

12          194.    ED is unreasonably delaying agency action by failing to timely approve pending

13   borrower-defense claims in contravention of the Corinthian Full-Relief Rule and prior practice,

14   both of which require expedited, full relief of the federal student loans of claimants covered by

15   the Corinthian Fraud Findings.

16          195.    ED has provided no adequate justification for this delay. ED's adoption of the

17   Partial-Relief Rule does not justify the delay, a rule which this Court has already held invalid.

18          196.    In numerous public statements, ED represented that relief to borrowers who

19   attended a program covered by the Corinthian Fraud Findings would be "expedited,"

20   "streamlined," "simple," and "quick."

21          197.    Tens of thousands of affected borrowers have been waiting more than 18 months

22   for relief. Some have been waiting more than three years.

23          198.    ED has acknowledged its legal responsibility to timely provide borrower-defense

24   relief to harmed borrowers.

25          199.    In October 2016, ED estimated that it would clear the existing backlog of claims

26   by spring 2017. ED has woefully failed to do so.

27          200.    ED has not brought to conclusion the borrower-defense claims presented to it

28   within a reasonable time. 5 U.S.C. § 555(b).

41

201. ED's delay harms affected borrowers.

202. ED has unreasonably delayed agency action on borrower-defense claims covered by the Corinthian Fraud Findings and should be compelled under 5 U.S.C. § 706(1) to bring them to conclusion.

## CLAIM 3

### UNLAWFULLY WITHHELD AGENCY ACTION

203. The People incorporate by reference the foregoing paragraphs.

204. Under the APA, a reviewing court shall compel agency action "unlawfully withheld." 5 U.S.C. § 706(1).

205. The Corinthian Full-Relief Rule is a "rule" under the APA. 5 U.S.C. § 551(4).

206. The Corinthian Full-Relief Rule qualified tens of thousands of defrauded borrowers who attended programs covered by the Corinthian Fraud Findings to expedited, full relief from their applicable federal student loans, which included a complete discharge of those loans and a return of all amounts collected by ED on those loans.

207. Application of the Corinthian Full-Relief Rule is a straightforward, predetermined, and ministerial agency task.

208. Before January 20, 2017, ED approved and granted expedited, full relief to 28,000 borrower-defense claimants under the Corinthian Full-Relief Rule.

209. ED does not have discretion to withhold application of the Corinthian Full-Relief Rule to borrowers covered by the Corinthian Fraud Findings, who have submitted, or will submit, borrower-defense claims under ED's established processes.

210. ED has already exercised its discretion in making the Corinthian Fraud Findings, in establishing the procedures to review and process borrower-defense claims, and in determining that the claims of eligible borrowers (a) are governed by California law, (b) have a valid defense under California law that supports a defense to repayment; and (c) have established a right under California law to the full discharge of their federal loans and the return of all amounts collected by ED on those loans.

211. ED is unlawfully withholding application of the Corinthian Full-Relief Rule to the

42

borrower-defense claims of borrowers who attended a program covered by the Corinthian Fraud Findings. ED should be compelled under 5 U.S.C. § 706(1) to process those claims in accordance with the Corinthian Full-Relief Rule and prior practice.

## CLAIM 4

## UNEQUAL TREATMENT OF CLAIMS

212.    The People incorporate by reference the foregoing paragraphs.

213.    Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

214.    For years ED applied the Corinthian Full-Relief to grant full relief to 28,000 borrowers covered by the Corinthian Fraud Findings.

215.    ED has abandoned the Corinthian Full-Relief Rule and replaced it with the Partial-Relief Rule, a rule that no longer grants full relief to borrower-defense claims covered by the Corinthian Fraud Findings.

216.    ED has applied and intends to apply the Partial-Relief Rule to borrower covered by the Corinthian Fraud Findings.

217.    In numerous instances, borrowers covered by the Corinthian Fraud Findings that attended the same Corinthian program, at the same time, and were subjected to the same misrepresentations will receive vastly different relief depending on which rule ED applies to them.

218.    ED's failure to provide an adequate justification for its disparate and unequal treatment of similarly situated claimants renders any grants of less-than full relief to borrowers who attended a program covered by the Corinthian Fraud Findings arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. They should therefore by vacated and set aside under 5 U.S.C. § 706(2)(A).

/ / /

## CLAIM 5

### UNLAWFUL DEBT COLLECTION AGAINST STUDENTS WITH PENDING BORROWER-DEFENSE CLAIMS

219.   The People incorporate by reference the foregoing paragraphs.

220.   Under the APA, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

221.   Upon information and belief, for many borrowers with pending borrower-defense claims (whether or not covered by the Corinthian Fraud Findings), ED has submitted their loans to the U.S. Department of the Treasury for collection through administrative offset (31 U.S.C. § 3716) or tax refund offset (31 U.S.C. § 3720A).

222.   The identity of these borrowers are peculiarly within ED's possession and control.

223.   In doing so, ED has certified that these loans are "legally enforceable." 31 C.F.R. § 285.2(d)(1); 31 C.F.R. § 285.5(d)(6). These loans are not "legally enforceable" because, among other reasons, they are "the subject of a pending administrative review process" and "collection action during the review process is prohibited." 31 C.F.R. § 285.5(b).

224.   ED's conduct is also inconsistent with agency statements and representations that it will stop collections on the loans of borrower-defense claimants that opt for forbearance.

225.   These certifications are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. They should therefore be held unlawful and set aside under 5 U.S.C. § 706(2)(A).

## CLAIM 6

### UNLAWFUL DEBT COLLECTION AGAINST STUDENTS COVERED BY THE CORINTHIAN FRAUD FINDINGS

226.   The People incorporate by reference the foregoing paragraphs.

227.   On information and belief, for many borrowers covered by the Corinthian Fraud Findings (whether or not they submitted a borrower-defense claim), ED has submitted their loans to the U.S. Department of the Treasury for collection through administrative offset (31 U.S.C. § 3716) or tax refund offset (31 U.S.C. § 3720A). In doing so, ED has certified that these loans

44

are "legally enforceable." 31 C.F.R. § 285.2(d)(1); 31 C.F.R. § 285.5(d)(6). For a loan to be "legally enforceable," ED must make "a final agency determination that the debt, in the amount stated, is due, and there are no legal bars to collection by offset." 31 C.F.R. § 285.5(b).

228.   The identity of these borrowers are peculiarly within ED's possession and control.

229.   ED is aware that the loans of borrowers covered by the Corinthian Fraud Findings are not enforceable because there are legal bars to collection. Specifically, ED is aware that borrowers covered by the Corinthian Fraud Findings have valid defenses to repayment, including (a) a borrower defense under 34 C.F.R. § 685.206(c)(1), and (b) a contractual defense arising under ED's Master Promissory Note.

230.   These certifications are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, and should therefore be held unlawful and set aside under 5 U.S.C. § 706(2)(A).

### DEMAND FOR RELIEF

WHEREFORE, the People respectfully request that this Court enter a judgment in their favor and grant the following relief:

A.   Vacate all approvals of borrower-defense claims under the Partial-Relief Rule and compel ED to approve and grant full relief to those claims under the Corinthian Full-Relief Rule.

B.   Compel ED to approve and grant full relief to all pending and future borrower-defense claimants covered by the Corinthian Fraud Findings under the Corinthian Full-Relief Rule;

C.   Declare unlawful and set aside ED action to collect on loans of borrowers with pending borrower-defense claims (whether or not covered by the Corinthian Fraud Findings) in which the borrower has requested forbearance or collection stoppage;

D.   Declare unlawful and set aside ED determinations and certifications that the loans of borrowers with pending borrower-defense claims who are also covered by the Corinthian Fraud Findings (whether or not the borrower requested a forbearance or collection stoppage) are eligible for administrative offset or tax refund offset;

45

1          E.      Declare unlawful and set aside Department determinations and

2   certifications that the loans of borrowers covered by the Corinthian Fraud Findings (whether or

3   not they have submitted a borrower-defense claim) are eligible for administrative offset or tax

4   refund offset.

5          F.      Award the People reasonable costs and attorneys' fees; and

6          G.      Grant other relief as the Court deems just and proper.

7

8   Dated: July 27, 2018                        Respectfully submitted,

9                                               XAVIER BECERRA
                                                Attorney General of California
10
                                                /s/ Bernard A. Eskandari
11                                              BERNARD A. ESKANDARI
                                                Supervising Deputy Attorney General
12
                                                *Attorneys for Plaintiff the People of the State*
13                                              *of California*

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28