*Privileged/Deliberative/Confidential*

Draft of May 14, 2015

## I.  Elements of the UCL applied to Heald Borrowers

**A. The misrepresentation of placement rates identified in ED's Heald fine letter constitutes unfair competition under the Unfair Competition Law.**

The UCL prohibits unfair competition, which it defines in a number of categories established by the UCL.  A business practice need only fall under one of these categories to constitute unfair competition.[1]

1.  Heald's misrepresentation of placement rates violated federal law, specifically, 34 C.F.R. § 668, as determined by ED.  The UCL defines unfair competition to include any "unlawful…business act or practice."  The Legislature intended unfair competition "to include anything that can properly be called a business practice and that at the same time is forbidden by law."[2] If a business practice violates any law, this is *per se* a UCL violation.[3] Therefore, Heald's misrepresentations constitute unlawful business practices and unfair competition under the UCL.

2.  Heald's misrepresentation of placement rates also constitute fraudulent business practices under the UCL, another form of unfair competition.  To show that a business practice is fraudulent, "it is necessary only to show that members of the public are likely to be deceived."[4] The UCL does not require knowledge of misrepresentation (scienter) or intent to defraud, as is required for fraudulent deceit under the California Civil Code.[5] True statements are actionable under the UCL if they are presented in a manner likely to mislead or deceive consumers, including by the omission of relevant information.[6]

    In the Heald fine letter, ED found as follows:
    > Heald's inaccurate or incomplete placement rate disclosures were misleading or false; [] they overstated the employment prospects of graduates of Heald's programs; and [] current and prospective graduates of Heald could reasonably have been expected to rely to their detriment upon the information in Heald's placement rate disclosures.

---

[1] *Cel-Tech Communications v. Los Angeles Cellular Telephone Co.*, 973 P.2d 527, 540 (Cal. 1999).

[2] *Bank of the West v. Superior Court*, 833 P.2d 545, 553 (Cal. 1992) (citations omitted).

[3] *See Kasky v. Nike*, 45 P.3d 243, 249 (Cal. 2002); *see also People v. E.W.A.P. Inc.*, 165 Cal.Rptr. 73, 75 (Cal. Ct. App. 1980).

[4] *Committee on Children's Television, Inc. v. General Foods Corp.*, 673 P.2d 660, 668 (Cal. 1983)35 Cal.3d 197, 211 (Sup. Ct. 1983) superseded by statute, 2004 Cal. Legis. Serv. Prop. 64 on other grounds, as recognized in *Branick v. Downey*, 138 P.3d 214 (Cal. 2006). Note: The "likely to be deceived" standard does not establish a private plaintiff's standing.

[5] Cal. Civ. C. § 1709.

[6] *Boschma v. Home Loan Center*, 129 Cal.Rpt.3d 874, 893 (Cal. Ct. App. 2011).

DOE_00003358

*Privileged/Deliberative/Confidential*
*Attorney-Client Communication*

Heald fine letter at 10. This finding places Heald's misrepresentations squarely within the UCL's definition of fraudulent business practices and thus within its definition of unfair competition.

3. Heald's misrepresentation of placement rates may also be unfair competition under two other prongs of 17200, "unfair, deceptive or untrue advertising" and "unfair...business act or practice." The advertising prong is considered to be very similar to the fraudulent business practice prong. *See* Stern, Business and Professional Code § 172000 Practice at 3-70 (2015).

Regarding unfair business practices, "[t]he state of the law...is somewhat unsettled."[7] However, the trend appears to be in favor of using section 5 of the Federal Trade Commission Act ("FTCA") to define unfairness. To find unfairness under the FTCA: (1) The consumer injury must be substantial; (2) the injury must not be outweighed by any countervailing benefits to consumers or competition; and (3) it must be an injury that consumers themselves could not reasonably have avoided.[8] "...[C]onsumers cannot have reasonably avoided the injury ... if their free market decisions were unjustifiably hampered by the conduct of the seller."[9] The placement rate misrepresentations at issue here easily could be described as meeting these standards.

**B. Borrowers who relied on Heald's misrepresented placement rates in deciding to attend Heald programs suffered economic harm.**

Section 17204 requires that an individual seeking relief under the UCL have "suffered injury in fact and [have] lost money or property as a result of" the unfair completion of which the person complains. In *Kwikset v. Superior Court*, the California Supreme Court set out numerous ways a consumer can show economic injury and meet these requirements. "A plaintiff may (1) surrender in a transaction more, or acquire in a transaction less, than he or she otherwise would have; (2) have a present or future property interest diminished; (3) be deprived of money or property to which he or she has a cognizable claim; or (4) be required to enter into a transaction, costing money or property, that would otherwise have been unnecessary."[10]

Regarding false labeling, the *Kwikset* court also stated,
A consumer who relies on a product label and challenges a misrepresentation contained therein can satisfy the standing requirement of section by alleging, as plaintiffs have here, that he or she would not have bought the product but for the misrepresentation. That assertion is sufficient to allege causation—the purchase would not have been made but for the misrepresentation. It is also sufficient to allege economic injury. From the original purchasing decision we know the consumer

---

[7] *Davis v. Ford Motor Credit Co.*, 101 Cal.Rptr.3d 697, 706 (Cal. Ct. App. 2009).
[8] *Id.* at 709.
[9] *Camacho v. Automobile Club of Southern California*, 48 Cal.Rptr.3d 770, 777-78 (Cal. Ct. App. 2006).
[10] *Kwikset Corp.*, 246 P.3d at 885-86.

2

*Privileged/Deliberative/Confidential*
*Attorney-Client Communication*

valued the product as labeled more than the money he or she parted with; from the complaint's allegations we know the consumer valued the money he or she parted with more than the product as it actually is; and from the combination we know that because of the misrepresentation the consumer (allegedly) was made to part with more money than he or she otherwise would have been willing to expend, *i.e.*, that the consumer paid more than he or she actually valued the product. That increment, the extra money paid, is economic injury and affords the consumer standing to sue.[11]

Other cases have made clear that a consumer suffers economic harm when he or she makes a purchase in reliance on false representations and thereby is denied benefits or value promised by the seller. For example, a federal district court ruled in *Johnson v. Gen. Mills, Inc.* that a consumer satisfied the UCL's harm requirement based on his reliance on false statements about a food's health benefits. The court stated,

> [The plaintiff] has UCL … standing because he alleges that he bought YoPlus in reliance on General Mills' allegedly deceptive representations concerning the digestive health benefit of YoPlus as communicated by the second generation YoPlus packaging and a television commercial for YoPlus. He further asserts that he suffered economic injury because he purchased YoPlus but did not receive the promised digestive health benefit.[12]

In *Daghlian v. DeVry University, Inc.*, plaintiff student enrolled at the school and incurred debt "in reliance on defendants' misrepresentations and omissions about the transferability of credits."[13] Plaintiff did not attempt to transfer the credits, and he did not allege that he had to restart his education at a different school.[14] Plaintiff alleged "he did not receive what he bargained for."[15] The court found the plaintiff suffered an injury in fact sufficient to bring a UCL cause of action.[16]

Here, students who were deceived by Heald's inflated placement rates can plausibly argue that they got far less than they bargained for, thus suffering an economic injury. Judging the quality and value of education is a notoriously difficult task. It would be reasonable for prospective students to look at placement rates (especially placement rates disclosed under legal requirements) as one significant benchmark of quality. For example, a student selecting a medical assistant training program might well have looked differently at Heald's offering had he known that the placement rate was 33% rather than the advertised 78 %. *See* Heald Fine Letter of April 14, 2015 at 9-10. The prospective

---

[11] *Id.* at 329-30.
[12] 275 F.R.D. 282, 286 (C.D. Cal. 2011).
[13] 461 F.Supp.2d 1121, 1156 (C.D. Cal. 2006).
[14] *Id.*
[15] *Id.* at 1155.
[16] *Id.* at 1156. *See also Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1106 (9th Cir. 2013), *as amended on denial of reh'g and reh'g en banc* (July 8, 2013) (consumer alleged economic harm where he purchased merchandise advertised as having been marked down from a fictitious original price; "the bargain hunter's expectations about the product he just purchased is *precisely* that it has a higher perceived value and therefore has a higher resale value.")

DOE_00003360

*Privileged/Deliberative/Confidential*
*Attorney-Client Communication*

student might have determined the Heald program was not worth the offering price. (A factual note is relevant here: the tuition at Heald was significantly higher than at community colleges. Indeed, one argument we have heard is that some students have said that had they known the actual success rate of the Corinthian schools, they would have chosen community colleges.)

The reputational and credentialing purpose of education further supports the argument that an inflated placement rate was part of what a purchaser might have valued in selecting a Heald program. Besides the training one receives in one's education, part of the utility of a degree is what it represents to others. According to some, Heald enjoyed a relatively good local reputation. It is over 100 years old and was regarded as the best asset among the Corinthian chains. That reputation is largely in tatters with the Department of Education's revelations about the school's inflated placement rates. Had students known the true placement rates in the Heald programs, they would have known that Heald's reputation was inflated beyond its reality, and they might have judged that the value of their credential was vulnerable to significant deflation if the truth were discovered. In this sense, too, then, students got far less than they bargained for, and this loss will be suffered every time one shows a resume that shows a Heald degree.

## C.    Borrowers Actually Relied on Heald's Misrepresentations In Deciding Whether to Enroll in a Heald Program.

To have standing for a cause of action under the UCL, a borrower would have to demonstrate that they actually relied on the misrepresentations made by Heald when deciding to enroll in a Heald program. If borrowers could attest to the fact that their decision to enroll in a Heald program was influenced in part by the material misrepresentations in Heald's promotional or recruiting materials, advertisements, or program brochures, then they would establish this element.

### 1.   California legal standard

To recover under the UCL, plaintiffs must demonstrate that a defendant's misrepresentations were an immediate (but not necessarily the only) cause of the injury-producing conduct. *In re Tobacco II Cases*, 207 P.3d 20, 39 (Cal. 2009). That is, "[i]t is not ... necessary that the plaintiff's reliance upon the truth of the fraudulent misrepresentation be the sole or even the predominant or decisive factor influencing his conduct.... It is enough that the representation has played a substantial part, and so had been a substantial factor, in influencing his decision." *Id.* (internal quotation marks omitted).

"Moreover, a presumption, or at least an inference, of reliance arises wherever there is a showing that a misrepresentation was material." *Id.* California courts have held that plaintiffs could recover under the UCL when a defendant's prolonged and misrepresentation-laden advertising campaign "influenced and reinforced" a plaintiff's injury. *Id.* at 40. *See also id.* ("Furthermore, where, as here, a plaintiff alleges exposure to a long-term advertising campaign, the plaintiff is not required to plead with an unrealistic degree of specificity that the plaintiff relied on particular advertisements or statements.")

4

DOE_00003361

*Privileged/Deliberative/Confidential*
*Attorney-Client Communication*

In sum, a plaintiff must plead and prove actual reliance to recover under the UCL, but "is not required to necessarily plead and prove individualized reliance on specific misrepresentations or false statements where, as here, those misrepresentations and false statements were part of an extensive and long-term advertising campaign." *Id.* at 40-41. And "an allegation of reliance is not defeated merely because there was alternative information available to the consumer-plaintiff." *Id.* at 40.

### 2. Analysis

This analysis assumes that, *before deciding to enroll in a Heald program,* a borrower was exposed to materials containing Heald's material misrepresentations about placement rates for a particular program or for programs offered by the Heald campus in which they enrolled. The Department's findings establish that material misrepresentations were made for all Heald programs and campuses in the following time periods:

- INSERT TIME WINDOWS

Accordingly, to qualify for recovery under borrower defense, a borrower would need to attest that the relevant facts are true for that borrower. A draft attestation is included in the Appendix.

Applying the law to the facts here requires different analyses for two types of such borrowers: (i) those that enrolled in a program for which Heald published inaccurate placement rates; and (ii) those that enrolled in Heald programs without published placement rates at campuses where extensive misrepresentations were made.

#### i. Borrowers enrolled in Heald programs with false placement rates.

The analysis is relatively simple for a borrower in the first category. To recover under the UCL, this type of borrower would argue that the misleading placement rates he was exposed to for a given Heald program "played a substantial part … in influencing his decision" to enroll in that program before he made that decision. *In re Tobacco II Cases*, 207 P.3d at 39. Similarly, the borrower could argue that Heald's misrepresentations in its extensive advertisements or materials "influenced and reinforced" his decision to enroll. *Id.* at 40.

Specifically, such a borrower would argue that seeing the seemingly high job placement rates of a particular Heald program in an advertisement or in recruiting materials made the program more attractive—especially as compared to similar programs offered by other colleges. That seemingly high placement rate reasonably led that borrower to choose Heald and enroll in that program, in the hopes of getting a job in that field upon graduation or completion. This would establish reliance under the UCL.

#### ii. Borrowers enrolled in other programs on Heald campuses where extensive misrepresentations were made.

Borrowers in the second category would make a slightly more nuanced argument. Such borrowers likely would not argue that they chose Program X because Heald misrepresented the job placement rates for Program Y. But they could persuasively argue

DOE_00003362

*Privileged/Deliberative/Confidential*
*Attorney-Client Communication*

that they relied on Heald materials that included material misrepresentations as evidence of the quality of their chosen program. Heald published misleading placement rates for many different programs—including very similar programs to the ones they selected—which would give rise to the false impression that a borrower's chosen program was of a higher quality than it actually was. Further, this type of borrower could argue that he believed that all of Heald's programs offered by a given campus were high quality because all of the placement rates disclosed for programs at that campus were seemingly high.

Heald published placement rates for multiple programs at every one of its campuses across California, Hawaii and Oregon. And as the Department found, <u>all</u> of Heald's placement disclosures contained inherently misleading flaws. For example, the Department determined "that in all of its placement disclosures, Heald failed to disclose that it counted as placed graduates who had obtained their jobs prior to graduation from the school, and in some cases, graduates who had obtained their jobs prior to the date they commenced their studies at Heald." Heald fine letter at 7. Further, "although Heald claimed in all of its placement rate disclosures that the students reported as placed were employed in their field of study, … in fact, Heald routinely and misleadingly characterized out-of-field placements jobs as in-field placements." Heald fine letter at 8.

Based in part on their extensive and pervasive nature, these misrepresentations in Heald promotional or recruiting materials were likely to deceive prospective students. *See Committee on Children's Television, Inc. v. General Foods Corp.*, 673 P.2d 660, 668 (Cal. 1983), superseded by statute, 2004 Cal. Legis. Serv. Prop. 64, on other grounds, as recognized in *Branick v. Downey*, 138 P.3d 214 (Cal. 2006) (holding that business practices are fraudulent if they are likely to deceive the general public).

> **Comment [UDoE1]:** This probably fits better in section A discussing how Heald's false placement rates constitute unfair competitive practices under the UCL. We can move it around as needed for a more fleshed out memo.

Accordingly, if false placement rates published by Heald in materials or advertisements "played a substantial part" in a borrower's decision to enroll in any Heald program, that borrower could establish reliance under the UCL.

### 3. Department precedent supports this interpretation.

It should be noted that Department precedent supports making an inference that an extensive pattern of misrepresentation affected students beyond those in the specific programs where misrepresentations were discovered. In the IBC case, 18 students were enrolled in programs for which a prior of admission of fraud did not exist and were successful in raising their defenses. In examining the claims of these 18 students, the Department's Office of General Counsel found that "it is reasonable to infer that if IBC was engaging in fraud and making material misstatements with regard to instructors' qualifications, quality of the equipment, graduate placement rate, and accreditation with respect to five other programs, that it did so with respect to other programs as well." OGC Interstate Business College Memo at 7 (February 10, 2003).

DOE_00003363

*Privileged/Deliberative/Confidential*
*Attorney-Client Communication*

**D. California, Oregon, and Hawaii Heald students have standing under the UCL**

Any person "who has suffered injury in fact and has lost money or property as a result of the unfair competition" has standing to bring a claim under the UCL.[17]  The California Supreme Court clarified the UCL's standing requirement in *Kwikset v. Superior Court*: "A consumer who relies on a product label and challenges a misrepresentation contained therein can satisfy the standing requirement of Section 17204 by alleging…that he or she would not have bought the product but for the misrepresentation."[18] Students attending Heald programs in California can demonstrate standing by alleging that they relied on misrepresentations made by Heald regarding job placement rates for its program graduates in choosing to attend Heald.

California courts have interpreted the UCL to apply only to violations occurring inside the state.[19]  While the UCL is restricted to wrongful conduct occurring in California, courts have found that injured non-residents have standing to assert UCL claims for such conduct provided they allege that the conduct occurred in the state.[20]  In analyzing whether non-residents can show their claims concern violations committed in California, courts consider "where the defendant does business, whether the defendant's principal offices are located in California… and the location from which advertising and other promotional literature decisions were made."[21]  Federal courts examining non-resident UCL claims as part of class action suits have determined that non-residents demonstrated standing under the UCL when at least one of these factors was met.[22]

Accordingly, non-resident students at the Heald campuses in Hawaii and Oregon can demonstrate standing under the UCL  by alleging that they relied on misrepresentations about Heald's job placement rates in choosing to attend Heald and those misrepresentations originated from Heald or Corinthian Colleges, Inc. offices in California. In analyzing the factors articulated by courts evaluating non-resident UCL

---

[17] CAL. BUS. & PROF. CODE §17204.
[18] *Kwikset Corp. v. Superior Court*, 246 P.3d 877, 885 (Cal. 2011).
[19] *Norwest Mortgage, Inc. v. Superior Court*, 85 Cal.App.4th 214, 222 (1999)("We do not construe a statute as regulating occurrences outside the state unless a contrary intention is clearly expressed or reasonably can be inferred from the language or purpose of the statute [citation omitted]…it [the UCL] contains no express declaration that it was designed or intended to regulate claims of non-residents arising from conduct occurring entirely outside of California.")
[20] *Id.* (Allowing non-resident members of class action to assert UCL claims related to the collection of insurance premiums in California).
[21] *In re Clorox Consumer Litigation*, 894 F.Supp.2d 1224, 1237 -1238 (N.D.Cal., 2012) (citing *In re Toyota Motor Corp.*, 785 F.Supp.2d 883, 917 (C.D.Cal.2011)).
[22] *See Forcellati v. Hyland's, Inc.*, 876 F.Supp.2d 1155, 1160 (C.D. Cal. June 1, 2012) (applying UCL extraterritorially where defendant's headquarters were located in California); *see also In re Clorox*, 894 F.Supp.2d at 1237–38 (applying UCL to nationwide class where defendant "conduct[ed] substantial business in California and ha[d] its principal place of business and corporate headquarters in the state, decisions regarding the challenged representation were made in California, [defendant's] marketing activities were coordinated at its California headquarters...").

DOE_00003364

*Privileged/Deliberative/Confidential*
*Attorney-Client Communication*

claims, facts presently available indicate that Heald students from Hawaii and Oregon could demonstrate that Heald primarily did business in California,[23] Heald's corporate office was located in California,[24] and public disclosure materials with Heald's misrepresented job placement rates were published out of Corinthian Colleges, Inc.'s California office.[25]

Heald's communications and interactions with the U.S. Department of Education's Federal Student Aid (FSA) office further indicate that Heald's primary business operations were based in California. Heald's required program disclosures with FSA describe Heald's main location as based in San Francisco with additional locations in Hawaii and Oregon.[26] In signing its current program participation agreement (PPA) with the Department in June 2013, Heald agreed to the merger of all of its campuses into one participating entity (based at its main location in California) with one identification number for the purpose of monitoring Heald's compliance with Title IV requirements and implicitly agreed that the main campus (based in California) would be held responsible for the actions of its additional campuses in Hawaii and Oregon.[27]   These facts are likely to be sufficient as the basis for non-resident Heald students alleging violations of the UCL. ED does not have enough information about Heald's operations to know with certainty that the misrepresentations made to Heald's Hawaii and Oregon students can be traced back to California. However, for purposes of establishing a cause of action pursuant to 34 C.F.R. § 685.206 (c), Heald students in Hawaii and Oregon must only sufficiently allege that Heald's conduct originated in or had strong connections to California.[28]

**E.  Statute of Limitations**

In 2013, the California Supreme Court resolved a split regarding whether Section 17208's four-year statute of limitations was rigid, or whether the discovery rule and other equitable doctrines applied to UCL claims. In *Aryeh v. Canon Business Solutions*, the court held the discovery rule applied, and thus the statute of limitations only begins accruing "when a reasonable person would have discovered the factual basis for a claim."[29] Because a reasonable person would not have known about Heald's placement

---

[23] *See* Corinthian College, Inc. Press Release, 4/26/2015, available at http://www.cci.edu/update.php. (noting 10 Heald locations in California, one campus in Hawaii, and one campus in Oregon).
[24] Heald College, LLC is registered with the California, Hawaii, and Oregon secretaries of state as having its principal place of business or mailing address in California.
[25] Corinthian College, Inc., "Program Disclosures," 7/1/2012.
[26] *Id.*
[27] *See* U.S. Dept of Educ., Denial of Recertification Application to Participate in the Federal Student Financial Assistance Programs, p. 3, n.3, 8/22/2014.
[28] *In re Mattel, Inc.*, 588 F.Supp.2d at 1119 ("While these connections may, after a more thorough development of the facts, prove to be specious or irrelevant, the Court finds that the alleged California connections are sufficient to state claims by non-California plaintiffs").
[29] 55 Cal.4th 1185, 1195-96 (Cal. 2013).

DOE_00003365

*Privileged/Deliberative/Confidential*
*Attorney-Client Communication*

rate violations until ED's Heald fine letter, published April 14, 2015, no claims based on those misrepresentations are now barred by the statute of limitations.

**II. Remedy: Borrowers who satisfy the elements of the UCL as described above are entitled to restitution of the full amounts they paid to Heald.**

The UCL expressly allows restitution.[30] Courts "may make such orders or judgments…as may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition."[31] Under the UCL, restitution is the only form of monetary relief available in a private action; damages are not recoverable.[32] Restitution for violations of the UCL is not mandatory but there appear to be few cases where a California court made of finding of liability and did not order restitution.[33]

California courts have broad powers to fashion restitutionary relief for violations of the UCL.[34] The California Supreme Court stated the test for restitution "is to restore plaintiff to the status quo ante."[35] It does not matter if the interest in money or property was never in the possession of the consumer, only that the consumer was entitled to that interest.[36]

The case law describes the UCL's restitutionary goals, but offers little instruction on how to prove a claim for restitution or how to specifically compute the amount of restitution. *Colgan v. Leatherman Tool Group, Inc.*[37] provides some guidance. The amount of a restitution award "must be supported by substantial evidence;" the court's discretion is "not unlimited;" and the court's discretion "does not extend beyond the boundaries of the parties' evidentiary showing."[38]

A restitution award may be properly calculated as the full amount of money obtained through unfair business practices.[39] In *Fladboe v. American Isuzu Motors, Inc.*, a trial

---

[30] CAL. BUS. & PROF. CODE §17203.
[31] *Id.*
[32] *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal.4th 1134 (1999); *see also Clark v. Superior Court*, 50 Cal.4th 605, 613 (2010) ("The only monetary remedy available in a private action under the unfair competition law is restitution.")
[33] *Cortez v. Purolator Air Filtration Prods.*, 23 4th 163, 180-81 (2000)(" Section 17203 does not mandate restitutionary or injunctive relief when an unfair business practice has been shown."). *But see Olson v. Cohen*, 106 Cal.App.4th 1209 (2003)(Holding that restitution was inappropriate where law firm client had not relied on law firm claim that it had registered as corporate entity in seeking legal services or was injured by the delay in registration).
[34] *See People v. Sup. Ct. (Jayhill Corp.)*, 507 P.2d 1400, 1402 (Cal. 1973)(" A court of equity may exercise the full range of its inherent powers in order to accomplish complete justice between the parties, restoring if necessary the Status quo ante as nearly as may be achieved).
[35] *Pineda v. Bank of America, N.A.*, 241 P.3d 870, 878 (Cal. 2010).
[36] *Id.*
[37] 38 Cal.Rptr.3d 36 (Cal. Ct. App. 2006).
[38] *Id.* at 700.
[39] *Fladboe v. American Isuzu Motors, Inc.*, 150 Cal.App.4th 42 (2007).

DOE_00003366

*Privileged/Deliberative/Confidential*
*Attorney-Client Communication*

court awarded Isuzu the full amount it paid in sales incentives to a dealership that
misrepresented itself to buyers as an authorized Isuzu dealer.  The dealership challenged
the trial court's award because Isuzu "did not show that it could have earned more from
any other dealer had it sold the vehicles and parts to another dealer."[40] The *Fladboe*
court, noting that "measure of recovery is restitution, not damages," held that the trial
court correctly ordered the dealership to return the money it obtained from Isuzu through
its misrepresentations.[41] Importantly, the court did not consider lessening the restitution
award based on the fact that the dealership had sold vehicles and parts for Isuzu, and
ostensibly, passed some part of those profits to Isuzu.

> **Comment [BS2]:** This point was actually not mentioned in the case so I am inferring that Isuzu made money off of the vehicles sold (why else would they give the dealership sales incentives?) but wanted to point this out if we think it's going too far.

Here, students paid money, often through federal loans, to Heald as a result of its
misrepresentations about the quality of its programs.  Like the dealership in *Fladboe*,
Heald falsely represented itself as an institution with certain qualities; i.e., high job
placement rates.  The restitution award for Heald students, like Isuzu, should be the full
amount of money obtained by Heald through its misrepresentations. The fact that some
Heald students may have reaped some benefits from their Heald education should not
discount the restitution amount awarded to students. The goal of restitution under the
UCL is to restore the plaintiff to his or her financial position prior being subjected to the
unfair practice not awarding an amount equivalent to the amount of damages suffered by
the plaintiff.

Following the reasoning in *Fladboe*, Heald students should receive the amount paid to
Heald, through loans, to attend its programs; i.e., tuition and fees.  Restitution under the
UCL would only return to students the amount of money, paid through Direct loans,
directly to Heald. This amount is likely less than the amount students took out in federal
Direct loans as students are permitted to obtain loans to cover the full cost of attendance
associated with their education, including room and board, books, and transportation.[42]
Any amount above that paid to and retained by Heald would likely be considered
damages and, therefore, disallowed under the DCL.[43]

---

[40] *Id.* at 68.
[41] *Id.*
[42] U.S. Department of Education, "Using the Loan for Educational Expenses," available at
http://www.direct.ed.gov/inschool.html.
[43] *Korea Supply Co.*, 29 Cal.4th 1134 (1999).

DOE_00003367

*Privileged/Deliberative/Confidential*
*Attorney-Client Communication*

## APPENDIX: DRAFT ATTESTATION

To qualify for relief, each borrower must affirmatively attest (e.g., by clicking a box or choosing an option on a drop-down menu) to the following, under penalty of perjury:

1. I attended a Heald College campus in the time range between START DATE (2010?) and END DATE (2/13/14?)
2. Prior to enrolling (or prior to making my decision to enroll) at Heald, I was exposed to one of the following:
   a. Recruitment materials provided by Heald representatives that included job placement rates for program graduates;
   b. Brochures advertising academic programs on Heald campuses that included information about job placement rates for program graduates;
   c. Print or online advertisements that described the quality of a Heald program degree or certificate in part by referring to job placement rates for graduates.
3. The information I read or learned about job placement rates for Heald graduates played a substantial part in my decision to enroll in Heald.
4. I took out federal student loans to cover the cost of attendance of the Heald program.

11

DOE_00003368

*Privileged/Deliberative/Confidential*

Draft of May 14, 2015

## I.      Elements of the UCL applied to Heald Borrowers

### A. The misrepresentation of placement rates identified in ED's Heald fine letter constitutes unfair competition under the Unfair Competition Law.

The UCL prohibits unfair competition, which it defines in a number of categories established by the UCL.  A business practice need only fall under one of these categories to constitute unfair competition.[1]

1.   Heald's misrepresentation of placement rates violated federal law, specifically, 34 C.F.R. § 668, as determined by ED.  The UCL defines unfair competition to include any "unlawful…business act or practice."  The Legislature intended unfair competition "to include anything that can properly be called a business practice and that at the same time is forbidden by law."[2] If a business practice violates any law, this is *per se* a UCL violation.[3] Therefore, Heald's misrepresentations constitute unlawful business practices and unfair competition under the UCL.

2.   Heald's misrepresentation of placement rates also constitute fraudulent business practices under the UCL, another form of unfair competition.  To show that a business practice is fraudulent, "it is necessary only to show that members of the public are likely to be deceived."[4] The UCL does not require knowledge of misrepresentation (scienter) or intent to defraud, as is required for fraudulent deceit under the California Civil Code.[5] True statements are actionable under the UCL if they are presented in a manner likely to mislead or deceive consumers, including by the omission of relevant information.[6]

In the Heald fine letter, ED found as follows:
> Heald's inaccurate or incomplete placement rate disclosures were misleading or false; [] they overstated the employment prospects of graduates of Heald's programs; and [] current and prospective graduates of Heald could reasonably have been expected to rely to their detriment upon the information in Heald's placement rate disclosures.

---

[1] *Cel-Tech Communications v. Los Angeles Cellular Telephone Co.*, 973 P.2d 527, 540 (Cal. 1999).

[2] *Bank of the West v. Superior Court*, 833 P.2d 545, 553 (Cal. 1992) (citations omitted).

[3] *See Kasky v. Nike*, 45 P.3d 243, 249 (Cal. 2002); *see also People v. E.W.A.P. Inc.*, 165 Cal.Rptr. 73, 75 (Cal. Ct. App. 1980).

[4] *Committee on Children's Television, Inc. v. General Foods Corp.*, 673 P.2d 660, 668 (Cal. 1983)35 Cal.3d 197, 211 (Sup. Ct. 1983) superseded by statute, 2004 Cal. Legtis. Serv. Prop. 64 on other grounds, as recognized in *Branick v. Downey*, 138 P.3d 214 (Cal. 2006). Note: The "likely to be deceived" standard does not establish a private plaintiff's standing.

[5] CAL. CIV. C. § 1709.

[6] *Boschma v. Home Loan Center*, 129 Cal.Rpt.3d 874, 893 (Cal. Ct. App. 2011).

*Privileged/Deliberative/Confidential*
*Attorney-Client Communication*

Heald fine letter at 10. This finding places Heald's misrepresentations squarely within the UCL's definition of fraudulent business practices and thus within its definition of unfair competition.

3. Heald's misrepresentation of placement rates may also be unfair competition under two other prongs of 17200, "unfair, deceptive or untrue advertising" and "unfair...business act or practice." The advertising prong is considered to be very similar to the fraudulent business practice prong. *See* Stern, Business and Professional Code § 172000 Practice at 3-70 (2015).

   Regarding unfair business practices, "[t]he state of the law...is somewhat unsettled."[7] However, the trend appears to be in favor of using section 5 of the Federal Trade Commission Act ("FTCA") to define unfairness. To find unfairness under the FTCA: (1) The consumer injury must be substantial; (2) the injury must not be outweighed by any countervailing benefits to consumers or competition; and (3) it must be an injury that consumers themselves could not reasonably have avoided.[8] "... [C]onsumers cannot have reasonably avoided the injury . . . if their free market decisions were unjustifiably hampered by the conduct of the seller."[9] The placement rate misrepresentations at issue here easily could be described as meeting these standards.

**B. Borrowers who relied on Heald's misrepresented placement rates in deciding to attend Heald programs suffered economic harm.**

Section 17204 requires that an individual seeking relief under the UCL have "suffered injury in fact and [have] lost money or property as a result of" the unfair completion of which the person complains. In *Kwikset v. Superior Court*, the California Supreme Court set out numerous ways a consumer can show economic injury and meet these requirements. "A plaintiff may (1) surrender in a transaction more, or acquire in a transaction less, than he or she otherwise would have; (2) have a present or future property interest diminished; (3) be deprived of money or property to which he or she has a cognizable claim; or (4) be required to enter into a transaction, costing money or property, that would otherwise have been unnecessary."[10]

Regarding false labeling, the *Kwikset* court also stated,
   A consumer who relies on a product label and challenges a misrepresentation contained therein can satisfy the standing requirement of section by alleging, as plaintiffs have here, that he or she would not have bought the product but for the misrepresentation. That assertion is sufficient to allege causation—the purchase would not have been made but for the misrepresentation. It is also sufficient to allege economic injury. From the original purchasing decision we know the consumer

---

[7] *Davis v. Ford Motor Credit Co.*, 101 Cal.Rptr.3d 697, 706 (Cal. Ct. App. 2009).
[8] *Id.* at 709.
[9] *Camacho v. Automobile Club of Southern California*, 48 Cal.Rptr.3d 770, 777-78 (Cal. Ct. App. 2006).
[10] *Kwikset Corp.*, 246 P.3d at 885-86.

DOE_00003370

*Privileged/Deliberative/Confidential*
*Attorney-Client Communication*

valued the product as labeled more than the money he or she parted with; from the complaint's allegations we know the consumer valued the money he or she parted with more than the product as it actually is; and from the combination we know that because of the misrepresentation the consumer (allegedly) was made to part with more money than he or she otherwise would have been willing to expend, *i.e.*, that the consumer paid more than he or she actually valued the product. That increment, the extra money paid, is economic injury and affords the consumer standing to sue.[11]

Other cases have made clear that a consumer suffers economic harm when he or she makes a purchase in reliance on false representations and thereby is denied benefits or value promised by the seller. For example, a federal district court ruled in *Johnson v. Gen. Mills, Inc.* that a consumer satisfied the UCL's harm requirement based on his reliance on false statements about a food's health benefits. The court stated,

> [The plaintiff] has UCL … standing because he alleges that he bought YoPlus in reliance on General Mills' allegedly deceptive representations concerning the digestive health benefit of YoPlus as communicated by the second generation YoPlus packaging and a television commercial for YoPlus. He further asserts that he suffered economic injury because he purchased YoPlus but did not receive the promised digestive health benefit.[12]

In *Daghlian v. DeVry University, Inc.*, plaintiff student enrolled at the school and incurred debt "in reliance on defendants' misrepresentations and omissions about the transferability of credits."[13] Plaintiff did not attempt to transfer the credits, and he did not allege that he had to restart his education at a different school.[14] Plaintiff alleged "he did not receive what he bargained for."[15] The court found the plaintiff suffered an injury in fact sufficient to bring a UCL cause of action.[16]

Here, students who were deceived by Heald's inflated placement rates can plausibly argue that they got far less than they bargained for, thus suffering an economic injury. Judging the quality and value of education is a notoriously difficult task. It would be reasonable for prospective students to look at placement rates (especially placement rates disclosed under legal requirements) as one significant benchmark of quality. For example, a student selecting a medical assistant training program might well have looked differently at Heald's offering had he known that the placement rate was 33% rather than the advertised 78 %. *See* Heald Fine Letter of April 14, 2015 at 9-10. The prospective

---

[11] *Id.* at 329-30.
[12] 275 F.R.D. 282, 286 (C.D. Cal. 2011).
[13] 461 F.Supp.2d 1121, 1156 (C.D. Cal. 2006).
[14] *Id.*
[15] *Id.* at 1155.
[16] *Id.* at 1156. *See also Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1106 (9th Cir. 2013), *as amended on denial of reh'g and reh'g en banc* (July 8, 2013) (consumer alleged economic harm where he purchased merchandise advertised as having been marked down from a fictitious original price; "the bargain hunter's expectations about the product he just purchased is *precisely* that it has a higher perceived value and therefore has a higher resale value.")

3

*Privileged/Deliberative/Confidential*
*Attorney-Client Communication*

student might have determined the Heald program was not worth the offering price. (A factual note is relevant here: the tuition at Heald was significantly higher than at community colleges. Indeed, one argument we have heard is that some students have said that had they known the actual success rate of the Corinthian schools, they would have chosen community colleges.)

The reputational and credentialing purpose of education further supports the argument that an inflated placement rate was part of what a purchaser might have valued in selecting a Heald program. Besides the training one receives in one's education, part of the utility of a degree is what it represents to others. According to some, Heald has enjoyed a relatively good local reputation. It is over 100 years old and was regarded as the best asset among the Corinthian chains. That reputation is largely in tatters with the Department of Education's revelations about the school's inflated placement rates. Had students known the true placement rates in the Heald programs, they would have known that Heald's reputation was inflated beyond its reality, and they might have judged that the value of their credential was vulnerable to significant deflation if the truth were discovered. In this sense, too, then, students got far less than they bargained for, and this loss will be suffered every time one shows a resume that shows a Heald degree.

**E. Statute of Limitations**

In 2013, the California Supreme Court resolved a split regarding whether Section 17208's four-year statute of limitations was rigid, or whether the discovery rule and other equitable doctrines applied to UCL claims. In *Aryeh v. Canon Business Solutions*, the court held the discovery rule applied, and thus the statute of limitations only begins accruing "when a reasonable person would have discovered the factual basis for a claim."[17] Because a reasonable person would not have known about Heald's placement rate violations until ED's Heald fine letter, published April 14, 2015, no claims based on those misrepresentations are now barred by the statute of limitations.

---

[17] 55 Cal.4th 1185, 1195-96 (Cal. 2013).

DOE_00003372

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
DRAFT/PREDECISIONAL

To:    Under Secretary Ted Mitchell

From:  Borrower Defense Unit

Date:  October 20, 2016

Re:    Recommendation for Borrower Defense Relief for Heald College Borrowers Alleging
       Transfer of Credit Claims

The Borrower Defense Unit proposes loan relief for students who enrolled in degree, certificate or Associate in Applied Science ("AAS") programs at the California campuses of Heald College after the school was acquired by Corinthian Colleges, Inc. ("Corinthian")[1], and who state that Heald misrepresented their ability to transfer to other schools after completing a degree at Heald. Heald made false and misleading representations to these students that they could generally transfer their credits, including to schools in the California State University ("CSU") system. These students are eligible for relief under the borrower defense regulation, 34 C.F.R. § 685.206(c), because these misrepresentations constitute a valid consumer protection claim under California's Unfair Competition Law ("UCL"). Moreover, full loan discharges, subject to the UCL's four-year statute of limitations, are appropriate in this circumstance given the lack of value conferred by Heald credits and/or degrees. Such relief is consistent with the Department's prior borrower defense relief to Corinthian borrowers.

## I.    Heald Represented That Heald Credits Were Transferable And Would Permit Students to Transfer to the CSU System To Earn A Bachelor's Degree

Numerous borrowers report that Heald representatives told them that attending Heald would permit them to transfer into other schools, particularly in the CSU system, and that their Heald credits would be accepted by those schools. Moreover, documents collected by the California AG's office and submitted in support of a default judgment against Heald corroborate these students' general transferability claims.

### A.    Oral Representations of Transferability

In a recent review of 738 borrower defense ("BD") claims submitted by former students of Heald's California campuses, 49 students enrolled in degree, certificate or Associate in Applied Science ("AAS") programs seek borrower defense relief based on oral representations about their ability to transfer their Heald credits to other schools, particularly schools in the CSU system.[2] In addition, in sworn witness statements obtained by the California Attorney General's Office, seven former students of Heald allege that school staff made oral representations that credits earned at Heald would transfer to other colleges and universities.[3] Heald borrowers seeking BD relief report that school representatives orally promised that they would be able to

---

[1] Further research needs to be conducted regarding the falsity of Heald's representations to students at its two non-California campuses, in Honolulu, Hawaii and Portland, Oregon.

[2] Our review of Heald claims is ongoing and we anticipate reviewing additional BD applications making transferability allegations.

[3] *See* Declaration of Nancy Quach, AGPA, in Support of Plaintiff's Application for Entry of Default Judgment Against All Defendants, *California v. Heald et al.* (Mar. 14, 2016) ("Quach Decl."), Ex. 105-11.

1

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
DRAFT/PREDECISIONAL

transfer to other schools and use their Heald credits towards a degree at those schools.  For example, borrowers state the following:

1. "When I first enrolled at Heald College in March of 2010, I explained to my representative that was assigned to me, that I wanted to go to Fresno State for my Bachelors Degree after graduating from Heald and while working...I was told by Elias Astuto my Heald Representative, that all of my credits would transfer to Fresno State..."[4]

2. "Also throughout my time at Heald I was told they are accredited (which I believe they were) and that if we wanted to continue our education at Fresno State (for example) our credits would transfer and we could continue our education.  What they failed to tell us Is that when you go to apply to Fresno State they do not accept any of your units as they are not accredited the same as Heald led you to believe.  We had meetings with the head of Heald's financial aid department and I remember a student asked 'will my units transfer to Fresno State' without hesitation he stated 'Yes they will transfer.'"[5]

3. "They had told me I was going to be able to transfer to a university such as San Jose State."[6]

4. "I was told I would be able to transfer to any 4 year college with my Heald credits."[7]

5. "They lied saying I could take my credits anywhere if I decided to leave the school...They said I could transfer my credits anywhere which I found out later was a lie."[8]

6. "I was also told when i was done i could transfer out to any university."[9]

7. "they told me that all the classes i took from heald college will be transferred to other schools."[10]

8. "I was also informed by my admissions advisor that all of my credits would be completely transferable, which I also later found to be false."[11]

---

[4] Claim No. BD1614388.
[5] Claim No. BD154156.
[6] Claim No. BD152391.
[7] Claim No. BD1604229.
[8] Claim No. BD151373.
[9] Claim No. BD156458.
[10] Claim No. BD150682.
[11] Claim No. BD1619101.

DOE_00003374

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
DRAFT/PREDECISIONAL

**B.    Corroborating Written Representations of Transferability**

The Heald website and promotional materials corroborate and/or support students' reports of oral assurances that they would be able to transfer to other schools and use their Heald credits towards a degree at those schools.[12]  Heald's marketing materials contain the following statements:

1.    The Heald website advertised that, "Because Heald is regionally accredited, it has articulation agreements with other regionally accredited institutions that accept Heald credits toward bachelor's degree programs.  This means that you can transfer your credits if you choose to pursue further education."[13]

2.    The website also stated:  "For those students who transfer coursework from Heald to apply to a higher degree, Heald has articulation agreements or documented transfer practices with several accredited institutions that accept Heald credits toward bachelor's degree programs."[14]  Moreover, the website listed the "California State University (CSU) system" and seven specific schools in the CSU system as schools with which Heald has articulation agreements and/or documented transfer practices.

3.    On another page on the Heald website, the "California State University (CSU) system" and eight specific CSU campuses were described as "Partner Schools," along with the statement "For students who want to transfer coursework from Heald to apply to a higher degree, Heald has articulation agreements or documented transfer practices with several accredited institutions that accept Heald credits toward bachelor's degree programs.[15]

4.    The Heald College "Viewbook" promised: "use your Heald credits towards a bachelor's degree" and "*Heald has articulation agreements or documented transfer guidance with a number of accredited institutions that accept Heald credits toward bachelor's degree programs.  This allows students to transfer and apply coursework toward a higher degree.*"[16]  (emphasis added.)  The Viewbook listed the CSU system and seven specific CSU schools as institutions that had articulation agreements or documented transfer guidance with Heald.

As discussed further below in Section III.C., limited disclaimers attendant to the claims on the website and in the Viewbook fail to cure the deceptive net impression of the transferability claims Heald representatives made to students.

---

[12] The Heald written representations described in this section are attached as Exhibit A to this memorandum.  All red markings on the documents were made by the California AG.
[13] Quach Decl. Ex. 90.
[14] *Id.*
[15] Quach Decl. Ex. 91-92.
[16] Quach Decl. Ex. 94.

DOE_00003375

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
DRAFT/PREDECISIONAL

## II.  Heald's Representations of Transferability Were False and Misleading

Heald's representations that credits earned at Heald were generally transferable to other schools and would allow Heald students to transfer into the CSU system to earn a bachelor's degree were false and misleading.  Obtaining a Heald diploma, certificate or AAS degree did not permit students to transfer into the CSU system using Heald credits alone.  These students would have insufficient credits to transfer as upper-division transfer students, and the CSU schools generally only accept upper-division transfer students.  Therefore, as a practical matter, Heald credits were not transferable to the CSU system.

Significantly, in its answer to the California Attorney General's first amended complaint, Heald admitted that "students who complete Heald diploma, certificate, or AAS degree programs do not, without further coursework, appear to qualify for admission as upper division transfers to CSU."[17]  A review of Heald's Course Catalog and Transfer Guide confirms that the diploma and certificate programs did not provide the 90 quarter units that CSU schools require for upper-division transfers.[18]  The AAS degree programs required 100 quarter credits, but some of the courses within these programs were not considered "college level" by the CSU system, and therefore AAS degree program graduates also would not have the 90 quarter units required for an upper-division transfer.  Even if individual Heald credits were technically transferable to a CSU school, Heald students could not actually transfer their credits because they could not enroll as an upper-division transfer using just their Heald credits.

The falsity of Heald's representations about transfer into the CSU system is particularly significant for several reasons.  First, the CSU system is "California's primary undergraduate teaching institution" and the "greatest producer of bachelor's degrees"[19] in the state, making it likely that students who sought to transfer credits from Heald's California campuses would seek to transfer those credits to the CSU system.  Second, Heald's representations regarding transferability focused on the ease of transferring to the CSU system—its website and other marketing materials specifically discuss the process for transferring to the CSU system.

The California State University system's public statements confirm that, dating back to at least 2012, students typically cannot transfer to CSU as lower-division transfer students.  The California State University System's CSUMentor website contains a page with information for transfer applicants.  That page states:

> *Most CSU campuses do not accept lower-division transfers, so be sure to check with the campus if you are considering transferring as a lower-division student.*[20]

---

[17] The School's Amended Verified Answer to First Amended Complaint for Civil Penalties, Permanent Injunction, and Other Equitable Relief at ¶ 86(b), 26, *California v. Heald et al.*, No. CGC-13-534793 (Ca. Super. Ct. Mar. 17, 2014).

[18] "Heald College Transfer Guide," Student Guide to Transfer, 10/14/14 (Aug. 23, 2016), http://www.cci.edu/multimedia/closure/Heald-Student-Guide-to-Transfer.pdf;  Heald College Academic Catalog, Effective July 2014.

[19] "2016 Facts About the CSU," The California State University (Aug. 23, 2016), *available at* http://www.calstate.edu/csufacts/2016Facts/.

[20] "Transfer Applicant Overview and Definitions," CSU Mentor (May 31, 2016), https://secure.csumentor.edu/planning/transfer/ (emphasis added).

4

DOE_00003376

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
DRAFT/PREDECISIONAL

The CSU Lower-Division Transfer Requirements website further states: "Please be aware that most CSU campuses do not admit lower-division transfer students."[21]  In fact, twenty out of twenty-three individual CSU campuses report on their websites that they do not accept lower-division transfer students:

1. **Channel Islands**:  On a site entitled "Transfer Admission Requirements," the school states: "California State University Channel Islands (CI) accepts transfer applications for upper-division transfer students: students with more than 60 transferable semester units, or 90 transferable quarter units."[22]  The website does not mention the admission of lower-division transfer students.  The reasonable interpretation of this omission is that no lower-division transfer students are accepted.

2. **Chico**:  The school's "Eligibility Requirements" for transfer admissions website states: "Please Note: CSU, Chico is not accepting applications from lower-division transfer students (less than 60 units by the time of enrollment at CSU, Chico)."[23]

3. **Dominguez Hills**:  On a site entitled "Admissions Criteria for Transfer Students," the school lists only requirements for upper-division transfer students, and does not mention lower-division transfer students.[24]  The reasonable interpretation of this omission is that no lower-division transfer students are accepted.

4. **East Bay**:  The school's "Transfer Admission" page states "CSUEB only accepts applications from upper-division transfer students."[25]

5. **Fresno**:  The school's transfer website states "Fresno State does not accept lower division transfer students at this time."[26]

6. **Fullerton**:  Fullerton's "Transfer Undergraduate Students" website states that "CSU Fullerton does not accept lower division transfer applicants.[27]

---

[21] "Lower Division Transfer Requirements," CSU Mentor (May 31, 2016), https://secure.csumentor.edu/planning/transfer/lower_div.asp; *see also* Quach Decl. Ex. 95; and "Transfer Applicant Overview and Definitions," CSU Mentor (Dec. 10, 2012), https://web.archive.org/web/20121610333100/http://www.csumentor.edu/planning/transfer/lower_div.asp.
[22] "Transfer Admission Requirements," CSU (May 31, 2016), http://www.csuci.edu/admissions/transfer/ud-requirements.htm.
[23] "Eligibility Requirements: Transfer Students," California State University: Chico (May 31, 2016), http://www.csuchico.edu/admissions/want-to-apply/transfer/eligibility.shtml.
[24] "Admissions Criteria for Transfer Students," California State University: Dominguez Hills (May 31, 2016), http://www4.csudh.edu/admissions/transfer-students/admission-requirements/index.
[25] "Transfer Student Admission," California State University: East Bay (May 31, 2016), http://www.csueastbay.edu/prospective/how-to-apply/transfer-student-admission/; *see also* Quach Decl. Ex. 98.
[26] "Student Affairs and Enrollment Management," Fresno State (May 31, 2016), http://www.fresnostate.edu/studentaffairs/outreach/transfers/requirements.html; *see also* Quach Decl. Ex. 99.
[27] "Upper Division Transfers," California State University Fullerton (May 31, 2016), http://admissions.fullerton.edu/prospectivestudent/transferlocaladmissionarea.php.

DOE_00003377

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
DRAFT/PREDECISIONAL

7. **Humboldt:** The school's Admissions website for lower-division transfer students states "HSU is not currently accepting lower division transfer applications."[28]

8. **Los Angeles:** The "Transfer Admission" page of the school's website states "Cal State LA is currently not accepting lower division transfer applicants."[29]

9. **Monterey Bay:** The school's "Transfer Admissions" website states "Cal State Monterey Bay is currently not accepting lower division transfer students. You must meet the upper division requirements for admissions purposes."[30]

10. **Northridge:** On a site entitled "Apply Lower-Division Transfer Student," the school states "NOTE: Due to increased enrollment demands, Cal State Northridge does not currently admit lower-division transfer applicants. No exceptions are anticipated at this time."[31]

11. **Pomona:** The Pomona transfer admissions website includes the following statement: "NOTE: We are currently not accepting applications from Lower-Division Transfers - applicants who have completed less than 60 semester transferable college units (90 quarter units)."[32]

12. **Sacramento:** The "Transfer Admission" webpage on the Sacramento State website states: "CSU, Sacramento is not accepting applications from lower division transfers."[33]

13. **San Bernardino:** In a section called "Lower-Division Transfer Students" on its Transfer FAQs, the school states "CSUSB is not able to accept applications from or admit lower division transfer students."[34]

14. **San Diego:** San Diego State's Fall 2016 Admissions Criteria include the following: "SDSU accepts transfer applications only from upper-division transfer or readmission applicants who will have completed 60 or more transferable semester (or 90 or more quarter) units by the end of spring 2016. We do not

---

[28] "Lower Division Transfer Requirements," Humboldt State University (May 31, 2016), http://www2.humboldt.edu/admissions/apply/transfers/lowerdivision.html.

[29] "Transfer Admission," Cal State LA (May 31, 2016), http://www.calstatela.edu/admissions/transfer-admission.

[30] "Transfer Requirements," CSU Monterey Bay (May 31, 2016), https://csumb.edu/admissions/transfer-requirements; *see also* Quach Decl. Ex. 100.

[31] "Apply Lower Division Transfer Student," CSU Northridge (May 31, 2016), http://www.csun.edu/admissions-records/apply-lower-division-transfer-student.

[32] "Admission Requirements and Deadlines," CAL POLY POMONA (May 31, 2016), https://www.cpp.edu/~admissions/undergraduate/transfer/before/requirements-deadlines.shtml.

[33] "Transfer Admission," Sacramento State (May 31, 2016), http://catalog.csus.edu/10-12/first%20100%20pages/transferadmission.html; *see also* Quach Decl. Ex. 101.

[34] "Admissions and Student Recruitment," CSU San Bernardino (May 31, 2016), http://admissions.csusb.edu/transfer/h_transferstatus.shtml.

DOE_00003378

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
DRAFT/PREDECISIONAL

accept transfer applications from lower-division students with fewer than 60 transferable semester units."[35]

15. **San Francisco:**  On the transfer section of the school's website, the school provides: "SF State is not currently accepting applications from lower division transfer students. Freshman and sophomore students who have completed fewer than 60 transferable semester units (90 quarter units) are considered lower-division transfer students."[36]

16. **San Jose:**  On a page called "Lower division transfers (Freshmen/Sophomores)," the school notes that "SJSU no longer admits lower division transfers.  A lower division transfer has completed 59 transferable semester units (89 quarter units) or fewer."[37]

17. **San Luis Obispo:**  The school's Transfer Students Admissions website states: "Cal Poly does NOT accept applications for these categories: … Lower-division transfer applicants (less than 60 transferable semester units or 90 transferable quarter units upon transfer)."[38]

18. **San Marcos:**  Under the "Transfer" section of its website, the school states "California State University San Marcos accepts upper-division transfer student applications each year between October 1 and November 30 for admission to the following fall term."[39]  The website does not mention the admission of lower-division transfer students.  The reasonable interpretation of this omission is that no lower-division transfer students are accepted.

19. **Sonoma:**  Under "Fall 2016 Admissions" the school's website states "Lower Division Transfer – CLOSED."  Under "Spring 2017 Admissions" the website states "Closed to lower-division applicants."[40]

---

[35] "Fall 2016 Transfer Admission Criteria," San Diego State University (May 31, 2016), http://arweb.sdsu.edu/es/admissions/transfers/index.html.
[36] "How to Apply – Transfer," San Francisco State University (May 31, 2016), http://www.sfsu.edu/future/apply/transfer.html.
[37] Quach Decl. Ex. 102; *see also* "Lower Division Transfers," San Jose State University (May 31, 2016), http://info.sjsu.edu/web-dbgen/narr/admission/rec-7327.10793.html.
[38] "Transfer Students," Cal Poly San Luis Obispo (May 31, 2016), http://admissions.calpoly.edu/applicants/transfer/.
[39] "Transfer Student," California State University San Marcos (May 31, 2016), https://www.csusm.edu/admissions/how-to-apply/transfer/index.html.  This campus appears to accept out-of-state and international lower-division transfers, but not in-state lower-division transfers.  *See* "Out-of-State Students," California State University San Marcos (May 31, 2016), https://www.csusm.edu/admissions/how-to-apply/out-of-state/index.html.  Heald California students would be applying as California residents and therefore would not be able to obtain admission this way.
[40]"Filing Information, Dates, and Deadlines," Sonoma State University (May 31, 2016), http://www.sonoma.edu/admissions/filing.html; *see also* Quach Decl. Ex. 104, "Office of Admissions: Admission Requirements for Transfers," Sonoma State University (Jan. 28, 2014), http://www.sonoma.edu/admissions/ts/requirements.

DOE_00003379

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
DRAFT/PREDECISIONAL

20. **Stanislaus**: The Stanislaus website states that "[w]e are closed to Lower-Division Transfers (transfers with fewer than 60 semester/90 quarter units)" for both the Fall 2016 and Spring 2016 semesters.[41]

The only CSU schools that <u>do</u> appear to accept lower-division transfer students are CSU Bakersfield[42], the Maritime Academy, and CSU Long Beach. The Maritime Academy is a specialized school with a student body of less than 1,000 students offering six majors relating to the maritime industry.[43] CSU Long Beach only accepts lower-division transfers for a few majors.[44] CSU Bakersfield seems to be the only CSU institution that offers a standard undergraduate curriculum and accepts lower-division transfer students.

We also conducted a historical review of websites of seven CSU campuses identified by Heald as "partner schools" in the school's marketing materials. None of our research into the historical transfer policies at CSU campuses, dating as far back as 2010, suggests the policies described above have changed.[45]

In sum, it is nearly impossible for a student to transfer into the CSU system as a lower-division transfer student. Since no Heald degree, certificate or AAS graduate would have sufficient credits to qualify for transfer as an upper-division transfer student, representations that Heald graduates could transfer to the CSU system or specific CSU schools to "pursue further education" were false and misleading.[46]

---

[41] "Dates and Deadlines," Stanislaus State (May 31, 2016), https://www.csustan.edu/admissions/dates-deadlines.
[42] "Admission Requirements for Transfer Students," CSU Bakersfield (May 31, 2016), http://www.csub.edu/admissions/apply/transfer/admission_requirements/.
[43] "Academics," California State University Maritime (May 31, 2016), https://www.csum.edu/web/academics.
[44] "Lower Division Transfer Requirements," California State University Long Beach (May 31, 2016), http://web.csulb.edu/divisions/aa/catalog/current/admissions/ld_transfer_requirements.html.
[45] *See* "Eligibility Requirements, Transfer Students," CSU Chico (Jan. 5, 2010), https://web.archive.org/web/20110105090936/http://www.csuchico.edu/admissions/want-to-apply/transfer/eligibility.shtml ("Please Note: CSU, Chico is not accepting applications from lower-division transfer students (less than 60 units by the time of enrollment at CSU, Chico)."); "Transfer Student Admission," CSU East Bay (Apr. 9, 2010), https://web.archive.org/web/20100409052353/http://www20.csueastbay.edu/prospective/how-to-apply/transfer-student-admission/ ("Cal State East Bay no longer accepts applications from lower-division transfers."); "Transfer Requirements," CSU Fresno (November 17, 2012), https://web.archive.org/web/20121117011918/http://www.fresnostate.edu/studentaffairs/outreach/transfers/requirements.html ("Fresno State does not accept lower division transfer students at this time."); "Transfer Admission," CSU Sacramento (Aug. 18, 2010), https://web.archive.org/web/20100818083106/http://catalog.csus.edu/10-12/first%20100%20pages/transferadmission.html ("CSU, Sacramento is not accepting applications from lower division transfers."); "Lower division transfers (Frosh/Sophomore)," CSU San Jose (October 21, 2014), https://web.archive.org/web/20141021203825/http://info.sjsu.edu/web-dbgen/narr/admission/rec-7327.10793.html ("SJSU no longer admits lower division transfers."); "Office of Admissions: Admission Requirements for Upper-Division Transfers," CSU Sonoma (July 5, 2011), https://web.archive.org/web/20110705071536/http://sonoma.edu/admissions/ts/requirements (No process is described for lower division transfers); "Dates and Deadlines," CSU Stanislaus (Mar 29, 2014), https://web.archive.org/web/20140329215220/http://www.csustan.edu/admissions/dates-deadlines ("We are closed to Lower-Division Transfers").
[46] Heald's statements may have been particularly misleading to students seeking to transfer into the CSU system, given recent changes in the law governing the transfer of credits into the CSU system. On September 29, 2010 the Student Transfer Agreement Reform Act ("STAR Act") was signed into law, making it easier for students attending

DOE_00003380

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
DRAFT/PREDECISIONAL

It should be noted that there is an articulation agreement between Heald and the CSU system, which provides that certain Heald coursework will be accepted by CSU to meet certain general education requirements.[47]  Also, according to a higher education advisory publication listing the transfer credit practices of major public institutions, CSU Northridge did have a general policy of accepting Heald credits from certain Heald campuses.[48]  The possibility that some Heald courses might be transferable into the CSU system, however, does not change the misleading nature of Heald's transferability representations, because students who enrolled in Heald's diploma, certificate and AAS programs would never have enough credits from Heald to qualify for transfer admission into the CSU system in the first place.  The fact that some Heald credits might be transferable after a Heald student was accepted as a transfer into CSU is immaterial when the student could not transfer into CSU at all using Heald credits alone.

Heald California students also faced challenges trying to transfer to other institutions outside the CSU system.  For example, in reviewed applications students report that they were unable to transfer all or a majority of their credits to the following institutions:

1.  Modesto Junior College,[49]

2.  Contra Costa College,[50]

3.  University of California, Berkeley,[51] and

4.  Unnamed Nevada community college.[52]

In fact, one student stated that Everest College – another school owned by Corinthian – would not accept Heald credits.[53]  Other students reported that their credits were not transferable to the school they transferred to, but did not specify the institution.[54]

---

California public community colleges to transfer into the CSU system as an upper division student.  SB 1440 – Padilla.  This program went into effect in the 2011-2012 academic year.  Under that law, students who have earned a transfer associate degree at a public California community college are guaranteed junior standing and priority admission consideration over all other transfer students when applying to a CSU program that has been deemed similar to the student's community college program.  Once admitted to CSU, the transfer associate degree student will only be required to complete 60 additional units to earn a bachelor's degree in the program.  The misleading nature of Heald's statements about the ease of transferring to CSU may have been enhanced by the new law.
[47] *See* CSU General Education-Breadth Certification List for Heald College, last updated April 2010 *available at* https://www.calstate.edu/APP/documents/GeneralEducation/Heald-GE-Breadth-certifications.pdf.  An articulation agreement, as defined by the Higher Education Act, is an "agreement between or among institutions of higher education that specifies the acceptability of courses in transfer toward meeting specific degree or program requirements."  Section 486A of the Higher Education Act, 20 U.S.C. §1093a.
[48] *See* American Association of Collegiate Registrars and Admissions Officers, TRANSFER CREDIT PRACTICES OF DESIGNATED EDUCATIONAL INSTITUTIONS: AN INFORMATION EXCHANGE, 2012 and TRANSFER CREDIT PRACTICES OF DESIGNATED EDUCATIONAL INSTITUTIONS: AN INFORMATION EXCHANGE, 2015 (noting that Heald credits were transferable to CSU Northridge).
[49] Claim No. BD156389 (Heald Salida/Modesto student).
[50] Claim No. BD153784 (Heald San Francisco student).
[51] Claim No. BD152473 (Heald Heyward student).
[52] Claim No. BD150563 (Heald Stockton student).
[53] Claim No. BD154681 (Heald Concord student).

9

DOE_00003381

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
DRAFT/PREDECISIONAL

In sum, the nearly-universal inability of Heald diploma, certificate and AAS students to transfer into the CSU system, combined with student-submitted evidence of credits not transferring to other schools, establishes that Heald's representations of general transferability were false and misleading.

## III.   Application of the Borrower Defense Regulation Supports Eligibility and Full Relief for These Borrowers

Under the current borrower defense regulation, students must allege an "act or omission" of their school "that would give rise to a cause of action against the school under applicable State law" to be eligible for relief.[55] The applicable state law here is California's UCL, which prohibits a wide range of business practices that constitute unfair competition, including corporate misrepresentations. For the following reasons, the cohort of Heald students identified below applying for borrower defense relief predicated on Heald's transferability misrepresentations: 1) have standing under the California UCL; and 2) are eligible for relief under the "unlawful" and "fraudulent" prongs of the UCL. Moreover, given the lack of value conferred by Heald credits and/or degrees, these students should be granted full loan discharges and refunds of amounts already paid as applicable, subject to the UCL's four-year statute of limitations.[56] Such relief is consistent with the Department's award of full borrower defense relief to Corinthian students to date.

### A.   Heald Students Have Standing Under California's UCL

Students attending Heald programs in California demonstrate standing under the UCL by alleging that they relied on misrepresentations made by Heald regarding the transferability of Heald course credits. Any person "who has suffered injury in fact and has lost money or property as a result of the unfair competition" has standing to bring a claim under the UCL.[57] California courts have interpreted the UCL to apply only to violations occurring inside the state.[58] Significantly, however, injured non-residents have standing to assert UCL claims for such conduct provided they allege that the conduct occurred in the state.[59] Here, all the students attended Heald's California campuses, and the misrepresentations at issue were made by Heald employees of campuses located in California. Thus, whether or not the students resided in California when they submitted their BD claim or at the time they enrolled, they have standing to bring a California UCL claim.

---

[54] Claim No. BD151150 (Heald Milipitas student); Claim No. BD153655 (Heald Milipitas student); Claim No. BD156458 (Heald Salinas student); Claim No. BD152391 (Heald Salinas student); Claim No. BD157356 (Heald Hayward student); Claim No. BD152589 (Heald Stockton).
[55] 34 C.F.R. § 685.206(c).
[56] CAL. BUS. & PROF. CODE §17208.
[57] CAL. BUS. & PROF. CODE §17204.
[58] *Norwest Mortgage, Inc. v. Superior Court*, 72 Cal.App.4th 214, 222 (1999).
[59] *Id.*

DOE_00003382

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
DRAFT/PREDECISIONAL

**B.    Heald Students Alleging Transfer of Credits Misrepresentations Are Eligible for Relief Under the "Unlawful" and "Fraudulent" Prongs of the UCL**

California's UCL prohibits, and provides civil remedies for, unfair competition, which it broadly defines to include "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by [the false advertising law]."[60] Here, Heald's misrepresentations regarding the transfer of credits constitute "unlawful" and "fraudulent" business practices under the UCL.[61]

### 1.    The Unlawful Prong

The UCL bars "anything that can properly be called a business practice and that at the same time is forbidden by law."[62] Thus, if a business practice violates any law, this is *per se* a UCL violation.[63]

Corporate misrepresentations like those Heald made regarding transferability are prohibited by a number of state and federal laws.  In particular, Heald's misrepresentation of the transferability of its credits violates the prohibition against deceptive advertising in the Federal Trade Commission Act ("FTC Act").[64]  Determining whether an advertisement violates the FTC Act involves a three-step inquiry considering: "(i) what claims are conveyed in the ad, (ii) whether those claims are false, misleading, or unsubstantiated, and (iii) whether the claims are material to prospective purchasers."[65]

As described above, Heald made oral and written representations that its credits were generally transferable to other schools and would allow Heald students to transfer into the CSU system to earn a bachelor's degree.  These statements were false and misleading.  Heald's

---

[60] *Id.*; *Kwikset Corp. v. Superior Court*, 51 Cal. App. 4th 310, 320 (2011); *see also Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999).

[61] Although not discussed here, Heald's transferability misrepresentations may also be unfair competition under two other prongs of Section 17200: "unfair, deceptive or untrue advertising" and "unfair…business act or practice." Courts typically fail to distinguish the false advertising prong from the fraudulent business practices prong; this memorandum focuses on the fraudulent business practices prong.  *See* Stern, Business and Professional Code § 172000 Practice at 3:212 (2016).

[62] *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1266 (1992) (citations omitted).

[63] *See Kasky v. Nike*, 27 Cal. 4th 939, 950 (2002); *see also People v. E.W.A.P. Inc.*, 106 Cal. App. 3d 315, 317 (Ct. App. 1980); *Sw. Marine, Inc. v. Triple A Mach. Shop, Inc.*, 720 F. Supp. 805, 808 (N.D. Cal. 1989) (finding that a plaintiff had standing to sue under the UCL based in part on alleged violations of federal environmental regulations).

[64] *See* FTC Act § 5(a)(1), 15 U.S.C. § 45(a)(1); FTC Act § 12(a), 15 U.S.C. § 52(a).  While the FTC Act does not provide a private right of action, California courts have consistently recognized that a valid UCL claim under the "unlawful" prong does not require that the underlying law provide such a right.  Thus, for example, the California Supreme Court has permitted plaintiffs to bring actions under the California Penal Code that do not allow for private lawsuits.  *See Stop Youth Addiction, Inc. v. Lucky Stores, Inc.*, 950 P.2d 1086, 1091 (Cal. 1998) ("whether a private right of action should be implied under [the predicate] statute … is immaterial since any unlawful business practice … may be redressed by a private action charging unfair competition in violation of Business and Professions Code sections 17200") (citing cases); *see also Rose v. Bank of Am., N.A.*, 304 P.3d 181, 186 (Cal. 2013) ("It is settled that a UCL action is not precluded merely because some statute does not, itself, provide for the action or prohibit the challenged conduct.  To forestall an action under the [UCL], another provision must actually bar the action or clearly permit the conduct.").

[65] *POM Wonderful, LLC v. F.T.C.*, 777 F.3d 478, 490 (D.C. Cir. 2015), *cert. denied*, 136 S. Ct. 1839 (2016) (citing cases).

DOE_00003383

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
DRAFT/PREDECISIONAL

transfer of credits representations misled students about the value of the credits they would be earning at Heald. Based on the school's misrepresentations, individuals considering enrolling at Heald would have the false belief that Heald credits would not only allow them to obtain a Heald degree, but would also give them a direct entrée into the CSU system as a transfer student, where they would be able to complete a bachelor's degree using their Heald credits. This was in nearly all cases impossible.

A false or misleading misrepresentation violates the FTC Act if it is material. To be material, "a claim does not have to be the *only* factor or the *most* important factor likely to affect a consumer's purchase decision, it simply has to be an important factor;" furthermore, express claims are presumptively material.[66] Heald's transferability representations meet the FTC Act's materiality threshold, because borrowers relied on the promise of transferable credits when making their enrollment decision. In attestations submitted to the Department,[67] these borrowers have noted the importance of Heald's transferability claim. Furthermore, their reliance on such claims is reasonable given the importance of transferability to students, as evidenced by the plight of many Heald students after the institution closed. Moreover, Heald's express assurances in its marketing and other materials that Heald credits transferred to other schools make such statements presumptively material, and demonstrate that Heald recognized how important the issue was for its students. Thus, Heald's transferability misrepresentations constitute unlawful business practices under the FTC Act, and therefore the UCL.

## 2. The Fraudulent Prong

Heald's misrepresentations regarding the transferability of its credits also are a fraudulent business practice under the UCL, and are therefore another form of unfair competition providing an independent basis for borrower defense relief for Heald students. To show that a business practice is fraudulent, "it is necessary only to show that members of the public are likely to be deceived."[68] The UCL does not require knowledge of misrepresentation (scienter) or intent to defraud, as is required for fraudulent deceit under the California Civil Code.[69] Even true statements are actionable under the UCL if they are presented in a manner likely to mislead or deceive consumers, including by the omission of relevant information.[70] As noted, the transferability representations that Heald made to students were false and likely to deceive, for the reasons discussed above and in Section II.

In order to bring a cause of action under the UCL, an individual must have "suffered injury in fact and... lost money or property" as a result of the deceptive practice alleged.[71] However, for a consumer who was deceived into purchasing a product—or a student who was

---

[66] *Novartis Corp.*, 127 F.T.C. 580 at 686, 695 (1999); *see also FTC v. Lights of America, Inc.*, No. SACV10-01333JVS, 2013 WL 5230681, at *41 (C.D. Cal. Sept. 17, 2013) ("Express claims ... are presumed to be material.").

[67] Although the large majority of these applications submitted statements signed under penalty of perjury, some applicants submitted their materials prior to the publication of Department's form and therefore made unsigned statements.

[68] *See Bank of the West*, 2 Cal. 4th at 1254.

[69] CAL CIV. C. § 1709.

[70] *Boschma v. Home Loan Center*, 198 Cal. App. 4th 230, 253 (2011).

[71] *Smith v. Wells Fargo Bank, N.A.*, 135 Cal.App.4th 1463, 1480 n. 13 (2005).

DOE_00003384

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
DRAFT/PREDECISIONAL

deceived into enrolling at a school[72]—it is sufficient for the individual to allege that they made their decision in reliance on the misrepresentations or omissions of the entity.[73] Reliance on the misrepresentation does not have to be "the sole or even the predominant or decisive factor influencing"[74] the individual's decision. Rather, "[it] is enough that the representation has played a substantial part, and so had been a substantial factor, in influencing [their] decision."[75]

As discussed above, the evidence shows that students relied on Heald's transferability representations when they enrolled. Moreover, Heald widely advertised the transferability of its credits online and in other marketing materials, thereby recognizing its materiality to a prospective student's enrollment. Indeed, express claims like those made by Heald about the transferability of credits are presumptively material.[76] Under the UCL, a showing of materiality gives rise to "a presumption, or at least an inference, of reliance."[77] Here, statements by borrowers support the presumption that promises of transferable credits were a substantial factor in their decision to enroll.

## C. Weak Disclaimers In Some of Heald's Written Materials Do Not Cure Its False and Misleading Transferability Representations

Heald's representations regarding its students' ability to transfer were false and misleading, despite the school's limited disclaimers in some written materials as follows:

1. At the bottom of the Heald webpages containing representations regarding transferability is the following disclaimer: "It is always up to the receiving institution to make the final determination regarding acceptance of transfer credits and class standing."[78]

2. Similarly, after misleading statements about transferability, the Heald Viewbook contains the following statement: "Acceptance standards vary by program and institution. Transfer of credits from Heald to another college is determined by the receiving school."[79]

3. In its answer to the California AG's complaint, Heald argued that a disclosure form signed by incoming students titled "Notice Concerning Transferability of Units and Degrees Earned at Our School," gave notice to students that credits

---

[72] *See Kwikset Corp. v. Superior Court*, 51 Cal. 4th at 316 (Cal. 2011).
[73] *See, e.g., Daghlian v. DeVry University, Inc.*, 461 F.Supp.2d 1121, 1156 (C.D. Cal. 2006) ("Although Daghlian does not allege that he attempted to transfer the credits to another educational institution, or that he was forced to begin his education anew at another institution, he does assert that he enrolled at DeVry and incurred $40,000 in debt '[i]n reliance on' defendants' misrepresentations and omissions about the transferability of credits. This sufficiently alleges that Daghlian personally suffered injury as a result of defendants' allegedly false and/or misleading advertising and unfair business practices.").
[74] *In re Tobacco II Cases*, 46 Cal. 4th 298, 327 (2009) (internal quotation marks omitted).
[75] *Id.* (internal quotation marks omitted).
[76] *See, e.g., Telebrands Corp.*, 140 F.T.C. 278, 292 (2005); *FTC v. Lights of America, Inc.*, No. SACV10-01333JVS, 2013 WL 5230681, at *41 (C.D. Cal. Sept. 17, 2013).
[77] *In re Tobacco II Cases*, 46 Cal. 4th at 298.
[78] Quach Decl. Ex. 90-92.
[79] Quach Decl. Ex. 93.

DOE_00003385

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
DRAFT/PREDECISIONAL

might not transfer to other schools. Allegedly, the disclosure states: "As with any accredited school, the transferability of credits to another institution is determined exclusively by each receiving institution. Units I earn in my programs, in most cases, will not be transferable to any other college or university.... I acknowledge that it has not been guaranteed or implied by any employee of the School that my credits, diploma or degree will be transferable to another institution."[80] However, this document was not attached to the answer and we have been unable to locate it to date.[81]

These disclaimers do not cure the falsity of Heald's oral promises regarding transferability. First, courts interpreting the FTC Act and the UCL have made clear that written disclaimers do not cure the falsity of oral misrepresentations. *See, e.g., FTC v. Minuteman Press*, 53 F. Supp. 2d 248, 262-63 (E.D.N.Y. 1998) (finding that oral misrepresentations were not cured by written disclaimers); *see also Chapman v. Skype Inc.*, 220 Cal. App. 4th 217, 228 (Cal. App. Ct. 2013) (finding under the UCL that Skype's representation that a calling plan was "unlimited" was misleading despite the fact that it provided limits on the plan in a separate policy provided to customers). The California Supreme Court has also held that misleading statements enticing consumers to enter into a contract may be a basis for a UCL claim, even though accurate terms may be provided to the consumer before entering into the contract. *Chern v. Bank of Am.*, 15 Cal. 3d 866, 876 (Cal. 1976) ("the fact that defendant may ultimately disclose the actual rate of interest in its Truth in Lending Statement does not excuse defendant's practice of quoting a lower rate in its initial dealings with potential customers. The original, lower rate may unfairly entice persons to commence loan negotiations with defendant in the expectation of obtaining that rate.").

Indeed, the disclaimers described above are not even sufficient to cure the otherwise false and misleading statements made by Heald regarding transferability in the written marketing materials. An advertisement "may be likely to mislead by virtue of the net impression it creates even though the solicitation also contains truthful disclosures."[82] The written marketing materials, when reviewed as a whole, still clearly convey that enrolling at Heald would allow a student to directly transfer from Heald to a CSU school in order to complete a bachelor's degree program, which, as explained above, is generally false and misleading. The materials' prominent references to CSU and other institutions as "Partner Schools" create the impression that a student would be able to transfer easily to Heald's "partner school," CSU. A disclaimer at the bottom of the webpage that the receiving institution would ultimately decide which specific credits transfer does not diminish the expectation that students could transfer to CSU, which they generally could not do.

Moreover, here, Heald's disclaimers were particularly ineffective when considered in the context of Corinthian's unsophisticated student population and high-pressure admissions practices. Corinthian documents show that the school sought to enroll vulnerable people who

---

[80] The School's Amended Verified Answer to First Amended Complaint for Civil Penalties, *supra* note 20 at 87.
[81] Heald did not allege in its answer in the California litigation that there were any disclaimers its course catalog that cured any misrepresentations about transferability. A 2014 edition of a Heald course catalog contains similar language to the written disclaimers described above, but there is no reason to think that any student would have reviewed the course catalog prior to enrollment, given what students report about the enrollment process.
[82] *F.T.C. v. Cyberspace.Com LLC*, 453 F.3d 1196, 1200 (9th Cir. 2006) (collecting cases).

14

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
DRAFT/PREDECISIONAL

had "low self-esteem," were "stuck, unable to see and plan well for the future" and "isolated," had "few people in their lives who care about them," and were "impatient, want quick solutions."[83] Corinthian's CEO, in a letter to Federal Student Aid, wrote that the school enrolled "a predominantly high risk student body that is underserved by traditional higher education institutions. Many of our campuses are located in or near difficult inner-city areas and provide access to students who have not previously achieved educational success."[84] Corinthian advertised on daytime TV,[85] targeting the un- or under-employed. In some instances,, Corinthian personnel actively recruited homeless individuals as students, despite the additional challenges they would face in completing their studies, even offering monetary incentives to take campus tours.[86]

Furthermore, regardless of the precise language in any documents provided at the time of enrollment, the nature of the enrollment process made it unlikely that students ever read them. Students repeatedly reported being pressured by school sales representatives to enroll immediately, including being rushed through the enrollment process and not being provided an opportunity to read and review the enrollment agreement.[87]

**D.   Eligible Borrowers**

Based on the above analysis, the following Heald students alleging transfer of credits claims should be eligible for relief, subject to the UCL's four-year statute of limitations:

1.   Any claimant who attended a Heald California campus and who:

a.   enrolled in any diploma, certificate, or AAS degree program (i.e., programs for which fewer than 90 quarter units were transferable to CSU schools) on or after January 4, 2010[88], and

---

[83] CA AG Quach Decl. Ex 113.

[84] Letter from Jack D. Massimino, CEO, Corinthian, to James W. Runcie, Chief Operating Officer, U.S. Office of Federal Student Aid (Nov. 12, 2014).

[85] CA AG Quach Decl. Ex 113.

[86] CA AG Decl. of Holly Harsh.

[87] See, e.g., BD Claim No. BD152166 ("I told [the admissions representative] I wasn't comfortable . . . and didn't understand the process and why I was signing for a loan if I was covered. I asked for more time to think. She continued to pressure and reassure me my financial aid was fully covered, how Heald guarantees student job placement and how the drop out ratings at Heald was lower than other schools in Honolulu. I felt pressured but trusted and enrolled in Heald College anyway."); Affidavit of D'Anne Coffie MA Ex. 08 at AGO-MA01891("After meeting with an Everest representative in October 2011, I wished to discuss my options with family but I felt pressure to enroll on the spot. I wanted a career in the medical field and the representative told me to act now since I was already there. They rushed the whole enrollment process."); Affidavit of Courtney Petrie, MA Ex. 08 at AGO-MA01914 ("The tour of the school felt very rushed, as if the school did not want to give the people on the tour time to make a decision."); Affidavit of Matisha Chao MA Ex. 08 at AGO-MA01887 ("They were like used car salesmen. They made sure I signed up before I walked out the door during my first visit, even though I only went there for a tour.").

[88] Because Corinthian purchased all of the Heald campuses on January 4, 2010 (through its purchase of Heald Capital, LLC), for the purposes of granting any potential relief to students, we can reasonably assume that these practices occurred from that point going forward. The transaction was signed on October 19, 2009. However, in its answer to the California AG's first amended complaint, Heald's acknowledgment that the diploma, certificate and AAS degree programs were not transferrable to CSU schools was not time-limited. There is also evidence that Heald College made representations regarding the transferability of its credits to the CSU schools as far back as

DOE_00003387

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
DRAFT/PREDECISIONAL

   b.  states the school misrepresented that credits were generally transferable, or that credits would be transferable to the CSU system or one of the 23 CSU campuses.

## IV.  Full BD Relief Should Be Provided to Eligible Borrowers

When determining the amount of relief due to plaintiffs under the UCL, courts rely on cases interpreting the Federal Trade Commission Act. *See, e.g., Makaeff v. Trump Univ.*, 309 F.R.D. 631, 637-8 (S.D. Cal. 2015).  In cases where a substantial/material misrepresentation was made, FTC law provides significant support for requiring complete restitution of the amount paid by consumers. *See, e.g., FTC v. Stefanchik*, 559 F.3d 924, 931 (9th Cir. 2009) (determining that restitution should include "the full amount lost by consumers rather than limiting damages to a defendant's profits"); *FTC v. Figgie International*, 994 F.2d 595, 606 (9th Cir. 1993) ("The injury to consumers… is the amount consumers spent… that would not have been spent absent [the] dishonest practices."); *FTC v. Security Rare Coin & Bullion Corp.*, 931 F.2d 1312, 1316 (8th Cir. 1991) ("restoration of the victims of [defendant's] con game to the status quo ante" by use of defendant's gross receipts is proper for restitution); *FTC v. Ivy Capital, Inc.*, No, 2:11-CV-283 JCM (GWF), 2013 WL 1224613 at *17 (D. Nev. 2013) (ordering full monetary relief for consumers harmed by misleading marketing regarding a business coaching program).

In a recent California federal court decision analyzing the appropriate remedy for consumers alleging educational misrepresentations under the UCL, the court explicitly analogized to the *Figgie* and *Ivy Capital* approach and found that a restitution model that aims to "restore the status quo by returning to the plaintiff funds in which he or she has an ownership interest" was a justifiable basis for a class action theory of relief. *Makaeff v. Trump Univ.*, 309 F.R.D. 631, 637-8 (S.D. Cal. 2015) (internal quotations removed).

However, nothing in the borrower defense statute or regulation requires the Department to apply state law remedies when reviewing a borrower's claim.  The only statutory limit on the Secretary's ability to grant relief is that no student may recover in excess of the amount the borrower has repaid on the loan.[89]

Indeed, under the current regulation, while a claimant must allege an act or omission that would "give rise to a cause of action" under "applicable state law" in order to be eligible for BD relief, the rule does not direct the Department to award relief to a claimant based on state law principles of restitution or damages.  Instead, the borrower defense regulation clearly provides that the Secretary has discretion to fashion relief as suited to the facts of a particular case:

If the borrower's defense against repayment is successful, the Secretary notifies the borrower that the borrower is relieved of the obligation to repay all or part of the loan and

---

January 2006. *See* http://www.heald.edu/programs/partner_colleges.htm ("For those students who want to transfer coursework from Heald to apply to a higher degree, Heald has articulation agreements with many other accredited institutions that accept Heald credits toward bachelor's degree programs. Below is a sampling of those schools: …California State University (CSU) system") (accessed January 2, 2006 via the Wayback Machine).  Therefore, after further research and review, there may be a basis on which to provide relief to a larger cohort of students alleging a misrepresentation regarding transferability of credits.

[89] Section 455 of Title IV of the Higher Education Act, 20 U.S.C. § 1087e(h).

DOE_00003388

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
DRAFT/PREDECISIONAL

associated costs and fees that the borrower would otherwise be obligated to pay. The Secretary affords the borrower such further relief *as the Secretary determines is appropriate under the circumstances* [including reimbursement to the borrower of amounts paid towards the loan].[90]

Moreover, the Supreme Court has recognized that, when an agency is fashioning "discretionary relief," such decisions "frequently rest upon a complex and hard-to-review mix of considerations," and therefore, "for the sake of uniformity, it is usually better to minimize the opportunity for reviewing courts to substitute their discretion for that of the agency." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 621 (1966).

The D.C. Circuit has also consistently recognized the "long-standing principle" that federal agencies must be afforded particularly wide latitude in fashioning remedies consistent with the statutes they are charged with administering. An agency's discretion is, "if anything, at zenith when the action assailed relates primarily not to the issue of ascertaining whether conduct violates the statute, or regulations, but rather to the fashioning of ... remedies." *Fallbrook Hosp. Corp. v. N.L.R.B.*, 785 F.3d 729, 735 (D.C. Cir. 2015) (internal quotations and citations removed) (rejecting a challenge to the National Labor Relations Board's decision to require a hospital to pay for a nurse's unions full costs for negotiating a labor agreement); *see also U.S. Postal Serv. v. Postal Regulatory Comm'n*, 747 F.3d 906, 910 (D.C. Cir. 2014) (approving a remedy order by the Postal Regulatory Commission requiring the U.S. Postal Service to reduce its rates for certain mailers); *Exxon Mobil Corp. v. FERC*, 571 F.3d 1208, 1216 (D.C. Cir. 2009) ("When FERC is fashioning remedies, we are particularly deferential."); *Am. Tel. & Tel. Co. v. FCC*, 454 F.3d 329, 334 (D.C. Cir. 2006) (approving the FCC's decision to apply an administrative order retroactively). Thus, while California and FTC Act case law is instructive as to the quantum of relief to be provided, the Department is not constrained by that authority.

Here, there is ample reason not to "offset" the award of full relief to these borrowers in light of the lack of value attendant to their Heald education. *See Makaeff*, 309 F.R.D. at 642 (allowing defendants to offer evidence warranting an offset from a baseline of full recovery). First, if a student cannot transfer credits without great difficulty, a chief value conferred by such credits is greatly diminished. Likewise, there is diminished value in a degree conferred by an institution that issues credits generally not worthy of transfer towards admission.

Second, and perhaps more importantly, the Department has found that Heald and its parent company Corinthian repeatedly misled students, regulators and accreditors regarding its ability to place students in jobs, systematically inflated its job placement rates, misrepresented job placement rates to a programmatic accreditor, and even engaged in an elaborate job placement fraud to maintain its accreditation.[91] Given this well-documented, pervasive, and

---

[90] 34 C.F.R. § 685.206(c)(2).

[91] *See* Letter from Robin S. Minor, Acting Director, Administrative Actions and Appeals Service Group, U.S. Office of Federal Student Aid, to Jack D. Massimino, CEO, Corinthan (Apr. 14, 2014); *see also* Letter from Mary E. Gust, Director, Administrative Actions and Appeals Service Group, U.S. Office of Federal Student Aid, to Jack D. Massimino, CEO, Corinthian (Aug. 22, 2014) (finding that "Everest Institute submitted false placement data to ACCSC to maintain the accreditation of Everest Decatur" and that the school's job placement rates were based on "CCI-designed programs through which Everest Decatur paid employers to hire its graduates" for short time periods in order to inflate placement rates).

DOE_00003389

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT
DRAFT/PREDECISIONAL

highly publicized misconduct at Corinthian, the value of a Heald education has been severely limited.

Indeed, borrower defense applications confirm the lack of value of a Heald education as many Heald students report that their coursework from Heald has been an impediment rather than an asset as they seek employment.  For example, a Heald student reported that "After graduation, I was not able to get any jobs whatsoever with my degree and in many interviews, the employer questioned the validity of my degree with a Heald institution."[92]  Another reports: "there is a stigma that follows [Heald].  I feel that when employers see where my degree comes from it will be seen as a joke because it came from a school that committed fraud and lied to their students."[93]  Yet another student states "The word 'Heald' in my resume actually made employers turn down my [job application]."[94]

Finally, awarding full relief to students who make transferability claims is consistent with the Department's approach to providing relief to Corinthian students seeking BD relief on the basis of false job placement rates.  Indeed, the Department granted full relief to students who alleged that they relied on Corinthian job placement rate representations, without offsetting the relief based on any value that students may have received by attending Corinthian.  Given the Department's approach to date, it would be inequitable to limit the relief of students who allege transferability claims while providing full relief to those students who qualify for job placement rate relief.

In sum, in these circumstances, and consistent with the Department's prior actions related to Corinthian, it is appropriate to award eligible borrowers full relief, subject to the UCL's four-year statute of limitations.

---

[92] Claim No. BD154195.
[93] Claim No. BD151006.
[94] Claim No. BD150260.

DOE_00003390

To:      Under Secretary Ted Mitchell

From:   Borrower Defense Unit

Date:    October 24, 2016

Re:      Recommendation for Everest/WyoTech Borrowers Alleging Transfer of Credit Claims

The Borrower Defense team recommends borrower defense (BD) relief for students who: (1) enrolled at any Corinthian-operated, nationally accredited Everest[1] campus or at WyoTech's Laramie campus[2] between the time Corinthian opened or acquired the campus and April 2015; and (2) alleges that Corinthian misrepresented the transferability of credits earned at that campus. Corinthian represented that credits earned at these Everest campuses were generally transferable. These representations were false and misleading. Accordingly, for the reasons explained below, full BD relief is appropriate for all Everest and WyoTech Laramie borrowers alleging misrepresentations regarding the transferability of credits, subject to reduced relief for those borrowers impacted by the statute of limitations.

## BACKGROUND

Everest consistently misled prospective students about the transferability of credits earned at their campuses in two ways. First, school staff made explicit representations regarding transferability. Second, staff strongly implied transferability by emphasizing the school's accreditation status.

The misleading nature of these statements hinges on the key differences between national career-related and regional institutional accreditation. Traditionally, national accreditors accredit mainly for-profit, career-based, single-purpose institutions, both degree and non-degree.[3] By contrast, regional accreditors accredit public and private, mainly non-profit and degree-granting, two- and four-year institutions.[4] Broadly speaking, credits earned at nationally accredited colleges "are rarely accepted at regionally accredited schools;"[5] and have never been generally transferable.[6] Almost every Everest campus was nationally accredited since its inception, and Corinthian personnel were fully aware of the negative impact of their accreditation on transferability.[7] Nevertheless, as Senator Tom Harkin notes in his 2012 report on the for-profit college sector (the "Harkin Report"), recruiters at for-profits "sometimes play on prospective students' ignorance about accreditation in order to use their schools' accreditation as a selling point."[8]

As discussed below, Everest personnel regularly led prospective students to believe, either through express or strongly implied representations, that credits earned at Everest would generally be

---

[1] Everest schools include Florida Metropolitan University campuses, which Corinthian acquired in 1996 and later rebranded as Everest University.

[2] To date, the BD Team has only reviewed WyoTech claims from the Laramie campus. While we have no reason to believe the facts and recommendations in this memorandum do not apply to other WyoTech campuses, at this time we are not extending our analysis to those campuses. For the purposes of this memorandum, references to "Everest" include WyoTech Laramie.

[3] See Council for Higher Education Accreditation: An Overview of US Accreditation, http://www.chea.org/pdf/Overview%20of%2US%Accreditation%202015.pdf. For this memorandum, "national" refers to national career-related accreditors or accreditation.

[4] Id. p. 2.

[5] Harkin Report, p. 56, citing Council for Higher Education Accreditation, The Fundamentals of Accreditation: What Do You Need to Know, Council for Higher Education Accreditation, p. 7, September 2002, http://www.chea.org/pdf/fund_accred_20ques _02.pdf (accessed May 24, 2012).

[6] Herman Bounds, Ed.D., Director of the Accreditation Group at the Department of Education, confirmed to the BD team via email that it is a standard practice in higher education for regionally accredited schools to not accept nationally accredited school credits. He also confirmed that those policies are a historical norm.

[7] See Mark Pelesh's statement at https://www.insidehighered.com/news/2007/02/26/transfer.

[8] Harkin Report at 55.

DOE_00003391

accepted at regionally accredited post-secondary institutions.  In actuality, those credits generally did not transfer to or were not accepted at regionally accredited schools.

## I.   Summary of Evidence of Representations of Transferability

Everest staff orally represented to potential students that they could generally transfer their Everest credits to any other school.  These oral representations occurred both in person and during telephone calls with prospective students.  Specifically, the school personnel:  (a) stated credits were generally transferable; and/or (b) "play[ed] on prospective students' ignorance about accreditation" to make claims about national accreditation that strongly implied general transferability.[9]

### A.  Student Accounts of In-Person Oral Representations of Transferability

Hundreds of student applications reviewed to date provide corroborative evidence that Everest admissions personnel regularly made misleading oral representations about transferability.  Indeed, our review of claims spanning from 1998 through 2010 shows that personnel made consistent transferability claims throughout the entire time that Corinthian operated the schools.

A sample of claims from the Everest Brandon campus demonstrates the consistency and specificity of false transferability claims made by school representatives:

- "In my entrance interview, I was told that I should enroll in the paralegal program if I planned on being a lawyer. I was told guarantee that my credits would be good to transfer to USF or UT and then Stetson Law."[10]
- "I was assured when I started that I could transfer my credits to any other school if I chose to do so."[11]
- "I was told my credits would transfer to University of South Florida for my BA in Finance and they did not so I was stuck with all these loans and no school will take them I was told that employers will recognize the degree from them and they laugh at me."[12]
- "Not a single credit was transferable. I specifically remember asking the rep before enrolling if credits were transferable and she said "absolutely," never once telling me that accreditation of the school was not the same as a traditional."[13]
- "The school told me that I would not have any problem transferring credits if I decided to further my education elsewhere or go to law school."[14]
- "The representative for FMU, asked what my goals were for my education. I stated that I wanted to attend USF for a bachelors degree. He said my credits would absolutely transfer and that he worked hand in hand with the academic advisers over at USF, to help students transition smoothly. He said that my credits would transfer even mid-way through the program."[15]
- "The admissions department also ensured me that earned credits would be accepted by other educational institutions… later discovered that credits from Everest University were not honored at state and local universities."[16]

---

[9] As discussed below, in Section III(B)(1), footnote 102, the implied representations also constitute actionable material omissions.
[10] BD151795
[11] BD150990
[12] BD151323
[13] BD150355
[14] BD151723
[15] BD150789
[16] BD153129

DOE_00003392

- "I asked if I decided to transfer after rec associates degree would all credits transfer to any college? I was told, an associates is an associates no matter where it comes from."[17]
- "Brian Walker admissions representative had stated that if I wanted to get a Masters degree from another college that my credits will transfer with no problem as FMU (now Everest) is accredited university"[18]
- "I asked if I could transfer my credits to get my Bachelor's degree after earning my Associate's and i was told they would transfer but I would receive a discount if i was to get my Bachelor's with them. They told me i could get my Master's anywhere because my credits would transfer. I asked for specific schools which would take the credits and I was told they don't see why anyone wouldn't take them . . . I was going to pursue my Master's but found out my credits do not transfer."[19]

In all of the above examples, the school explicitly misrepresented the transferability of its credits to the student.

Applicants also state that the school represented general transferability via statements that Everest was "accredited" or "fully accredited." Such implied representations of transferability are supported by the Harkin Report, as well as the Corinthian telephone audits and recordings discussed below. That this "accreditation" tactic, in context, created a strongly implied representation of transferability is illustrated by the fact that students who were unable to transfer their credits believe that Everest lied about being accredited at all (italics added):

- "FLORIDA METROPOLITAN UNIVERSITY-ONLINE (FMU-ONLINE) *LIED BY STATING THAT THEY WERE AN ACCREDITED UNIVERSITY WHEN IN FACT THEY KNOW THEY WERE NOT* . . . THE MISCONDUCT FROM FMU-ONLINE PREVENTED ME TO TRANSFER ANY OF THE CLASSESS I HAD TAKEN THERE, TO BE TRANSFERABLE."[20]
- "Before i applied for the loan i was told my credit can be tranfer if need when i was attending class *i found out thats not true they* [sic] *are not a acreedited school.*"[21]
- "I DID NOT KNOW THAT THE SCHOOL WAS NOT PROPERLY ACCREDITED. CREDIT WERE NOT TRANSFERABLE"[22]
- "Everest University misrepresented their accreditation I was told during my school interview that the school was accredited, *and later found out once I applied to other colleges that the school was not accredited.*"[23]
- "I actually went to Valencia once and they told me that they [Everest] are not accredited, thus I'd have to start all over again."[24]
- "Throughout the course, there was speculation that the school was not accredited, but they continuously posted fake documents around the school claiming that they were accredited and that any credits we received would transfer over without any problem."[25]
- "I was told that credits would transfer to other schools offering the same classes but when i tried to transfer after having ear problems i was told that *NONE of my credits could transfer because FMU [later Everest] was not an accredited school.*"[26]

[17] BD153757
[18] BD150139
[19] BD150545
[20] BD154282
[21] BD153723
[22] BD152794
[23] BD152222
[24] BD150941
[25] BD150786

3

- 'I am struggling to have my credits transfer to Southern New Hampshire University. They told me that since Everest is closing that it may be difficult to get any credits to transfer *because Everest is not an accredited institution. Everest told me that they were accredited.*"[27]

Whether students allege an explicit misrepresentation about transferability ("I was told all my credits would transfer") or a strongly implied misrepresentation ("I was told the school was accredited, but then I found out my credits wouldn't transfer"), the student statements are unprompted,[28] specific, and consistent across a span of years.

For example, of the 303 claims reviewed to date at the Everest-Brandon campus, 52 include the allegation that admissions personnel made express representations regarding transferability (examples of which were quoted above) and an additional 6 allege an implied misrepresentation (tying accreditation to transferability).[29] The student statements are consistent regarding the representations made, including details such as specific schools that would accept Everest credits, or the suggestion that credits earned in Everest's paralegal program would enable students to continue on to law school.

The 58 Everest-Brandon transferability claims come from students who attended between 1998 and 2010.[30] Corinthian owned and controlled the Everest-Brandon location beginning in 1996, and the first claim alleging a transferability misrepresentation comes from a student who enrolled in 1998. We have transferability claims from this campus for each year from 1998 through 2010, with a spike in the late-2000s. We have fewer claims from earlier years, but those earlier claims bear the same indicia of reliability as the later claims. Significantly, the student statements about the admissions representatives' misrepresentations exhibit consistency across the span of years:

- 1998: "I attended the school due to the flexible hours and the fact that I was told by the [the school] that my credits in fact would transfer over to other schools."[31]
- 2000: "I was also told that my credits could transfer to any local college or university that was regionally accredited."[32]
- 2006: "The school told me that I would not have any problem transferring credits if I decided to further my education elsewhere or go to law school."[33]
- 2010: "…Also, was told that credits would transfer to any University (not true)."[34]

The pervasiveness and consistency of the misrepresentation over time at Everest-Brandon corroborate students' allegations about transferability claims throughout the entirety of Corinthian's control of the school.

---

[26] BD150315
[27] BD152848
[28] All of the above student statements came from a variety of different types of applications including the Everest/WyoTech attestation form ED created for JPR claims, various versions of the Debt Collective forms, and narratives in Word documents or the bodies of emails. The majority of these allegations are unprompted—some versions of the Debt Collective form specifically ask about transfer of credits, but others do not, and ED's attestation form only instructs borrowers to provide "any other information…that you think is relevant."
[29] These figures do not include applications on the Debt Collective form where the applicant only checked the box indicating they were misled about "[t]he fact that my program lacked the required accreditation to allow me to work in my field and/or transfer my credits to another college" without providing any narrative.
[30] Review Group 15, from which these sample claims are taken, includes any Everest or WyoTech claim from students who enrolled before 2010. A few claims from students enrolled in 2010 can also be found in the review group.
[31] BD1617575
[32] BD1600530
[33] BD151723
[34] BD1613824

DOE_00003394

Significantly, just as the 58 Everest-Brandon claims corroborate each other, the number of similar allegations at and across multiple other campuses further corroborates students' allegations of transferability representations made by Everest personnel.   Across campuses and across years, the similarity of student statements indicates that the misrepresentations were system-wide and, indeed, part of the Corinthian culture, discussed below, of enticing students to enroll at any cost.[35]

| Campus | Applications reviewed | Applications alleging an express or implied transferability representation | % |
|---|---|---|---|
| Everest Brandon | 303 | 58 | 19 |
| Everest Grand Rapids | 46 | 11 | 24 |
| Everest Orange Park | 36 | 9 | 25 |
| Everest Orlando North | 45 | 11 | 24 |
| Everest Orlando South | 157 | 56 | 36 |
| Everest Phoenix[36] | 81 | 22 | 27 |
| Everest Pompano Beach | 28 | 10 | 36 |
| Everest Rochester | 53 | 15 | 28 |
| Everest Tampa | 26 | 10 | 38 |
| WyoTech Laramie | 18 | 6 | 33 |
| **TOTAL** | **793** | **198** | **25** |

The campuses shown above represent the nine Everest campuses, and one WyoTech campus, for which we have the most claims. The campuses are located in five separate states (AZ, FL, MI, NY, and WY) and the total applications reviewed are from the period of time when Corinthian gained control of the campus[37] through 2010. Every campus from which we have reviewed a significant number of applications has revealed that between one-fifth and one-third of total applicants allege a misrepresentation about transferability of credits. Just like the Everest-Brandon campus discussed above, the transferability claims from these campuses are distributed roughly evenly throughout the period those campuses were owned and controlled by Corinthian. Most importantly, the review of these claims across campuses and years demonstrates that students are making extremely similar allegations about what the schools said about transferability – whether that student enrolled at Brandon in 1998 or Rochester in 2008.

Accordingly, we recommend no further year-by-year or campus-by-campus breakdown for every one of the over ninety Everest campuses as unnecessary. The hundreds of claims reviewed corroborate that Everest personnel made representations that credits were generally transferable beginning shortly after Corinthian opened or gained control of a campus.

**B.   Telephone Scripts, Audits, and Recordings**

Not surprisingly, Corinthian's training documents do not contain express misrepresentations about transferability.  However, they lay the foundation for abuses by failing to emphasize the non-transferability of credits or other potentially important information and in some cases tacitly encouraging misinformation.  For example, in a Corinthian presentation entitled "Overcoming Phone Obstacles" attached to the Harkin Report, Corinthian instructs its admissions representatives to provide limited

---

[35] *See* discussion below, Section III(C), detailing Corinthian's high-pressure sales techniques and internal emphasis on enrolling as many students as possible whether or not it is in the students' interest.

[36] Although Everest Phoenix was a regionally accredited campus, these figures are included for their corroborative value in establishing that Everest personnel regularly made representations regarding transferability.

[37] The oldest Everest campuses were opened in California in 1995. Others opened anywhere between 1996 and 2012. The nine campuses contained in the chart opened or came under Corinthian control between 1996 and 2004.

DOE_00003395

information.[38]  By encouraging its admissions representatives to listen more and talk less, Corinthian believed it could give the student "limited information that will bring the student into the school."[39] Similarly, a training manual for admissions representatives attached to the Harkin Report contains call scripts for admissions representatives.[40]  One section of the script suggests that representatives tell students who ask that credits "will probably not be transferable,"[41] but a later sample conversation instructs the representatives to tell students: "… you'll need to ask the receiving institution that question. I can't tell you what their policy might be because every institution sets their own policy regarding credit transfer."[42]

However, an internal Corinthian audit shows that even to the extent the scripts accurately described the transferability of Corinthian credits, admissions representatives under pressure to enroll students frequently did not follow them.  A 2012 audit of Everest's Online Learning Division – Colorado Springs, Tempe,[43] and Tampa (which includes Brandon, South Orlando, and Pompano Beach) – identified substantial failures to provide accurate information regarding the transferability of credits during calls with prospective students.  Specifically, representatives for the Colorado Springs campus "failed to or incorrectly mentioned" credit transferability 31% of the time when students asked; at Tempe and Tampa, these errors occurred in 40% of audited calls.[44] Karen Fleming, a quality assurance and compliance auditor for Corinthian, summed up the inaccurate information on transferability in an April 13, 2012 email to colleagues, stating: "Admissions representative[s] did not inform the student that if they wish to transfer their credits from Everest to another institution, that the acceptance of those credits would be at the judgment of the receiving institution…"[45]

Recordings of phone calls supplied by the Illinois Attorney General further illustrate that Corinthian employees misled potential students to believe that credits would be accepted at other schools. In summaries of 9 out of 29 recorded calls between Everest call center employees and prospective students provided to us by the Illinois Attorney General's office, Everest representatives gave prospective students information about transferability that was either false or technically accurate but misleading.[46] In one phone call, the representative directly links accreditation to transferability stating:  "We are a nationally accredited school. So you can use that almost anywhere you go."[47] Another representative, after confirming the school was accredited, refused to answer a prospective student's question about transferability.[48]

---

[38] Harkin report, Appendix 25, CoCo Document 3.
[39] *Id.* at p. 7
[40] Harkin report, Appendix 25, CoCo Document 4
[41] Harkin report, Appendix 25, CoCo Document 4, pp. 7-8
[42] Harkin report, Appendix 25, CoCo Document 4, p. 14
[43] Everest Tempe was one of the regionally accredited campuses in Arizona. While the effect of accreditation on transferability for the AZ campus is not the same as for nationally accredited schools, the fact that representatives for that campus either failed to provide accurate information, or affirmatively provided inaccurate information, regarding transferability between 20% and 40% of the time when observed serves to corroborate allegations that such representations were regularly made regarding other campuses nationwide.
[44] Quach Decl. Ex. 40, at CCICA156477. After a "corrective action plan" was initiated, those numbers dropped to 18% at Colorado Springs, 20% at Tempe, and 26% at Tampa. *See* Quach Decl. Ex. 40, at CCICA156454
[45] *Id.*
[46] IL AG "Hot Call" table
[47] IL AG; 3333182367_3333182298_efb49c0853f315387993e156
[48] ""The school will obviously give you the education and credentials with regard to certification"    24:00 "Are you guys accredited." A: "Absolutely." Student then asked about transfer of credits.  She wouldn't answer. IL AG; Second Leg, 3333592713_3333592639_13469370fa1b53e21c997bc8

DOE_00003396

II.    **Summary of Evidence of Falsity of Representation**

Three main sources of evidence demonstrate that credits from Everest were not generally transferable to most other schools. The first is the nature of the schools' accreditation. The second is the *Transfer Credit Practices* guide, which admissions officers use to determine how other schools treat a school's credits. The third is a survey we conducted of transfer policies in a few states that had large populations of Everest students. Additionally, public statements by Corinthian executives show that Corinthian was aware that credits from their schools were not generally transferable.

A.    **Accreditation**

Regionally accredited schools generally do not accept transfer credit from nationally accredited schools. Most of the nation's two- and four-year degree-granting post-secondary schools are regionally accredited, while national accrediting agencies accredit career, vocational, and trade schools. Generally, schools that are regionally accredited will not accept credits from nationally accredited schools.

A 2014 study by the National Center for Education Statistics found that 81.4% - 84.3% of students who transfer to, from, or between nationally accredited schools have none of their earned credits transfer (compared to 37% of students transferring between regionally accredited schools),[49] and that the average student transferring to, from, or between nationally accredited schools lost 83% - 90% of their credits upon transfer (compared to an average loss of 39% for regional to regional transfers).[50] The California State University system, the largest four-year public university system in the US, does not generally accept credits from *any* institution without regional accreditation.[51] Similarly, major systems in Florida, Georgia, Texas, Minnesota, and Massachusetts only generally accept credits from regionally accredited schools.[52]

Similarly, a GAO report found that among regionally accredited schools, 63% specified that they accepted credits from *any* regionally accredited school, whereas only 14% specified that they accepted transfer credits from nationally accredited schools;[53] less than one percent of post-secondary institutions specified that accreditation was not a factor in their transfer decisions.[54] Nationally accredited institutions told the GAO that their students "often have difficulty transferring credits and that . . . regionally accredited institutions did not always accept courses taken at the nationally accredited institution."[55] Nationally accredited institutions reported that they "advised students to assume that credits would not transfer to regionally accredited institutions."[56]

---

[49] Simone, S.A. (2014). *Transferability of Postsecondary Credit Following Student Transfer or Coenrollment* (NCES 2014-163). U.S. Department of Education. Washington, DC: National Center for Education Statistics. p. 36

[50] *Id.* at 37. While the study did not conclude there was a direct link between accreditation status and credit transfer, it did find that accreditation status was a factor in credit transfer. The importance of that "factor" is highlighted in the percentage of transfer credits lost when nationally accredited students attempts to transfer those credits. Moreover, experts in the field consider accreditation to be a major factor in credit transferability. According to Christine Kerlin, Ed.D., the "type of accreditation is one of the first considerations, and often the primary consideration, by a receiving institution in reviewing transfer credit." See Expert Rebuttal Report to Expert Report by Dennis M. Cariello in the Matter of *State of Minnesota by its Attorney General, Lori Swanson v. Minnesota School of Business, Inc. et al.* at 4 (July 2015). *See also* statements of Herman Bounds, Ed.D, Director of Accreditation Group at the Department of Education, referenced in FN 6.

[51] *Transfer Credit Practices*, 2015 Edition

[52] See "Survey of Two- and Four-Year Schools in Selected States", Section II(C).

[53] GAO-06-22, p. 9

[54] GAO-06-22, p. 9

[55] *Id*, p. 10

[56] *Id*

7

The fact that regionally accredited schools generally do not accept nationally accredited credits has always been true. The 2005 GAO report treats the issue as the status quo, and not a recent development.[57] Until the last couple decades, credit transfer between nationals and regionals was a non-issue since, historically, nationally accredited schools offered technical certificates, not degree programs.[58] However, in the last 15-20 years, more nationally accredited schools have started offering degree programs, and the inability of those credits to transfer has become a larger issue.[59]

Corinthian itself was sufficiently aware of the impact of national accreditation on transferability that it supported various regulatory and/or legislative efforts to require schools to "state that they will not automatically reject credit from nationally accredited institutions."[60] In 2007, Corinthian's VP for legislative and regulatory affairs, Mark Pelesh, stated: "Students are required too often to repeat coursework, pay for something twice, use the public's resources in terms of federal and state financial aid, and have impediments put in the way to advancing their career objectives… it's high time we do something that has some regulatory teeth and impact."[61]

## B. Transfer Credit Practices of Designated Educational Institutions

The *Transfer Credit Practices of Designated Educational Institutions,* a reference guide published by the American Association of Collegiate Registrars and Admissions Officers, also demonstrates that these credits were not generally transferable as Corinthian frequently told borrowers. It reports the transfer acceptance practices of one major institution in each state, usually the flagship campus of the state university system, regarding credit from institutions in that state. Other schools are not required to follow the reporting school's policies, but the guide is useful for determining how institutions' credits are treated generally.

In a review of *Transfer Credit Practices* from the last twenty years,[62] none of the reporting institutions, outside of Arizona, had a policy of generally accepting credits from Everest. Outside of Arizona, the most favorable policy regarding credits from Everest was one university system that accepted them "on a provisional basis subject to validation as prescribed by the reporting institution".[63] All other reporting institutions either had no official policy or did not normally accept credits from Everest.[64]

---

[57] *See also* https://www.americanprogress.org/issues/higher-education/report/2015/12/14/127200/hooked-on-accreditation-a-historical-perspective/; https://en.wikipedia.org/wiki/Regional_accreditation; El-Kwahas, Elaine (2001) *Accreditation in the USA: Origins, Developments, and Future Prospects* http://unesdoc.unesco.org/images/0012/001292/129295e.pdf; Brittingham, Barbara (2009) *Accreditation in the United States: How Did We Get to Where We Are?* http://onlinelibrary.wiley.com/doi/10.1002/he.331/pdf; http://www.acics.org/accreditation/content.aspx?id=2258

[58] *See* "Council for Higher Education Accreditation: Transfer and the Public Interest" (Nov. 2000) available at http://www.chea.org/pdf/transfer_state_02.pdf, where, without addressing for-profits specifically, the reports states that "higher education is experiencing a significant change in how students attend college and who provides higher education"; *see also* "History of Accreditation" available on a major national accreditor's website at http://www.acics.org/accreditation/content.aspx?id=2258.

[59] Herman Bounds, Ed.D., Director of the Accreditation Group at the Department of Education, confirmed to the BD team via email that it is a standard practice in higher education for regionally accredited schools to not accept nationally accredited school credits. He also confirmed that those policies are a historical norm. *See also* 2006 Spellings Report (ED report arguing that something needs to be done about credit transfer practices).

[60] https://www.insidehighered.com/news/2005/10/19/transfer

[61] https://www.insidehighered.com/news/2007/02/26/transfer

[62] The 1994-1996, 1996-1998, 1998-2000, 2006, 2009, 2012, and 2015 editions.

[63] California State University, Northridge, for certain Everest campuses, but only in 2006 and 2012. Of the 6 Everest campuses from which CSU would accept credits on a provisional basis, credits from 5 of those were limited to "graduate, professional, or technical programs only". By 2015, CSU Northridge policy for all Everest/WyoTech campuses was "credit not normally accepted".

[64] Florida statute allows nationally accredited schools to participate in the Statewide Course Numbering System, which may allow credits taken at those schools to transfer, but for the Everest campuses that participated in the System, "the credentials of

DOE_00003398

### C.  Survey of Two- and Four-Year Schools in Selected States

In May 2016, the BD Team also surveyed the transfer policies of two- and four-year schools in three of the states with high numbers of Everest students (FL, GA, and TX), regarding credits earned at Everest.  We reviewed the schools' credit transfer acceptance policies available online, emailed admissions officers, and/or spoke directly with admissions officers. None of the state four-year school systems had a policy of generally accepting credits from nationally accredited schools, including Everest.[65]  Most of the two-year community colleges would only accept credits from regionally accredited schools on a general basis (one two-year school in FL and one in TX regularly accepted credits from ACICS schools, including Everest).

Similarly, as part of their investigation into Everest campuses in Massachusetts, MA AGO contacted several two- and four-year schools within commuting distance of the Everest schools. None of the schools normally accepted credits from Everest, with all of the four-year and one of the two-year schools specifying that they only had acceptance policies for regionally accredited schools.[66] The UMass flagship campus either was not contacted or did not reply, but according to its website, "the following courses generally will not transfer to UMass: Taught by a school which does not have regional academic accreditation at the post-secondary level."[67]

### D.  Student Accounts

Unsurprisingly, student accounts also show that other institutions of higher learning did not accept credits earned at Everest:

- "I am currently a student at Daytona State College and have been forced to repeat many of the courses I took and paid for at Florida Metropolitan University [Everest Orlando North]. Daytona State does not recognize any of credits earned at FMU, forcing me to repeat them and continue to pay a student loan on worthless education."[68]
- "I tried to enroll at University of Central Florida, Seminole State College and Valencia College. UCF did not even respond to me. SSC and Valencia informed me that they could not accept my credits."[69]
- "I was Told all college credits would transfer, it didn't matter that this college was private, I spoke with a community college advisor and none of these credits transfer."[70]
- "Credits were not transferable.  I checked with Western Dakota Tech in Rapid City SD at the time as I felt I was not getting the education I was promised."[71]

In some instances, students even lost the majority of credits earned at one Everest campus when they transferred or re-enrolled at another Everest campus. One student writes: "The fact is none of them [credits earned at Tampa] were accepted by Tempe Everest even though it was from their OWN sister

---

faculty teaching each course are considered in determining the number assigned to the course and the transferability of the course"; those Everest campuses are still listed as "credits not normally accepted".
[65] University of Florida (Gainesville), University of West Florida, the Georgia State University system, University of Georgia (Athens), University of Texas (Austin), University of Texas (San Antonio), Baylor University, and Rice University. Florida State University (Tallahassee) would accept, and has accepted, Everest credits on a provisional basis, upon review, as noted above.
[66] MA AGO, Ex. 34
[67] https://www.umass.edu/registrar/students/transfer-information/transfer-credit
[68] BD151803
[69] BD1604707
[70] BD150366
[71] BD155798

DOE_00003399

school."[72] Another student reports: "They told me that I will be able to use my previous credit… but [Everest Orlando South] made me take the class again."[73]

This inability to transfer credits to other institutions is consistent both at individual campuses and between campuses during the time they were operated by Corinthian.

**III.    Application of the Borrower Defense Regulation Supports Eligibility and Full Relief for These Borrowers, Subject to Reduction for Borrowers Affected by the Statute of Limitations**

Under the current borrower defense regulation, students must allege an "act or omission" of their school "that would give rise to a cause of action against the school under applicable State law" to be eligible for relief.[74]  The applicable state law here is California's UCL, which prohibits a wide range of business practices that constitute unfair competition, including corporate misrepresentations.  For the following reasons, the cohort of Everest students identified below applying for borrower defense relief predicated on Everest's transferability misrepresentations:  1) have standing under the California UCL; and 2) are eligible for relief under the "unlawful" and "fraudulent" prongs of the UCL.  Moreover, given the lack of value conferred by Everest credits and/or degrees, these students should be granted full loan discharges and refunds of amounts already paid, subject to reduction for borrowers affected by the statute of limitations.

**A.   Everest Students Have Standing Under California's UCL**

Both students who attended Everest programs in California and those who attended campuses in other states have standing under the California UCL.  First, students attending Everest programs in California can demonstrate standing under the UCL by alleging that they relied on misrepresentations made by Everest regarding the transferability of Everest course credits.  Any person "who has suffered injury in fact and has lost money or property as a result of the unfair competition" has standing to bring a claim under the UCL.[75]  Second, while California statutes do not generally have effect outside of California, "[California] statutory remedies may be invoked by out-of-state parties when they are harmed by wrongful conduct occurring in California."[76]  Courts look to "where the defendant does business, whether the defendant's principal offices are located in California, where class members are located, and the location from which advertising and other promotional literature decisions were made"[77] when determining whether non-California residents may avail themselves of California's consumer protection statutes.  Corinthian and its subsidiaries, through which it operated Everest schools, had their primary places of business and headquarters in California,[78] had more campuses in California than any other state,[79] produced and coordinated marketing and advertising in California,[80] and developed and promulgated the policies and training materials for their personnel in California.[81] Further, the single

---

[72] BD1603868

[73] BD155063

[74] 34 C.F.R. § 685.206(c).

[75] CAL. BUS. & PROF. CODE §17204.

[76] *Norwest Mortgage, INc. v. Super. Ct.*, 72 Cal.App.4th 214, 224-25, 85 Cal.Rptr.2nd 18(Cal.Ct.App. 1999)

[77] *In re Clorox Consumer Litigation*, 894 F.Supp.2d 1224, 1237 -1238 (N.D.Cal., 2012) (citing *In re Toyota Motor Corp.*, 785 F.Supp.2d 883, 917 (C.D.Cal.2011)).

[78] CCI Answer CA Amended Complaint ¶¶9-27

[79] There were 27 Corinthian campuses in California (14 Everest, 3 WyoTech, and 10 Heald). The other states with large numbers of Corinthian campuses were Florida (15 Everest and 1 WyoTech campuses) and Texas (9 Everest campuses).

[80] Tim Evans Interview, WI AG Sutherlin Affidavit Ex. 12 ("Evans said that all advertising was done by corporate."); Mark Sullivan interview, WI AG Sutherlin Affidavit Ex. 13 ("He [Sullivan] didn't do any of the marketing. That wasn't done by the local campuses."); Deposition of Scott Lester, WI AG Sutherlin Ex. 15 ("Every bit of marketing came out of corporate. Every marketing decision came from corporate.")

[81] WI Educational Approval Board letters to Everest Milwaukee,  WI AG Sutherline Affidavit, Ex. 10

DOE_00003400

incoming call facility for prospective Everest students from the throughout the nation was located in California.[82]

Additionally, former employees report that corporate decision makers based in California directed admissions staff to make misleading statements and engage in various high-pressure sales tactics to increase enrollment:

- "Q: And when the Admissions Reps were making representations to the students about the externships, about the career possibilities, about what life could be, were those accurate representations given the state of the school?
  A: *They were the representations that they were given by corporate as part of their -- the way they were told to do the job.* Were they accurate? No."[83]
- Call center representatives "were trained to lie."[84]
- "There is a huge cultural issue at Corinthian Colleges that quietly promotes dishonesty & fraud at all the Everest campuses. *This culture of dishonesty & intimidation is generated by the corporate office* that has spread all over the company like cancer."[85]

Based on these factors – that Corinthian was headquartered and had its principal place of business in California, and that decisions and policies made by its California based corporate leadership harmed Everest students across the nation – Everest students from campuses nationwide have standing under the California UCL.

### B.  Everest Students Alleging Transfer of Credits Misrepresentations Are Eligible for Relief Under the "Unlawful" and "Fraudulent" Prongs of the UCL

California's UCL prohibits, and provides civil remedies for, unfair competition, which it broadly defines to include "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by [the false advertising law]."[86] Here, Everest's misrepresentations regarding the transfer of credits constitute "unlawful" and "fraudulent" business practices under the UCL.[87]

#### 1.  The Unlawful Prong

The UCL bars "anything that can properly be called a business practice and that at the same time is forbidden by law."[88] Thus, if a business practice violates any law, this is *per se* a UCL violation.[89]

Corporate misrepresentations like those Everest made regarding transferability are prohibited by a number of state and federal laws. In particular, Everest's misrepresentation of the transferability of its

---

[82] Interview Report, Ivan Limpin, Former Employee, Corinthian Schools Call Center (Feb. 28, 2013); taken by CA AG Office.
[83] Deposition of Scott Lester, Everest Milwaukee Director of Admissions, later President. WI AG, Ex. 15
[84] Interview Report, Ivan Limpin, Former Employee, Corinthian Schools Call Center (Feb. 28, 2013); taken by CA AG Office.
[85] Letter from Anonymous former Everest employee to ACCSC Commissioner, Ex. 54 of CA AG Motion for Default at CCICA179681
[86] *Id*; *Kwikset Corp. v. Superior Court*, 51 Cal. App. 4th 310, 320 (2011); *see also Cel-Tech Commc'ns, Inc. v. Los Angeles Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999).
[87] Although not discussed here, Everest's transferability misrepresentations may also be unfair competition under two other prongs of Section 17200: "unfair, deceptive or untrue advertising" and "unfair...business act or practice." Courts typically fail to distinguish the false advertising prong from the fraudulent business practices prong; this memorandum focuses on the fraudulent business practices prong. *See* Stern, Business and Professional Code    § 17200 Practice at 3:212 (2016).
[88] *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1266 (1992) (citations omitted).
[89] *See Kasky v. Nike*, 27 Cal. 4th 939, 950 (2002); *see also People v. E.W.A.P. Inc.*, 106 Cal. App. 3d 315, 317 (Ct. App. 1980); *Sw. Marine, Inc. v. Triple A Mach. Shop, Inc.*, 720 F. Supp. 805, 808 (N.D. Cal. 1989) (finding that a plaintiff had standing to sue under the UCL based in part on alleged violations of federal environmental regulations).

11

DOE_00003401

credits violates the prohibition against deceptive advertising in the Federal Trade Commission Act ("FTC Act").[90] Determining whether an advertisement violates the FTC Act involves a three-step inquiry considering: "(i) what claims are conveyed in the ad, (ii) whether those claims are false, misleading, or unsubstantiated, and (iii) whether the claims are material to prospective purchasers."[91]

As described above, Everest's representations about the transferability of its credits were false, erroneous and misleading. Everest's transfer of credits representations misled students about the value of the credits they would be earning at Everest. Based on the school's misrepresentations, individuals considering enrolling at Everest would have the false belief that Everest credits would not only allow them to obtain an Everest degree, but would also provide them with credits generally transferable to any other institution.

A false or misleading misrepresentation violates the FTC Act if it is material. To be material, "a claim does not have to be the *only* factor or the *most* important factor likely to affect a consumer's purchase decision, it simply has to be an important factor"; furthermore, express claims are presumptively material.[92] Everest's transferability representations meet the FTC Act's materiality threshold, because borrowers relied on the promise of transferable credits when making their enrollment decision. In applications submitted to the Department,[93] these borrowers have specifically identified false representations regarding transferability as some of the misconduct giving rise to their claim. Many students' applications specifically state that they intended to continue their educations at four-year schools.[94] For other students intent on beginning a career as soon as possible, the transferability of credits and ability to continue academically offered an alternative if they were unable to find a job immediately.[95] Finally, students considered the transferability of credits earned at an institution to be an indicator of the quality and value of that institution's instruction.[96]

---

[90] *See* FTC Act § 5(a)(1), 15 U.S.C. § 45(a)(1); FTC Act § 12(a), 15 U.S.C. § 52(a). While the FTC Act does not provide a private right of action, California courts have consistently recognized that a valid UCL claim under the "unlawful" prong does not require that the underlying law provide such a right. Thus, for example, the California Supreme Court has permitted plaintiffs to bring actions under the California Penal Code that do not allow for private lawsuits. *See Stop Youth Addiction, Inc. v. Lucky Stores, Inc.*, 950 P.2d 1086, 1091 (Cal. 1998) ("whether a private right of action should be implied under [the predicate] statute ... is immaterial since any unlawful business practice ... may be redressed by a private action charging unfair competition in violation of Business and Professions Code sections 17200") (citing cases); *see also Rose v. Bank of Am., N.A.*, 304 P.3d 181, 186 (Cal. 2013) ("It is settled that a UCL action is not precluded merely because some other statute on the subject does not, itself, provide for the action or prohibit the challenged conduct. To forestall an action under the [UCL], another provision must actually bar the action or clearly permit the conduct.").

[91] *POM Wonderful, LLC v. F.T.C.*, 777 F.3d 478, 490 (D.C. Cir. 2015), *cert. denied*, 136 S. Ct. 1839 (2016) (citing cases).

[92] *Novartis Corp.*, 127 F.T.C. 580 at 686, 695 (1999); *see also FTC v. Lights of America, Inc.*, No. SACV10-01333JVS, 2013 WL 5230681, at *41 (C.D. Cal. Sept. 17, 2013) ("Express claims ... are presumed to be material.").

[93] Although many of these applicants submitted statements signed under penalty of perjury, some applicants submitted their materials prior to the publication of the Department's form and therefore made unsworn statements.

[94] "They claimed that all credits earned would be accepted by any other colleges... I wanted to continue my education and perhaps attend law school but was told that a majority, if not all of my credits from Everest, would not be accepted." BD150202; "I was told that after completing my AA in Forensics I would be able to take the credits and pursue a Bachelors degree in Forensic Psychology which would double/triple my future earnings..." BD150303

[95] "After graduating and not being able to get into the career I had studied for. I tried transfering credits and could not find schools that wanted to accept them." BD151251; "One of my first questions once I enrolled in Everest University was regarding the credibility and accreditation of the school. I wanted to make sure that upon graduation, I would be able to find a job and/or be able to further my education using Everest as a foundation." BD1602822

[96] "'Students who may not even be interested in transferring credits nonetheless will ask us whether other institutions will accept their credits,' [Corinthian Executive Vice President for Legislative and Regulatory Affairs Mark] Pelesh said. 'What they're really asking is, is this a legitimate institution? Is it part of the legitimate postsecondary higher education world?' And policies

12

These students' reliance on such claims is reasonable given the importance of transferability to students, as evidenced by the plight of many Everest students after the institution closed.   Thus, Everest's transferability misrepresentations constitute unlawful business practices under the UCL.

## 2.   The Fraudulent Prong

Everest's misrepresentations regarding the transferability of its credits also are a fraudulent business practice under the UCL, and are therefore another form of unfair competition providing an independent basis for borrower defense relief for Everest students.  To show that a business practice is fraudulent, "it is necessary only to show that members of the public are likely to be deceived."[97] The UCL does not require knowledge of misrepresentation (scienter) or intent to defraud, as is required for fraudulent deceit under the California Civil Code.[98]  Even true statements are actionable under the UCL if they are presented in a manner likely to mislead or deceive consumers, including by the omission of relevant information.[99]  As noted, the transferability representations that Everest made to students were false and likely to deceive, for the reasons discussed above and in Section II.

In order to bring a cause of action under the UCL, an individual must have "suffered injury in fact and… lost money or property" as a result of the deceptive practice alleged.[100]  However, for a consumer who was deceived into purchasing a product[101]—or a student who was deceived into enrolling at a school—it is sufficient for the individual to allege that they made their decision in reliance on the misrepresentations or omissions[102] of the entity.[103]

Reliance on the misrepresentation does not have to be "the sole or even the predominant or decisive factor influencing"[104] the individual's decision.  Rather, "[it] is enough that the representation has played a substantial part, and so had been a substantial factor, in influencing [their] decision."[105]

As discussed above, the evidence shows that students relied on Everest's transferability representations when they enrolled.[106]  Indeed, express or implied claims like those made by Everest about

---

that openly distinguish between credits earned at for-profit and nonprofit colleges -- turning down their nose at the former -- send a signal that answers that question No, he said." https://www.insidehighered.com/news/2007/02/26/transfer

[97] See Bank of the West, 2 Cal. 4th at 1254.

[98] CAL. CIV. C. § 1709.

[99] Boschma v. Home Loan Center, 198 Cal. App. 4th 230, 253 (2011).

[100] Smith v. Wells Fargo Bank, N.A., 135 Cal.App.4th 1463, 1480 n. 13 (2005).

[101] See Kwikset Corp. v. Superior Court, 51 Cal. 4th at 316 (Cal. 2011).

[102] Everest's implied representations of transferability are also actionable as deceptive half-truth omissions. A half-truth omission occurs when an affirmative representation is misleading in the absence of material qualifying information. See Deception Policy Statement, 103 F.T.C. at 176; FTC v. Five-Star Auto Club, Inc., 97 F. Supp. 2d 502, 532 (S.D.N.Y. 2000) ("Failure to disclose pertinent information is deceptive if it has a tendency or capacity to deceive."). An advertisement can be deceptive because it failed to disclose material information even if it does not contain any false statements. FTC v. Medical Billers Network, Inc., 543 F. Supp. 2d 283, 304 (S.D.N.Y. 2008). Here, Everest's affirmative statements about being "accredited" were deceptive absent further information distinguishing between regional and national accreditation and explaining the impact of national accreditation on transferability.

[103] See, e.g., Daghlian v. DeVry University, Inc., 461 F.Supp.2d 1121, 1156 (C.D. Cal. 2006) ("Although Daghlian does not allege that he attempted to transfer the credits to another educational institution, or that he was forced to begin his education anew at another institution, he does assert that he enrolled at DeVry and incurred $40,000 in debt '[i]n reliance on' defendants' misrepresentations and omissions about the transferability of credits. This sufficiently alleges that Daghlian personally suffered injury as a result of defendants' allegedly false and/or misleading advertising and unfair business practices.").

[104] In re Tobacco II Cases, 46 Cal. 4th 298, 327 (2009) (internal quotation marks omitted).

[105] Id. (internal quotation marks omitted).

[106] Because deception occurs at the time of decision, or for Everest students, at the time of enrollment, it is sufficient for Everest students to say that they chose to enroll based upon a transferability misrepresentation, regardless of subsequent efforts to transfer.

13

the transferability of credits are presumptively material.[107] Moreover, under the UCL, a showing of materiality gives rise to "a presumption, or at least an inference, of reliance."[108] Here, statements by borrowers support the presumption that promises of transferable credits were a substantial factor in their decision to enroll.

### C. Weak Disclaimers In Some of Everest's Written Materials Do Not Cure Its False and Misleading Transferability Representations

Everest's representations regarding its students' ability to transfer were false and misleading, despite the school's limited disclaimers in some written materials. In many instances enrollment agreements and course catalogs contained technically accurate information about transferability, but such written information did not change the overall impression created by the oral representations.

If a student examined the enrollment agreement, the student would have to read through four pages of fine print to find a box entitled "Enrollment Agreement" and subtitled "The Student Understands."[109] Midway through that box of fine print, item number 5 provides some information on transferability. That item is not highlighted or bolded in any way. The text cautioned students that Corinthian could not *guarantee* the transferability of credits to another school, but did not go so far as to cast doubt on the general transferability of Corinthian credits.[110] The agreement then continues on with two additional pages of fine print disclaimers. Everest's course catalogs generally contained limiting language similar to the enrollment agreements, and that language was similarly buried.[111]

These disclaimers do not cure the falsity of Everest's oral promises regarding transferability. First, courts interpreting the FTC Act and the UCL have made clear that written disclaimers do not cure the falsity of oral misrepresentations.[112] The California Supreme Court has also held that misleading statements enticing consumers to enter into a contract may be a basis for a UCL claim, even though accurate terms may be provided to the consumer before entering into the contract.[113]

The written disclaimers were hidden in text and provided only after admissions representatives orally promised general transferability. Moreover, here, Everest's disclaimers were particularly ineffective when considered in the context of Corinthian's unsophisticated student population and high-pressure admissions practices.

---

[107] *See, e.g., Telebrands Corp.*, 140 F.T.C. at 292 (presuming that claims are material if they pertain to the efficacy, safety, or central characteristics of a product); *FTC v. Lights of America, Inc.*, No. SACV10-01333JVS, 2013 WL 5230681, at *41 (C.D. Cal. Sept. 17, 2013) (holding that claims about the watts and lifetime of the LED light bulbs were *per se* material because they were express, and "that even if they were implied claims, they were material because the claims relate to the efficacy of the product."); *FTC v. Bronson Partners, LLC*, 564 F. Supp. 2d 119, 135 (D. Conn. 2008) (noting that an implied claim where the advertiser intended to make the claim was presumed to be material).

[108] *In re Tobacco II Cases*, 46 Cal. 4th at 298.

[109] *See, e.g.*, Everest Institute Brighton/Chelsea Enrollment Agreement.

[110] *See, e.g.*, Everest Institute Brighton/Chelsea Enrollment Agreement: "The School does not guarantee the transferability of credits to any school, university or institution. The student should contact a receiving institution regarding transfer of credit from The School prior to enrollment." MA AGO Ex. 9 at AGO-MA02062

[111] Most course catalogs stated that the acceptance of credits was at the discretion of the receiving institution. We found one outlier example, the Everest Miami course catalog, which declared Everest credits were not generally transferable.

[112] *See, e.g., FTC v. Minuteman Press*, 53 F. Supp. 2d 248, 262-63 (E.D.N.Y. 1998) (finding that oral misrepresentations were not cured by written disclaimers); *see also Chapman v. Skype Inc.*, 220 Cal. App. 4th 217, 228 (Cal. App. Ct. 2013) (finding under the UCL that Skype's representation that a calling plan was "unlimited" was misleading despite the fact that it provided limits on the plan in a separate policy provided to customers).

[113] *Chern v. Bank of Am.*, 15 Cal. 3d 866, 876 (Cal. 1976) ("the fact that defendant may ultimately disclose the actual rate of interest in its Truth in Lending Statement does not excuse defendant's practice of quoting a lower rate in its initial dealings with potential customers. The original, lower rate may unfairly entice persons to commence loan negotiations with defendant in the expectation of obtaining that rate.").

14

DOE_00003404

Corinthian documents show that the school sought to enroll vulnerable people who had "low self-esteem," were "stuck, unable to see and plan well for the future" and "isolated," had "few people in their lives who care about them," and were "impatient, want quick solutions."[114] Corinthian's CEO, in a letter to Federal Student Aid, wrote that the school enrolled "a predominantly high risk student body that is underserved by traditional higher education institutions. Many of our campuses are located in or near difficult inner-city areas and provide access to students who have not previously achieved educational success."[115] Corinthian advertised on daytime TV,[116] targeting the un- or under-employed. In some instances, Corinthian personnel actively recruited homeless individuals as students, despite the additional challenges they would face in completing their studies, even offering monetary incentives to take campus tours.[117] In sum, the net impression of the oral misrepresentations on the typical Corinthian student likely would not have been altered by buried written disclosures.

Moreover, the nature of the enrollment process made it unlikely that students ever read such disclosures prior to admission. Students were rushed through the enrollment process at Corinthian and were not provided an opportunity to read and digest the enrollment agreement.[118] As the Harkin Report found, this practice stemmed from the emphasis on growth: "Enrollment growth is critical to the business success of for-profit education companies... In order to meet revenue and profit expectations, for-profit colleges recruit as many students as possible to sign up for their programs."[119] The report quotes a 2005 Corinthian hiring manual as stating: "remember that this is a sales position and the new hire must understand that from the very beginning."[120] At Corinthian, internal documents make clear that recruiters were not trained or expected to advise students,[121] but to sell the program – to "enroll your brains out."[122]

Many Everest students state that they did not choose their own classes[123] or sometimes even their own program of study, making it even less likely they would see disclosures in course catalogs.[124] These student reports back up the Harkin report's conclusion that Corinthian recruiters were effectively salespersons, with the goal to enroll the student in whichever classes or programs made the most sense for

---

[114] CA AG Quach Decl. Ex 113.

[115] Letter from Jack D. Massimino, CEO, Corinthian, to James W. Runcie, Chief Operating Officer, U.S. Office of Federal Student Aid (Nov. 12, 2014).

[116] CA AG Quach Decl. Ex 113.

[117] CA AG Decl. of Holly Harsh.

[118] "After meeting with an Everest representative in October 2011, I wished to discuss my options with family but I felt pressure to enroll on the spot. I wanted a career in the medical field and the representative told me to act now since I was already there. They rushed the whole enrollment process." Affidavit of D'Anne Coffie MA Ex. 08 at AGO-MA01891; "The tour of the school felt very rushed, as if the school did not want to give the people on the tour time to make a decision." Affidavit of Courtney Petrie, MA Ex. 08 at AGO-MA01914; "They were like used car salesmen. They made sure I signed up before I walked out the door during my first visit, even though I only went there for a tour." Affidavit of Matisha Chao MA Ex. 08 at AGO-MA01887

[119] Harkin Report, p. 387.

[120] *Id.*

[121] Harkin Report, p. 387.

[122] Deposition of Scott Lester, Former Admissions Director of Everest Milwaukee, WI AG, Sutherlin Affidavit Exhibit 15 , p. 49

[123] "I ended up taking courses that were not even applicable to my degree or not necessary for me to complete my degree. In other words, *I paid additional for classes I didn't really need to take*." BD150455; "My student advisor when I first got started was explaining how classes were available for a few hundred dollars for the courses. While there may have been some for that price, not many were *the classes they said I had to take*." BD150813

[124] "I went to school from Jan 2011 to March 2014 and was enrolled in the Associates Billing and Coding and then they *convinced me to move to a BS in Health Care Administration*… As I approached my end of my degree I ran out of money and realized *they had made me take classes I did not need* in my program and had 4 classes to finish and I was stuck…" BD151750; "They totally mislead me when I was requesting to sign up for their Crime Scene Investigator program. My student adviser had actually put me into their Criminal Justice Program instead and the mistake wasn't figured out until it was past their drop/add time frame of classes so I was stuck taking classes that had NOTHING to do with my actual program I wanted to study. They told me there was nothing they could do and I had to just wait til the time frame of starting their next term." BD153136

DOE_00003405

the school, not the student. Students were not provided the time to read any written materials because the students' interests were not at the heart of the transaction.[125]

Finally, the fact that 198 of the 793 (25%) Everest/WyoTech claims reviewed to date allege that Corinthian represented that credits would generally be accepted at other schools, with no mention of any written disclaimer, strongly supports the conclusion that the disclaimers were ineffective. As discussed above, viewed in light of the unsophisticated population Corinthian targeted, and the high pressure sales tactics and oral representations we know Corinthian personnel to have employed, these disclaimers do not offset the net impression of the school's misrepresentations.

### D.  Eligible Borrowers

Based on the above analysis, the following Everest and WyoTech Laramie students alleging transfer of credits claims should be eligible for relief:

1.  Any claimant who attended a nationally accredited Everest campus or WyoTech's Laramie campus and who:

    a.  alleges that Everest expressly represented that credits earned there would be generally transferable; or

    b.  alleges that Everest misrepresented the nature and/or value of their accreditation, in a manner that implied that their credits were generally transferable.

2.  Borrowers who allege that their credits did not transfer, but do not allege a corresponding misrepresentation, will not be eligible for relief on this basis.

3.  Eligible borrowers will be limited to students first enrolling after Corinthian acquired the campus in question.

### E.  Full BD Relief Should Be Provided to Eligible Borrowers, Subject to Reduction for Borrowers Affected by the Statute of Limitations

When determining the amount of relief due to plaintiffs under the UCL, courts rely on cases interpreting the Federal Trade Commission Act.[126] In cases where a substantial/material misrepresentation was made, FTC law provides significant support for requiring complete restitution of the amount paid by consumers.[127]

In a recent California federal court decision analyzing the appropriate remedy for consumers alleging educational misrepresentations under the UCL, the court explicitly analogized to the *Figgie* and *Ivy Capital* approach and found that a restitution model that aims to "restore the status quo by returning to

---

[125] "I was also provided with a course catalog/program disclosure statement stating in writing that the placement rate was 72%. *These written materials were provided only after I had signed up.*" MA AGO Ex. 03 at AGO-MA00180

[126] *See, e.g., Makaeff v. Trump Univ.*, 309 F.R.D. 631, 637-8 (S.D. Cal. 2015).

[127] *See, e.g., FTC v. Stefanchik*, 559 F.3d 924, 931 (9th Cir. 2009) (determining that restitution should include "the full amount lost by consumers rather than limiting damages to a defendant's profits"); *FTC v. Figgie International*, 994 F.2d 595, 606 (9th Cir. 1993) ("The injury to consumers... is the amount consumers spent... that would not have been spent absent [the] dishonest practices."); *FTC v. Security Rare Coin & Bullion Corp.*, 931 F.2d 1312, 1316 (8th Cir. 1991) ("restoration of the victims of [defendant's] con game to the status quo ante" by use of defendant's gross receipts is proper for restitution); *FTC v. Ivy Capital, Inc.*, No, 2:11-CV-283 JCM (GWF), 2013 WL 1224613 at *17 (D. Nev. 2013) (ordering full monetary relief for consumers harmed by misleading marketing regarding a business coaching program).

DOE_00003406

the plaintiff funds in which he or she has an ownership interest" was a justifiable basis for a class action theory of relief.[128]

However, nothing in the borrower defense statute or regulation requires the Department to apply state law remedies when reviewing a borrower's claim. The only statutory limit on the Secretary's ability to grant relief is that no student may recover in excess of the amount the borrower has repaid on the loan.[129]

Indeed, under the current regulation, while a claimant must allege an act or omission that would "give rise to a cause of action" under "applicable state law" in order to be eligible for BD relief, the rule does not direct the Department to award relief to a claimant based on state law principles of restitution or damages. Instead, the borrower defense regulation clearly provides that the Secretary has discretion to fashion relief as suited to the facts of a particular case:

> If the borrower's defense against repayment is successful, the Secretary notifies the borrower that the borrower is relieved of the obligation to repay all or part of the loan and associated costs and fees that the borrower would otherwise be obligated to pay. The Secretary affords the borrower such further relief *as the Secretary determines is appropriate under the circumstances* [including reimbursement to the borrower of amounts paid towards the loan].[130]

Moreover, the Supreme Court has recognized that, when an agency is fashioning "discretionary relief," such decisions "frequently rest upon a complex and hard-to-review mix of considerations," and therefore, "for the sake of uniformity, it is usually better to minimize the opportunity for reviewing courts to substitute their discretion for that of the agency."[131]

The D.C. Circuit has also consistently recognized the "long-standing principle" that federal agencies must be afforded particularly wide latitude in fashioning remedies consistent with the statutes they are charged with administering. An agency's discretion is, "if anything, at zenith when the action assailed relates primarily not to the issue of ascertaining whether conduct violates the statute, or regulations, but rather to the fashioning of … remedies."[132] Thus, while California and FTC Act case law is instructive as to the quantum of relief to be provided, the Department is not constrained by that authority.

Here, there is ample reason not to "offset" the award of full relief to these borrowers in light of the lack of value attendant to their Everest education. *See Makaeff,* 309 F.R.D. at 642 (allowing defendants to offer evidence warranting an offset from a baseline of full recovery). First, if a student cannot generally transfer credits, a chief value conferred by such credits is greatly diminished.

Second, and perhaps more importantly, the Department has found that Everest and its parent company Corinthian repeatedly misled students, regulators and accreditors regarding its ability to place students in jobs, systematically inflated its job placement rates, misrepresented job placement rates to a programmatic accreditor, and even engaged in an elaborate job placement fraud to maintain its

---

[128] *Makaeff v. Trump Univ.*, 309 F.R.D. 631, 637-8 (S.D. Cal. 2015) (internal quotations removed).
[129] Section 455 of Title IV of the Higher Education Act, 20 U.S.C. § 1087e(h).
[130] 34 C.F.R. § 685.206(c)(2).
[131] *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 621 (1966).
[132] *Fallbrook Hosp. Corp. v. N.L.R.B.*, 785 F.3d 729, 735 (D.C. Cir. 2015) (internal quotations and citations removed) (rejecting a challenge to the National Labor Relations Board's decision to require a hospital to pay for a nurse's unions full costs for negotiating a labor agreement); *see also U.S. Postal Serv. v. Postal Regulatory Comm'n*, 747 F.3d 906, 910 (D.C. Cir. 2014) (approving a remedy order by the Postal Regulatory Commission requiring the U.S. Postal Service to reduce its rates for certain mailers); *Exxon Mobil Corp. v. FERC*, 571 F.3d 1208, 1216 (D.C. Cir. 2009) ("When FERC is fashioning remedies, we are particularly deferential."); *Am. Tel. & Tel. Co. v. FCC*, 454 F.3d 329, 334 (D.C. Cir. 2006) (approving the FCC's decision to apply an administrative order retroactively).

DOE_00003407

accreditation.[133]  Given this well-documented, pervasive, and highly publicized misconduct at Corinthian, the value of an Everest education has been severely limited.

Borrower defense applications confirm the lack of value of an Everest education as many Everest students report that their coursework from Everest has been an impediment rather than an asset as they seek employment.  For example, one student reports: "I was only working part time when I was attending school and this degree has done nothing to help me obtain better employment. I am also embarrassed to even put this on my resume because any potential employer who looks this school will discover it was a fraud."[134]  Another reports: "I cannot find a job using my degree. I find one faster if I leave the fact that I didn't go to college at all. People just laugh in my face about Everest saying that it is not a 'real school.'"[135]  Yet another student states: "Employers will not touch me. After graduating I posted a resume online. I did not receive any responses until I removed Everest Online from my resume."[136]

Finally, awarding full relief to students who make transferability claims is consistent with the Department's approach to providing relief to Corinthian students seeking BD relief on the basis of false job placement rates.  Indeed, the Department granted full relief to students who alleged that they relied on Corinthian job placement rate representations, without offsetting the relief based on any value that students may have received by attending Corinthian.  Given the Department's approach to date, it would be inequitable to limit the relief of students who allege transferability claims while providing full relief to those students who qualify for job placement rate relief.

In sum, in these circumstances, and consistent with the Department's prior actions related to Corinthian, it is appropriate to award eligible borrowers full relief, subject to reduction for borrowers affected by the statute of limitations.

---

[133] *See* Letter from Robin S. Minor, Acting Director, Administrative Actions and Appeals Service Group, U.S. Office of Federal Student Aid, to Jack D. Massimino, CEO, Corinithan (Apr. 14, 2014); *see also* Letter from Mary E. Gust, Director, Administrative Actions and Appeals Service Group, U.S. Office of Federal Student Aid, to Jack D. Massimino, CEO, Corinthian (Aug. 22, 2014) (finding that "Everest Institute submitted false placement data to ACCSC to maintain the accreditation of Everest Decatur" and that the school's job placement rates were based on "CCI-designed programs through which Everest Decatur paid employers to hire its graduates" for short time periods in order to inflate placement rates).
[134] BD1614100
[135] BD1602593
[136] BD151191

DOE_00003408

To:  Under Secretary Ted Mitchell
From:  Borrower Defense Unit
Date:  January 9, 2017
Re:  Recommendation for Corinthian Borrowers Alleging That They Were Guaranteed Employment

Corinthian Colleges, Inc. ("Corinthian") consistently represented that all graduates obtained jobs after graduation or, relatedly, that its students were guaranteed employment after graduation. These representations were false and misleading. Accordingly, the Borrower Defense Unit recommends full relief for Corinthian borrower defense (BD) applicants who submit "guaranteed employment allegations" – that is, borrowers who (1) enrolled at any Corinthian-operated Heald, Everest, or WyoTech campus between the time Corinthian opened or acquired the campus and April 2015; and (2) alleged that they were promised, guaranteed, or otherwise assured that they would receive a job upon graduation, or that all graduates obtain employment (implicitly including themselves).

I.        **Summary of Corinthian's Representations to Borrowers Promising Employment**

In BD applications, borrowers who attended Heald, Everest, and WyoTech consistently allege, each in their own words, that Corinthian staff orally promised, guaranteed, or otherwise assured them that they would be placed in jobs. These oral representations sometimes took the form of a guarantee regarding the individual student and sometimes took the form of a guarantee of universal employment for graduates. In both cases, the obvious impression to students would have been that 1) the value of the education would be substantial; and 2) they would get jobs upon graduation.

These representations occurred both in person and during telephone calls with prospective students. Borrowers' allegations of "guaranteed employment" are unprompted,[1] specific, and consistent across a span of years. Indeed, the Department has received consistent guaranteed employment claims from borrowers at every campus sampled, including borrowers who enrolled between 1998 and 2013, demonstrating that personnel made consistent guaranteed employment representations throughout the entire time that Corinthian operated its schools. Taken together, based on an evaluation of the credibility of those statements, as well as Corinthian's record of making misrepresentations to prospective students,[2] a preponderance of the evidence demonstrates that Corinthian promised borrowers that they would receive jobs upon graduation.

A.        **Guaranteed Employment Representations at Heald College**

At Heald, of the 1015 claims sampled, 141 (13.9% of the total) include allegations of guaranteed employment.[3] The high incidence of guaranteed employment allegations was evident at all Heald campuses. At Heald Modesto, for example, of 61 BD claims sampled, 9 allege guaranteed employment (14.8% of the

---

[1] All of the above student statements came from a variety of different types of applications including the Heald, Everest, and WyoTech attestation forms ED created for job placement rate claims, various versions of the Debt Collective forms, and narratives in Word documents or the bodies of emails. The majority of these allegations are unprompted—some versions of the Debt Collective form ask about "false and misleading conduct relating to job prospects," but ED's attestation form only instructs borrowers to provide "any other information…that you think is relevant."

[2] *See* discussion below, Section II, describing Corinthian's misrepresentations regarding job placement rates.

[3] This count excludes allegations that may pertain to guaranteed jobs but that were not sufficiently clear or specific to qualify for relief. For example, allegations that Corinthian's career services offices did not assist the borrower in finding a job were not interpreted as guaranteed employment allegations.

DOE_00003409

total).[4]  A sample of claims from Modesto borrowers demonstrates the consistency and specificity of guaranteed employment representations made by school representatives:

- "Heald college recruiters stated, 'I was guaranteed' to obtain a job after graduation."[5]
- "I was told that when I finished my program I would automatically have job placement and never received that placement."[6]
- "Heald promised me a job placement in the field.  To this day, I haven't been able to find a job in my field, or a good paying job."[7]
- "I was given the false pretense that I could obtain a career in law enforcement with an Associate's degree and was guaranteed job placement."[8]

Guaranteed employment allegations appeared with similar pervasiveness and consistency at all of the other 11 Heald campuses.  A sample of these claims, detailed below, demonstrates the high incidence of guaranteed employment misrepresentations at the school.

- Heald Concord: "During my experience, they promised me jobs after graduation . . . I still have the same jobs after graduation and Heald did nothing to help me . . . Heald College promised that they will find job for me upon graduation."[9]
- Heald Honolulu: "Upon admission, my admission's advisor, Roy Honjo, informed that an associate's degree in applied science in Health Information Technology (HIT) would provide me many job opportunities . . . He insisted I would find a job that would suit me and would be a smart decision to pursue."[10]
- Heald Roseville: "When I first looked into Heald College and spoke with the Academic Advisor, I was promised a job position within six months.  It is now 2015 and I have yet to have ever worked in a medical office.  The degree has done nothing for me."[11]
- Heald Salinas: "When I first enrolled, they said I had a job at the end of my education."[12]
- Heald San Jose: "They stated on many occasions that after I graduate and complete the program that I would be placed in job where I would be able to pay off my student loans easily... They guaranteed job placement and never delivered."[13]
- Heald San Francisco: "Heald College's promises of guaranteed job placement after graduation sold me on becoming a student."[14]

---

[4] The Modesto campus was selected because relatively few Modesto borrowers qualified for relief based on ED's findings regarding job placement rates.  Modesto was a relatively new campus, and therefore had calculated placement rates for fewer years in the period surveyed.
[5] BD155524.
[6] BD155784.
[7] BD155698.
[8] BD154018.
[9] BD151426.
[10] BD1600328.
[11] BD157436.
[12] BD151163.
[13] BD153799.
[14] BD153784.

2

| Heald Claims | | | |
|---|---|---|---|
| Campus | Applications reviewed | Applications alleging guaranteed employment representation | % |
| Heald Modesto | 61 | 9 | 14.8% |
| Heald San Jose | 151 | 29 | 19.2% |
| Heald Rancho Cordova | 40 | 5 | 12.5% |
| Heald Roseville | 56 | 9 | 16.1% |
| Heald Hayward | 138 | 18 | 13.0% |
| Heald Stockton | 125 | 11 | 8.8% |
| Heald Concord | 150 | 22 | 14.7% |
| Heald Fresno | 103 | 11 | 10.7% |
| Heald Honolulu | 63 | 10 | 15.9% |
| Heald Portland | 24 | 3 | 12.5% |
| Heald Salinas | 43 | 4 | 9.3% |
| Heald San Francisco | 61 | 10 | 16.4% |
| **TOTAL** | **1015** | **141** | **13.9%** |

**B.    Guaranteed Employment Representations at Everest and WyoTech**

The high incidence of guaranteed employment allegations at Heald was evident at Everest and WyoTech, as well. At Everest, 231 out of 1277 BD claims sampled, or 18.1%, made guaranteed employment allegations. At Everest Brandon, for example, 45 of 305 claims sampled, or 14.8% of the total, alleged guaranteed employment. A sample of claims from Everest Brandon borrowers follows:

- "They told me that every student that graduated the program was placed."[15]
- "I was told that I would be able to attain a job in my field with no problem. I have applied to multiple agencies and was told I was not qualified."[16]
- "I was told I would find a job in my field . . . I 'graduated' and still can't find a job that will honor my degree."[17]
- "I was told that I would be placed into a career field of my studies, but I was not."[18]

The Department sampled claims at 22 Everest campuses[19] across ten separate states (AZ, FL, MI, MA, TX, VA, CO, WI, NY, CA). Just like the Everest Brandon campus discussed above, the guaranteed employment allegations were common at all of these campuses and were distributed roughly evenly throughout the period those campuses were owned and controlled by Corinthian. Most importantly, the review of these claims across campuses and years demonstrates that students made substantially similar guaranteed employment allegations – whether the student enrolled at Brandon in 1998 or Rochester in 2008.

---

[15] BD151311.
[16] BD150332
[17] BD1612793.
[18] BD1614055.
[19] The oldest Everest campuses were opened in California in 1995. Others opened anywhere between 1996 and 2012. The 22 campuses contained in the chart opened or came under Corinthian control between 1996 and 2004.

3

DOE_00003411

Similarly, at WyoTech, 64 out of 455 BD claims sampled, or 14.1%, alleged guaranteed employment. At WyoTech Laramie, for example, 8 of 31 claims, or 25.8% of the total, alleged guaranteed employment. A sample of claims from WyoTech Laramie borrowers follows:

- "They promised me a high paying career and said they would find it for me after graduation. They stated that all of the students who pass the program . . . will have jobs waiting for them."[20]
- "The education was sold as a way to guarantee future employment, with access to a nationwide network of job placement experts."[21]
- "The school was promising a career in the field after schooling."[22]
- "[They] would say that just by speaking the name Wyotech you so get hired and make over 100K a year. They said it would be automatic hiring and that the industry knows the Wyotech name."[23]
- "We were recruited hard and we were promised [that] [name redacted] . . . would have his choice of many fine, well-paying positions once he completed his studies."[24]

The tables below summarize the number of guaranteed employment allegations at Everest and WyoTech for all of the sampled campuses:

| Everest Claims | | | |
|---|---|---|---|
| Campus | Applications reviewed | Applications alleging guaranteed employment representation | % |
| Everest Brandon | 305 | 45 | 14.8% |
| Everest Grand Rapids | 46 | 3 | 6.5% |
| Everest Largo | 31 | 6 | 19.4% |
| Everest Ontario Metro | 34 | 7 | 20.6% |
| Everest Orange Park | 36 | 9 | 25.0% |
| Everest Orlando North | 47 | 6 | 12.8% |
| Everest Orlando South | 226 | 33 | 14.6% |
| Everest Phoenix | 81 | 40 | 49.4% |
| Everest Pompano Beach | 97 | 9 | 9.3% |
| Everest Rochester | 53 | 14 | 26.4% |
| Everest Tampa | 32 | 9 | 28.1% |
| Everest San Bernardino | 15 | 1 | 6.6% |
| Everest Milwaukee | 38 | 6 | 15.8% |
| Everest Colorado Springs | 37 | 10 | 27.0% |
| Everest Ft. Worth South | 54 | 8 | 14.8% |
| Everest Tyson's Corner | 15 | 2 | 13.3% |
| Everest Vienna | 21 | 2 | 9.5% |
| Everest Arlington | 31 | 4 | 12.9% |
| Everest Aurora | 50 | 3 | 6% |
| Everest Thornton | 4 | 1 | 25% |
| Everest Chelsea | 12 | 6 | 50% |
| Everest Brighton | 12 | 7 | 58.3% |
| **TOTAL** | **1277** | **231** | **18.1%** |

---

[20] BD150863.
[21] BD152602.
[22] BD155621.
[23] BD151128.
[24] BD151903.

4

DOE_00003412

| WyoTech Claims | | | |
|---|---|---|---|
| Campus | Applications reviewed | Applications alleging guaranteed employment representation | % |
| WyoTech Laramie | 31 | 8 | 25.8% |
| WyoTech Fremont | 135 | 16 | 11.8% |
| WyoTech Blairsville | 157 | 18 | 11.4% |
| WyoTech West Sacramento | 132 | 22 | 16.6% |
| TOTAL | 455 | 64 | 14.1% |

Significantly, just as the aforementioned Heald, Everest, and WyoTech claims at each campus corroborate each other, the number of similar allegations at and across all Corinthian schools and campuses strongly suggests that promises of employment were endemic to Corinthian's institutional culture.

### C.   Guaranteed Employment Claims Consistent Across a Span of Years

Although the Borrower Defense Unit has received fewer claims from borrowers that attended Corinthian schools in earlier years,[25] such claims bear the same indicia of reliability as claims from students who attended more recently. Student statements about admissions representatives' misrepresentations are consistent across a span of years, as demonstrated by claims from former students at Everest – Orlando South:

- [1999]: "Everest recruiters told students that they were 'guaranteed' to obtain jobs."[26]
- [2001]: "They . . . told me I would be guaranteed a job once I graduated."[27]
- [2002]: "I was told **I would get a job right away...**"[28]
- [2003]: "I was lured into this organization with false promises of **100% job placement...**"[29]
- [2005]: "They said I was **guaranteed job placement after I graduated.**"[30]
- [2006]: "**Everest guaranteed me career placement upon graduation.**"[31]
- [2007]: "They told me that I will be **guaranteed a job placement after I graduate.**"[32]
- [2008]: "They told me I was **guaranteed a job.**"[33]
- [2009]: "**I was promised job placement, high salaries and success.**"[34]
- [2010] "**I was guaranteed a job** from my Academic advisor and Career Counselor."[35]
- [2011] "...told me I was **guaranteed a job** in my profession **after I graduated** making twice as much as minimum wage at least."[36]
- [2012]: "I was promised **employment after graduation.**"[37]

---

[25] The Department's outreach has targeted borrowers from more recent years in an attempt to reach borrowers that may be eligible for relief on the basis of misrepresented job placement rates.
[26] BD155177.
[27] BD156179.
[28] BD1600004
[29] BD151816
[30] BD150148.
[31] BD157758.
[32] BD153166.
[33] BD153136.
[34] BD156038
[35] BD1605002.
[36] BD155731.
[37] BD1615288.

5

- [2013]: "They called me over and over and promise jobs after graduating...["38]

**D.**    **Corinthian Employee Statements and Other Employment-Related Misrepresentations Corroborate Guaranteed Employment Claims**

The similarity of student statements across schools, campuses, and years strongly suggests that the misrepresentations were system-wide and, indeed, part of Corinthian's institutional culture. This conclusion finds further support in the affidavits of former employees, who admitted that Corinthian employees misled prospective students about their employment prospects. For example, a former instructor at Everest's Chelsea campus stated, "People in corporate told prospective students they guaranteed jobs . . . They saw job placement not as job placement in the students' fields of study, but as a student getting any job."[39] An admissions representative from the same campus stated, "Admissions representatives told prospective students that medical assistants are in high-demand and that they would have no problem finding jobs . . . and they will definitely find jobs."[40]

Furthermore, guaranteeing jobs to prospective students appears to have been part of a pattern of employment-related misrepresentations at Corinthian. An internal Corinthian audit of admissions calls from one its campuses found that that 21% of admissions representatives "provided [a] false or misleading statement (such as best case scenario)," which likely pertained to employment outcomes.[41] Further, in a letter issuing a nearly $30 million fine to Heald, the Department found that Heald "represented with regard to many of its programs that it placed 100% of its graduates in jobs," but Heald was unable to provide evidence to substantiate these representations. The Department further noted that based on the evidence that Heald was able to provide, the job placement rates appeared to be substantially lower than 100%, and for several programs, below 50%.[42] At the same time that Corinthian was making false representations about its job placement rates, executives at Corinthian were putting heavy pressure on campuses to attract new students. One admissions director reported that his superiors at Corinthian instructed him to "enroll your brains out."[43] In this context, it is unsurprising that staff at the campus level would be guaranteeing students a job.

Accordingly, we recommend no further year-by-year or campus-by-campus breakdown for additional Corinthian campuses. The hundreds of claims reviewed corroborate that Corinthian personnel made guaranteed employment representations beginning shortly after Corinthian opened or gained control of a campus.

**II.**    **Evidence of the Falsity of the Alleged Representations**

Corinthian's own records show that the school was unsuccessful at placing large numbers of Corinthian graduates. The Everest records, for example, reveal that nearly half of the school's programs placed 50% or fewer of the program graduates. Further, evidence from Corinthian's internal communications shows that they were aware that the school could not live up to their promises of employment. For example, an internal email from Corinthian's Vice President for Operations stated that, "at some campuses" they had "not been

---

[38] BD1617088.
[39] *Massachusetts v. Corinthian Colleges, Inc.*, Civil Action 14-01093-E, *Medolo* Aff. ¶ 4, June 26, 2015.
[40] *Massachusetts v. Corinthian Colleges, Inc.*, Civil Action 14-01093-E, Morrison Aff. ¶ 5, July 6, 2015.
[41] Exhibit 40 - CA AG Default Motion at 278.
[42] Heald Fine Letter, http://www2.ed.gov/documents/press-releases/heald-fine-action-placement-rate.pdf.
[43] Deposition of Scott Lester, Former Admissions Director of Everest Milwaukee, Exhibit 36 - CA AG Default Motion.

6

consistently delivering" on the promise to students to "find a position that will help them launch a successful career."[44]

The narratives in borrower defense applications also support these conclusions.  Many students that make guaranteed employment allegations—and many other BD applicants—state that they were unable to find a job upon graduation; that they were unable to find employment that used their degree; or that they were forced to remain in the job that they had prior to enrolling at Heald, Everest, or WyoTech.  In sum, the evidence overwhelmingly shows that Corinthian campuses could not truthfully guarantee prospective students employment upon graduation.

### III.   Application of the Borrower Defense Regulation Supports Eligibility and Full Relief for Borrowers Alleging Guaranteed Employment Misrepresentations Under Applicable State Law, Subject to Reduction for Borrowers Affected by the Statute of Limitations

For the reasons set forth below, the Corinthian borrowers' applications for borrower defense relief predicated on a guaranteed employment allegation: a) are reviewed under California law; and b) have a valid claim under the "unlawful" and "fraudulent" prongs of California's Unfair Competition Law ("UCL"),[45] which prohibits a wide range of business practices that constitute unfair competition, including corporate misrepresentations.  Moreover, given the lack of value conferred by Corinthian credits and/or degrees, these students should be granted full loan discharges and refunds of amounts already paid, subject to reduction for borrowers affected by the statute of limitations.

#### A.   The Department will apply California Law to These Claims.

To prevail with a defense to repayment, a borrower must assert acts or omissions "that would give rise to a cause of action against the school under applicable state law."[46]  With the assistance of the Office of General Counsel, we have examined specifically whether borrowers making the claims described in this memo could bring a cause of action in California and determined that they could.  Specifically, the Department has concluded not only that students who were subjected in California to the acts complained of here would have been able to bring their cases in California courts under California law, but also that borrowers who attended Corinthian in other states could have brought their claims in the context of a class action in a California court, which would have applied California law.

California has general jurisdiction over Corinthian.[47]  As to the law a California court would have applied, California courts have recognized that a forum state (such as California) "may apply its own substantive law to the claims of a nationwide class without violating the federal due process clause or full faith and credit clause if the state has a 'significant contact or significant aggregation of contacts' to the claims of each class member such that application of the forum law is 'not arbitrary or unfair.'"  *Washington Mut. Bank, FA v. Superior Court*, 15 P.3d 1071, 1080 (Cal. 2001) (*quoting Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 821 (1985)).  California is neither an arbitrary nor an unfair state for a class of Corinthian borrowers to bring a

---

[44] Exhibit 36 - CA AG Default Motion.
[45] CAL. BUS. & PROF. CODE § 17200, et seq.
[46] 34 C.F.R.  § 685.206(c) (emphasis added).
[47] Corinthian was headquartered in California, and was therefore a resident corporation subject to the state's general jurisdiction.  Furthermore, even a non-resident corporation is subject to a forum's general jurisdiction "if [its] contacts in the forum state are substantial[,] continuous and systematic."  *Vons Companies, Inc. v. Seabest Foods, Inc.*, 926 P.2d 1085, 1092 (Cal. 1996) (internal quotation marks and alterations omitted).  In such a case, "defendant's contacts with the forum are so wide-ranging that they take the place of physical presence in the forum as a basis for jurisdiction," and there is no need to determine whether the specific acts alleged in the suit meet the threshold for specific jurisdiction.  *Id.*  Such is the case with Corinthian; the largest numbers of both campuses and students were located in California.

7

DOE_00003415

claim, and the conduct at issue had significant contacts with California insofar as the students were enrolling in a California-based school and recruiters were receiving at least some of their training from high levels of administration at the school.

Furthermore, under California's choice-of-law test, the court considers both the defendant's headquarters and the state where many students attended the school.[48] Another key factor in the choice-of-law analysis under California law is the location "where the wrong occurred."[49] At Corinthian, the largest numbers of both campuses and students were located in California. Further, as proved to be the case in the Department's investigation of Corinthian, the fact that a school is headquartered in a given state will often mean that *"some or all"* of the challenged conduct emanates" from that state, another common factor in choice of law determinations.[50] At Corinthian, former employees report that corporate decision makers based in California directed admissions staff to make misleading statements and engage in various high-pressure sales tactics to increase enrollment.[51]

Based on these factors – that Corinthian was headquartered and had its principal place of business in California, that the largest numbers of its campuses and students were located in California, and that decisions and policies made by its California based corporate leadership harmed students across the nation – it is reasonable for the Department to determine that a California court would apply California law to these claims. Therefore, BD claims submitted by former students from all Corinthian campuses will be considered under the California UCL.

**B.    Corinthian Students Making Guaranteed Employment Allegations Have A Valid Claim Under the "Unlawful" and "Fraudulent" Prongs of the UCL**

California's UCL prohibits unfair competition, providing civil remedies for "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by [the false advertising law]."[52] Here, Corinthian's statements leading prospective students to believe that they were guaranteed employment constitute "unlawful" and "fraudulent" business practices under the UCL.

**1.    The Unlawful Prong**

The UCL bars "anything that can properly be called a business practice and that at the same time is forbidden by law."[53] Thus, if a business practice violates any law, this is *per se* a UCL violation.[54] Corporate

---

[48] *See, e.g., In re Clorox Consumer Litig.*, 894 F. Supp. 2d 1224, 1237–38 (N.D. Cal. 2012) (citing *In re Toyota Motor Corp.*, 785 F.Supp.2d 883, 917 (C.D.Cal.2011)) (considering, among other factors, "where the defendant does business [and] whether the defendant's principal offices are located in California…").

[49] *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 593–94 (9th Cir. 2012). *See also McCann v. Foster Wheeler LLC*, 225 P.3d 516, 534 (Cal. 2010) ("Although California no longer follows the old choice-of-law rule that generally called for application of the law of the jurisdiction in which a defendant's allegedly tortious conduct occurred without regard to the nature of the issue that was before the court, California choice-of-law cases nonetheless continue to recognize that a jurisdiction ordinarily has the predominant interest in regulating conduct that occurs within its borders." (internal citation and quotation marks omitted)).

[50] *See, e.g., Clothesrigger, Inc. v. GTE Corp.*, 191 Cal. App. 3d 605, 612 (Ct. App. 1987).

[51] *See* Deposition of Scott Lester, Everest Milwaukee Director of Admissions, later President. WI AG, Ex. 15; Interview Report, Ivan Limpin, Former Employee, Corinthian Schools Call Center (Feb. 28, 2013).

[52] CAL. BUS. & PROF. CODE §17204, *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 320 (Cal. App. Ct. 2011); *see also Cel-Tech Communications v. Los Angeles Cellular Telephone Co.*, 973 P.2d 527, 540 (Cal. 1999).

[53] *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1266 (1992) (citations omitted).

8

DOE_00003416

misrepresentations like Corinthian's promises of employment are prohibited by a number of state and federal laws.[55] In particular, Corinthian's misrepresentation regarding its students' employment prospects violates the prohibition against "unfair or deceptive acts or practices" in the Federal Trade Commission Act ("FTC Act").[56] Determining whether statements to consumers violate the FTC Act involves a three-step inquiry considering whether: "first, there is a representation, omission, or practice that, second, is likely to mislead consumers acting reasonably under the circumstances, and third, the representation, omission, or practice is material."[57]

Applying that three step inquiry, Corinthian clearly violated the FTC Act.

1. As described above, Corinthian made representations to students regarding guaranteed employment;
2. Also as described above, those representations were false, erroneous, and misleading; and
3. As discussed below, the representations regarding guaranteed employment were material.

To be material, "a claim does not have to be the *only* factor or the *most* important factor likely to affect a consumer's purchase decision, it simply has to be an important factor"; furthermore, express claims are presumptively material.[58] Representations that students are guaranteed employment meet the FTC Act's materiality threshold because borrowers considered the promise of employment to be important when making their enrollment decisions. In attestations submitted to the Department, these borrowers have specifically identified false promises of employment as the misconduct giving rise to their claim. Moreover, given that Corinthian schools were heavily career-focused, the guarantee of a job would have been highly material to a prospective student's evaluation of the school. Students enrolled "primarily to gain skills and find a position that will help them launch a successful career."[59] Corinthian's own marketing materials emphasized that the school was a pathway to employment, often noting "solid industry employment contacts"[60] and the availability of "lifetime career services." For many students, the principal purpose of attending a career college like

---

[54] *See Kasky v. Nike*, 27 Cal. 4th 939, 950 (2002); *see also People v. E.W.A.P. Inc.*, 106 Cal. App. 3d 315, 317 (Ct. App. 1980); *Sw. Marine, Inc. v. Triple A Mach. Shop, Inc.*, 720 F. Supp. 805, 808 (N.D. Cal. 1989) (finding that a plaintiff had standing to sue under the UCL based in part on alleged violations of federal environmental regulations).
[55] Though the analysis below focuses exclusively on the FTC Act, Corinthian's misrepresentations to students may also violate other state and federal laws. For example, the California Education Code states that an institution shall not "promise or guarantee employment, or otherwise overstate the availability of jobs upon graduation." Cal. Educ. Code §94897, et seq. However, because the conclusion below is that Corinthian's conduct violates the FTC Act, this memo does not reach the issue of whether it may be unlawful under other applicable rules.
[56] *See* FTC Act § 5(a)(1), 15 U.S.C. § 45(a)(1); FTC Act § 12(a), 15 U.S.C. § 52(a). While the FTC Act does not provide a private right of action, California courts have consistently recognized that a valid UCL claim under the "unlawful" prong does not require that the underlying law provide such a right. Thus, for example, the California Supreme Court has permitted plaintiffs to bring actions under the California Penal Code that do not allow for private lawsuits. *See Stop Youth Addiction, Inc. v. Lucky Stores, Inc.*, 950 P.2d 1086, 1091 (Cal. 1998) ("whether a private right of action should be implied under [the predicate] statute ... is immaterial since any unlawful business practice ... may be redressed by a private action charging unfair competition in violation of Business and Professions Code sections 17200") (citing cases); *see also Rose v. Bank of Am., N.A.*, 304 P.3d 181, 186 (Cal. 2013) ("It is settled that a UCL action is not precluded merely because some other statute on the subject does not, itself, provide for the action or prohibit the challenged conduct. To forestall an action under the [UCL], another provision must actually bar the action or clearly permit the conduct.").
[57] *F.T.C. v. Pantron I Corp.*, 33 F.3d 1088, 1095 (9th Cir. 1994).
[58] *Novartis Corp.*, 127 F.T.C. 580 at 686, 695 (1999); *see also FTC v. Lights of America, Inc.*, No. SACV10-01333JVS, 2013 WL 5230681, at *41 (C.D. Cal. Sept. 17, 2013) ("Express claims ... are presumed to be material.").
[59] Exhibit 36 - CA AG Default Motion.
[60] Exhibit 179, Part 1; Declaration of Jacinto P. Fernandez (CA AG), Exhibit Y

9

Everest, Heald or WyoTech was to obtain employment in a particular field.[61] Based on the school's misrepresentations, individuals considering enrollment reasonably believed that they were certain to find employment upon graduation. Accordingly, Corinthian's false or misleading misrepresentations regarding guaranteed employment were material and therefore violated the unlawful prong of the FTC Act and constituted an unlawful business practice under the UCL.

### 2.   The Fraudulent Prong

Corinthian's misrepresentations regarding employment prospects also are a fraudulent business practice under the UCL, and therefore are another form of unfair competition providing an independent basis for borrower defense relief for Corinthian students. To show that a business practice is fraudulent, "it is necessary only to show that members of the public are likely to be deceived."[62] The UCL does not require knowledge of misrepresentation (scienter) or intent to defraud, as is required for fraudulent deceit under the California Civil Code.[63] Even true statements are actionable under the UCL if they are presented in a manner likely to mislead or deceive consumers, including by the omission of relevant information.[64] As noted, the representations Corinthian made to students guaranteeing employment were false and likely to deceive, for the reasons discussed above and in Section II.

In order to bring a cause of action under the UCL, an individual must have "suffered injury in fact and... lost money or property" as a result of the deceptive practice alleged.[65] However, for a consumer who was deceived into purchasing a product[66]—or a student who was deceived into enrolling at a school—it is sufficient for the individual to allege that they made their decision in reliance on the misrepresentations or omissions of the entity.

Reliance on the misrepresentation does not have to be "the sole or even the predominant or decisive factor influencing"[67] the individual's decision. Rather, "[it] is enough that the representation has played a substantial part, and so had been a substantial factor, in influencing [their] decision."[68]

Express or implied claims like those made by Corinthian about employment prospects are presumptively material,[69] and, under the UCL, a showing of materiality gives rise to "a presumption, or at least an inference, of reliance."[70] However, as discussed above, the preponderance of evidence also demonstrates, independently, that employment was a central consideration for these borrowers—one which each of the applications in question identified, unprompted, as the crux of their dissatisfaction with their decision to

---

[61] Under these circumstances, students' reliance on a guarantee of employment was reasonable.  Prospective students would have taken seriously a guarantee of employment and not interpreted it as mere "puffery."  The large volume of claims making guaranteed employment allegations is a clear indication that students believed what they were told.

[62] *See Bank of the West*, 2 Cal. 4th at 1254.

[63] CAL. CIV. C. § 1709.

[64] *Boschma v. Home Loan Center*, 198 Cal. App. 4th 230, 253 (2011).

[65] *Smith v. Wells Fargo Bank, N.A.*, 135 Cal.App.4th 1463, 1480 n. 13 (2005).

[66] *See Kwikset Corp. v. Superior Court*, 51 Cal. 4th at 316 (Cal. 2011).

[67] *In re Tobacco II Cases*, 46 Cal. 4th 298, 327 (2009) (internal quotation marks omitted).

[68] *Id.* (internal quotation marks omitted).

[69] *See, e.g., Telebrands Corp.*, 140 F.T.C. at 292 (presuming that claims are material if they pertain to the efficacy, safety, or central characteristics of a product); *FTC v. Lights of America, Inc.*, No. SACV10-01333JVS, 2013 WL 5230681, at *41 (C.D. Cal. Sept. 17, 2013) (holding that claims about the watts and lifetime of the LED light bulbs were *per se* material because they were express, and "that even if they were implied claims, they were material because the claims relate to the efficacy of the product."); *FTC v. Bronson Partners, LLC*, 564 F. Supp. 2d 119, 135 (D. Conn. 2008) (noting that an implied claim where the advertiser intended to make the claim was presumed to be material).

[70] *In re Tobacco II Cases*, 46 Cal. 4th at 298.

10

enroll.[71] Statements by large numbers of borrowers across Corinthian campuses make clear that the promise of employment entered substantially into their choice to attend a Corinthian school.

**C.    Weak Disclaimers In Some of Everest and WyoTech's Written Materials Do Not Cure Its False and Misleading Representations Guaranteeing Employment**

Corinthian's promises of employment were false and misleading, despite the limited disclaimers on some Everest and WyoTech enrollment agreements. Although those enrollment agreements state that the school does not guarantee "job placement" or "a salary," such written information did not change the overall impression created by the oral representations.

For example, if a student examined an Everest enrollment agreement, the student would have to read through two pages of fine print to find a box entitled "Enrollment Agreement" and subtitled "The Student Understands."[72] Part of the way through that box of fine print, item number 2 states that Everest "does not guarantee job placement to graduates upon program / course completion or upon graduation, and does not guarantee a salary or salary range to graduates."[73] That item is not highlighted or bolded in any way. The agreement then continues on with an additional page of fine print disclaimers. The WyoTech enrollment agreement includes a similar disclaimer on its first page: "The school does not guarantee employment following graduation, but does offer placement assistance to graduates." This is included as item "(a)" in a list of nine fine print disclaimers following a paragraph-long disclaimer about the cost of books and tools.

These disclaimers do not cure the falsity of Everest and WyoTech's oral promises regarding employment prospects. First, courts interpreting the FTC Act and the UCL have made clear that written disclaimers do not cure the falsity of oral misrepresentations.[74] The California Supreme Court has also held that misleading statements enticing consumers to enter into a contract may be a basis for a UCL claim, even though accurate terms may be provided to the consumer before entering into the contract.[75]

The written disclaimers were hidden in text and provided only after admissions representatives orally promised employment. Moreover, here, Corinthian's disclaimers were particularly ineffective when considered in the context of Corinthian's unsophisticated student population and high-pressure admissions practices.[76]

Corinthian documents show that the school sought to enroll vulnerable people who had "low self-esteem," were "stuck, unable to see and plan well for the future" and "isolated," had "few people in their lives who care about them," and were "impatient, want[ed] quick solutions."[77] Corinthian's CEO, in a letter to

---

[71] Because deception occurs at the time of decision, or for Everest students, at the time of enrollment, it is sufficient for Everest students to say that they chose to enroll based upon a guaranteed employment misrepresentation, regardless of any subsequent employment.

[72] *See, e.g.,* Everest Institute Brighton/Chelsea Enrollment Agreement.

[73] BD150633, Attachment #3, page 7.

[74] *See, e.g., FTC v. Minuteman Press,* 53 F. Supp. 2d 248, 262-63 (E.D.N.Y. 1998) (finding that oral misrepresentations were not cured by written disclaimers); *see also Chapman v. Skype Inc.,* 220 Cal. App. 4th 217, 228 (Cal. App. Ct. 2013) (finding under the UCL that Skype's oral representation that a calling plan was "unlimited" was misleading despite the fact that it provided limits on the plan in a separate policy provided to customers).

[75] *Chern v. Bank of Am.,* 15 Cal. 3d 866, 876 (Cal. 1976) ("the fact that defendant may ultimately disclose the actual rate of interest in its Truth in Lending Statement does not excuse defendant's practice of quoting a lower rate in its initial dealings with potential customers. The original, lower rate may unfairly entice persons to commence loan negotiations with defendant in the expectation of obtaining that rate.").

[76] The nature of the enrollment process made it unlikely that students ever read such disclosures prior to admission. Students consistently reported that they were rushed through the enrollment process and subjected to high pressure sales tactics.

[77] CA AG Quach Decl. Ex 113.

11

DOE_00003419

Federal Student Aid, wrote that the school enrolled "a predominantly high risk student body that is underserved by traditional higher education institutions. Many of our campuses are located in or near difficult inner-city areas and provide access to students who have not previously achieved educational success."[78] Corinthian advertised on daytime TV,[79] targeting the un- or under-employed. In some instances, Corinthian personnel actively recruited homeless individuals as students, despite the additional challenges they would face in completing their studies, even offering monetary incentives to take campus tours.[80] In sum, the net impression of the oral misrepresentations on the typical Corinthian student likely would not have been altered by buried written disclosures.

Finally, the fact that the 436 Corinthian claims reviewed to date that allege Corinthian guaranteed employment make no mention of any written disclaimer further supports the conclusion that the disclaimers were ineffective. As discussed above, viewed in light of the unsophisticated population Corinthian targeted, and the high pressure sales tactics and oral representations that Corinthian personnel employed, these disclaimers do not offset the net impression of the school's misrepresentations.

### D.      Eligible Borrowers

Based on the above analysis, the following Corinthian students making guaranteed jobs allegations should be eligible for relief: any claimant who attended a Corinthian campus and who alleges that they were promised, guaranteed, or otherwise assured employment or job placement.

The Department will not undertake a case-by-case analysis of borrowers to determine whether they ultimately secured employment. As we found in the job-placement-rate analysis, the misrepresentation in this case went to the overall value of the education (a school that can guarantee its students jobs must be a very good school indeed), and was substantial regardless of a borrower's ultimate ability to secure employment. Furthermore, in this case, the Department's review of the borrower applications suggests that a presumption should be made that borrowers who raised this issue were not, in fact, able to secure employment.

### E.      Full BD Relief Should Be Provided to Eligible Borrowers, Subject to Reduction for Borrowers Affected by the Statute of Limitations

When determining the amount of relief due to plaintiffs under the UCL, courts rely on cases interpreting the Federal Trade Commission Act.[81] In cases where a substantial/material misrepresentation was made, FTC law provides significant support for requiring complete restitution of the amount paid by consumers.[82]

In a recent California federal court decision analyzing the appropriate remedy for consumers alleging educational misrepresentations under the UCL, the court explicitly analogized to the *Figgie* and *Ivy Capital*

---

[78] Letter from Jack D. Massimino, CEO, Corinthian, to James W. Runcie, Chief Operating Officer, U.S. Office of Federal Student Aid (Nov. 12, 2014).
[79] CA AG Quach Decl. Ex 113.
[80] CA AG Decl. of Holly Harsh.
[81] *See, e.g., Makaeff v. Trump Univ.*, 309 F.R.D. 631, 637-8 (S.D. Cal. 2015).
[82] *See, e.g., FTC v. Stefanchik*, 559 F.3d 924, 931 (9th Cir. 2009) (determining that restitution should include "the full amount lost by consumers rather than limiting damages to a defendant's profits"); *FTC v. Figgie International*, 994 F.2d 595, 606 (9th Cir. 1993) ("The injury to consumers... is the amount consumers spent... that would not have been spent absent [the] dishonest practices."); *FTC v. Security Rare Coin & Bullion Corp.*, 931 F.2d 1312, 1316 (8th Cir. 1991) ("restoration of the victims of [defendant's] con game to the status quo ante" by use of defendant's gross receipts is proper for restitution); *FTC v. Ivy Capital, Inc.*, No, 2:11-CV-283 JCM (GWF), 2013 WL 1224613 at *17 (D. Nev. 2013) (ordering full monetary relief for consumers harmed by misleading marketing regarding a business coaching program).

DOE_00003420

approach and found that a restitution model that aims to "restore the status quo by returning to the plaintiff funds in which he or she has an ownership interest" was a justifiable basis for a class action theory of relief.[83]

Here, there is ample reason not to "offset" the award of full relief to these borrowers in light of the lack of value attendant to their Corinthian education. *See Makaeff*, 309 F.R.D. at 642 (allowing defendants to offer evidence warranting an offset from a baseline of full recovery). The Department has found that Corinthian repeatedly misled students, regulators and accreditors regarding its ability to place students in jobs, systematically inflated its job placement rates, misrepresented job placement rates to a programmatic accreditor, and even engaged in an elaborate job placement fraud to maintain its accreditation.[84] Given this well-documented, pervasive, and highly publicized misconduct at Corinthian, the value of an Everest, Heald or WyoTech education has been severely limited.

Borrower defense applications confirm the lack of value of a Corinthian education as many Corinthian students report that their degree or affiliation with the school has been an impediment rather than an asset as they seek employment. For example, one Everest student reports: "I was only working part time when I was attending school and this degree has done nothing to help me obtain better employment. I am also embarrassed to even put this on my resume because any potential employer who looks this school will discover it was a fraud."[85] Another reports: "I cannot find a job using my degree. I find one faster if I leave the fact that I didn't go to college at all. People just laugh in my face about Everest saying that it is not a 'real school.'"[86] A student from WyoTech states: "Any association with WyoTech hurts my chances for employment. I was promised jobs with big salaries, a career I would hold for life and all WyoTech gave me was debt and shame. I was told by two interviewers, that they would NEVER hire a WyoTech graduate..."[87] And a Heald student states: "The school is not reputable no other institution recognizes the credits earned and jobs stray away from Heald graduates, claiming they lack in teaching students current and up to date information in the coding industry. I have yet to work in my field of study and utilize my degree. I have a useless degree from a closed college."[88]

Finally, awarding full relief to students who make guaranteed employment allegations is consistent with the Department's approach to providing relief to Corinthian students seeking BD relief on the basis of false job placement rates. Indeed, the Department granted full relief to students who alleged that they relied on Corinthian job placement rate representations, without offsetting the relief based on any value that students may have received by attending Corinthian. Given the Department's approach to date, it would be inconsistent to limit the relief of students who make guaranteed employment allegations—which are essentially 100% job placement claims—while providing full relief to those students who qualify for job placement rate relief.

---

[83] *Makaeff v. Trump Univ.*, 309 F.R.D. 631, 637-8 (S.D. Cal. 2015) (internal quotations removed).
[84] *See* Letter from Robin S. Minor, Acting Director, Administrative Actions and Appeals Service Group, U.S. Office of Federal Student Aid, to Jack D. Massimino, CEO, Corinthian (Apr. 14, 2014); *see also* Letter from Mary E. Gust, Director, Administrative Actions and Appeals Service Group, U.S. Office of Federal Student Aid, to Jack D. Massimino, CEO, Corinthian (Aug. 22, 2014) (finding that "Everest Institute submitted false placement data to ACCSC to maintain the accreditation of Everest Decatur" and that the school's job placement rates were based on "CORINTHIAN-designed programs through which Everest Decatur paid employers to hire its graduates" for short time periods in order to inflate placement rates).
[85] BD1614100.
[86] BD1602593.
[87] BD151191.
[88] BD157356.

13

In sum, in these circumstances, and consistent with the Department's prior actions related to Corinthian,[89] it is appropriate to award eligible borrowers full relief, subject to reduction for borrowers affected by the statute of limitations.


CONCUR:


_John C. DiPaolo_

Office of the General Counsel


_1/12/17_

Date

---

[89] This approach also is consistent with the Department's new regulations in that the Department has considered whether the value of the education provided by Corinthian was such that it would be appropriate to offset the relief provided to borrowers who were guaranteed employment. The Department has concluded that the Corinthian education lacked sufficient value to do so.

14



**UNITED STATES DEPARTMENT OF EDUCATION**
**OFFICE OF INSPECTOR GENERAL**

THE INSPECTOR GENERAL

February 6, 2018

TO:        James F. Manning
           Acting Chief Operating Officer, Federal Student Aid

FROM:      Kathleen S. Tighe     *Kathleen S Tyn*
           Inspector General

SUBJECT:   Use of Social Security Earnings Data for Borrower Defense Claims

On December 27, 2017, Senator Elizabeth Warren wrote to me and Acting Inspector General Gale Stallworth Stone of the Social Security Administration regarding the announcement that the Department of Education would be utilizing aggregate earnings data obtained from SSA under an information exchange agreement to make determinations in borrower defense claims (copy of letter enclosed). Senator Warren raised concerns that such a use was not authorized by the information exchange agreement between Federal Student Aid and SSA.

We obtained today SSA OIG's January 30, 2018, response to Senator Warren (copy enclosed). SSA OIG noted that use of the earnings data for borrower defense claims "could not have been foreseen at the time the agreement was established." SSA OIG wrote that it was referring Senator Warren's letter to the Data Integrity Board of SSA as the appropriate party to review the issues raised, particularly in light of the pending renewal of the exchange agreement.

We understand that borrower defense decisions utilizing the SSA data may be imminent. Our own review of the information exchange agreement indicates that use of the exchanged data for borrower loan decisions is not plainly included. In light of the lack of clear authorization and the SSA OIG referral to the SSA Data Integrity Board, we recommend that FSA confirm with SSA the appropriate use of data obtained under the information exchange agreement.

If you have any questions, please contact me at 202-245-6900 or Assistant Counsel to the Inspector General Howard Sorensen at ▮▮▮▮▮▮.

Enclosures
cc: Kent Talbert,
    Delegated the Duties of the Deputy Secretary

ELIZABETH WARREN
MASSACHUSETTS

COMMITTEES
BANKING, HOUSING, AND URBAN AFFAIRS
HEALTH, EDUCATION, LABOR, AND PENSIONS
ARMED SERVICES
SPECIAL COMMITTEE ON AGING

# United States Senate

UNITED STATES SENATE
WASHINGTON, DC 20510-2105
P: 202-224-4543

2400 JFK FEDERAL BUILDING
15 NEW SUDBURY STREET
BOSTON, MA 02203
P: 617-565-3170

1550 MAIN STREET
SUITE 406
SPRINGFIELD, MA 01103
P: 413-788-2690

www.warren.senate.gov

December 27, 2017

The Honorable Kathleen S. Tighe
Inspector General
U.S. Department of Education
550 12th Street, SW
Washington, DC 20202

The Honorable Gale Stallworth Stone
Acting Inspector General
U.S. Social Security Administration
1100 West High Rise
6501 Security Boulevard
Baltimore, MD 21235

Dear Inspectors General Tighe and Stallworth Stone:

I write to request that you inspect and examine whether the Department of Education ("the Department" or ED) violated its information exchange agreement with the U.S. Social Security Administration ("SSA") in order to establish a scheme to limit relief to thousands of defrauded borrowers under its Borrower Defense for Repayment ("Borrower Defense") authority.

On December 20th, 2017, the Department announced a new plan and formula to grant partial debt relief to former Corinthian College students and other defrauded student borrowers by comparing their average earnings to students who graduated from similar vocational programs of study.[1] The Department stated in its press release that, "[s]tudents whose earnings are at 50 percent or more of their [Gainful Employement] program peers will receive proportionally tiered relief to compensate for the difference and make them whole."[2] It appears the Department plans to use federal earnings data produced from federal tax records to calculate partial relief for defrauded student borrowers. The Department obtained these federal earnings data through an information exchange agreement between the Department and SSA for aggregate earnings data.[3]

I have a number of concerns with this plan, including whether it is allowed under the current information exchange agreement between the Department and SSA. On December 20th, 2017, *The Washington Post* reported that SSA provided an "unofficial, non-legal, staff-level" opinion that SSA staff "do[es] not believe [the Education Department] would be authorized to use earnings information [SSA] provide[s] under any current agreement to make decisions about whether or not to grant debt relief to borrowers in certain vocations."[4]

---

[1] "Improved Borrower Defense discharge process will aid defrauded borrowers, protect taxpayers." *U.S. Department of Education*. (2017, December 20). Online at: https://www.ed.gov/news/press-releases/improved-borrower-defense-discharge-process-will-aid-defrauded-borrowers-protect-taxpayers.
[2] *Id.*
[3] "Amended Information Exchange Agreement Between the Department of Education and the Social Security Administration for Aggregate Earnings Data." ED Agreement No. 10012/SSA IEA No. 325.
[4] Douglas-Gabriel, D. (2017, December 20). "Betsy DeVos takes action on backlog of student debt relief claims." *The Washington Post*. Online at: https://www.washingtonpost.com/news/grade-point/wp/2017/12/20/betsy-devos-takes-action-on-backlog-of-student-debt-relief-claims/?utm_term=.c47ceed968a5.

DOE_00003424

I am troubled by the Department's potential misuse of federal earnings data acquired from SSA through an information exchange agreement in order to determine the amount of loan relief for defrauded students. The information exchange agreements between the Department and SSA, including Agreement No. 10012/SSA IEA No. 325, allow for the sharing of information "For Aggregate Earnings Data."[5] Agreement No. 10012/SSA IEA No. 325 aims to:

> "assist [ED] in evaluating institutions that participate in the federal student aid programs authorized under Title IV of the Higher Education Act of 1965... ED will also use the information to consider policy options for revising the regulations for programs that are required to prepare students for gainful employment in recognized occupations, and through those regulations to determine each educational aid program's institutional eligibility as measured under 34 CFR § 668.405 Part 600."

Notably, this information exchange agreement explicitly and exclusively allows federal earnings data to be used for the Gainful Employment Rule as finalized by the Department in October 2014.[6] The information exchange agreement makes no mention of Borrower Defense or any use for student loan discharge determinations. And the information exchange agreement is clear that "SSA and ED will use and access the data only for purposes described in this agreement."[7]

There is no evidence of a new data exchange agreement between the Department and SSA for use in Borrower Defense determinations, nor has there been a revision to the Gainful Employment information exchange agreement. Despite these facts, an Education Department spokeman told the *Washington Post*, "This use is fully consistent with the department's agreement with the Social Security Administration."[8] Based on the plain text of the information exchange agreement, this does not appear to be true.

I am seeking clarity on this situation. In light of all of this, I request that you inspect and examine the circumstances by which the Department is using SSA federal earnings data to make partial relief determinations under Borrower Defense and whether this is an authorized use of SSA federal earnings data under the current information exchange agreements bewteen the agencies.

Thank you for your prompt attention to this matter.

Sincerely,

ELIZABETH WARREN
United States Senator

---

[5] ED Agreement No. 10012/SSA IEA No. 325.
[6] 34 CFR 600; 34 CFR 668.
[7] ED Agreement No. 10012/SSA IEA No. 325.
[8] Douglas-Gabriel, D. (2017, December 20).

DOE_00003425



## OIG   Office *of the* Inspector General
SOCIAL SECURITY ADMINISTRATION

January 30, 2018

The Honorable Elizabeth Warren
United States Senate
Washington, DC  20510

Dear Senator Warren:

I am writing in response to your January 2, 2018 letter requesting that we examine whether the Department of Education (ED) violated its information exchange agreement[1] with the Social Security Administration (SSA).

In response to your letter, we obtained a copy of the agreement.  Under the terms of the agreement, SSA provides ED aggregate earnings information in a form that cannot be associated with, or otherwise identify, a particular individual.

- The Purpose section of the agreement states that ED will use the aggregated earnings information "...to assist them in evaluating institutions that participate in the federal student aid programs authorized under Title IV of the *Higher Education Act of 1965*, as amended (HEA), and programs at those institutions that enroll students who receive HEA funds."

- The Responsibilities of the Parties section of the agreement allows ED to request, and SSA to provide, aggregated earnings information for "...students who were enrolled in, or graduated from educational institutions that participate in the federal student aid programs."

At this time, we do not know whether ED has used SSA aggregate earnings data in its planned program related to borrower relief.  However, since the new ED program did not exist when this agreement was established in May 2013, this use of SSA's data could not have been foreseen at the time the agreement was established.  This agreement expires in May 2018, so it must be renegotiated soon between SSA and ED to continue the exchange.

Oversight of such agreements falls under the authority of SSA's Data Integrity Board, which has responsibility over all matching programs in which SSA participates, either as a source or recipient agency, as well as any alleged violation of such agreements.  SSA's Data Integrity Board is also responsible for approving any renewal, suspension, or termination of new or existing electronic information exchange and matching programs.  Further, the Data Integrity

---

[1] *Information Exchange Agreement Between the Department of Education and the Social Security Administration for Aggregate Earnings Data (ED Agreement No. 10012 SSA IEA No. 325).*

WEB: OIG.SSA.GOV | FACEBOOK: OIGSSA | TWITTER: @THESSAOIG | YOUTUBE: THESSAOIG

6401 SECURITY BOULEVARD | BALTIMORE, MD 21235-0001

DOE_00003426

Page 2—The Honorable Elizabeth Warren

Board Chair serves as the focal point for the Congress on all matters pertaining to SSA's electronic information exchange and computer matching programs.

We believe SSA's Data Integrity Board is the appropriate party to review the information provided in your letter; therefore, we have referred your letter to that entity for appropriate action and response.  We have asked the Data Integrity Board Chair for a copy of its response to you. Once the Data Integrity Board reviews the existing agreement in light of your concerns, we will be able to determine if further action on our part is warranted.

If you have any questions, please call me, or have your staff contact Walter Bayer, Congressional and Intragovernmental Liaison, at ████████████.

Sincerely,

Gale Stallworth Stone
Acting Inspector General